UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X
EDUARD SLININ and ALL CITY FUNDING, LLC

                Plaintiffs,

                                                         **DKT NO. 15 CV 9674 (RJS)**

  -against-

MIDLAND RESOURCES HOLDING, LTD                   **COMPLAINT**
and ALEX SHNAIDER,

                Defendants.
-----------------------------------------------------------------------X

       Plaintiffs, EDWARD SLININ and ALL CITY FUNDING, LLC by their attorneys, Dealy Silberstein & Braverman, LLP, complaining of the Defendants, MIDLAND RESOURCES HOLDING, LTD and ALEX SHNAIDER, hereby allege as follows:

## PARTIES

1. Plaintiff, Eduard Slinin, ("Slinin") is a natural person who resides in the State of New York.

2. Plaintiff, All City Funding, Inc., ("ACF") is a New York Corporation with its principal place of business located at 335 Bond Street, Brooklyn, New York. ACF funded some of the transactions identified herein below.

3. Upon information and belief, Defendant Midland Resources Holding, Ltd. ("MRH") is a corporation organized under the laws of the Balliwick of Guernsey, Channel Islands.

4. Upon information and belief, Defendant, Alex Shnaider, ("Shnaider"), is a resident of Toronto, Ontario, Canada and a citizen of Canada. He also maintains a residence in the State of Florida.

## JURISDICTION AND VENUE

5. The Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §1332(a)(2), in that the Plaintiffs are citizens of this State and Defendants are citizens of foreign states.

6. Venue is proper in this District pursuant to 28 U.S.C. §1391(2) in that a substantial part of the events or omissions giving rise to this claim occurred in the Southern District of New York.

## NATURE OF ACTION

7. This is an action for, among other things, an accounting pursuant to Section 44 of the New York Partnership Law; dissolution of a partnership pursuant to Partnership Law §53, monetary damages resulting from Defendants breach of fiduciary duties, conversion and embezzlement of partnership assets and profits and ouster of Plaintiff from the partnership business.

8. In or about 2007 Slinin and Shnaider formed a partnership in the form of a joint venture ("JV"), whereby various contracts for the construction of aircraft by Bombardier, Inc. ("Bombardier") were assigned/sold to third parties who were procured by Slinin. The profits and losses of the JV were to be shared equally between the parties, whether same were derived from the assignment of contracts or sales of the jets that were acquired by or for the JV.

9. Under the terms of the JVs, Shnaider would acquire for the JV interests in Bombardier contracts/aircraft at a time when there were lenghty waiting lists for the subject private jets, while Slinin obtained the JV clients who would pay a premium to the JV for being assigned rights in its contracts. Although the JV was operated successfully for a period of time, Defendant Shnaider ousted Slinin from the JV and received profits from the JV operations in excess of Thirteen Million Dollars ($13,000,000.00) without paying any portion thereof to Slinin. Plaintiff reasonably believes that Defendant Shnaider funneled these funds to/through his company, MRH and that Defendant MRH is presently in possession of JV property/assets.

10. Beginning in or about 2007 and continuing through 2011 the JV entered in a series of transactions which resulted in their contracting with Bombardier for the construction of six Challenger 850 Executive jet aircraft ("Challenger"), one Global Express XRS jet aircraft ("Global") and one Learjet 60 XR jet aircraft ("Learjet"). As more fully set forth below one or more of these contracts were then sold or assigned to third parties who paid a premium to acquire the contract.

11. In addition, as a result of certain of the contracts being cancelled Defendant Alex Shnaider, because of his relationship with Bombardier, and with the consent of Slinin, was able to obtain credit for the deposits on those contracts, combine them and apply them towards the purchase of three aircraft, two of which he sold for a substantial profit.

12. With respect to each of these transactions, Shnaider was in charge of maintaining the books and records of the various companies handling the contact assignments and plane sales.

2

13. As a result of the sale or assignment of these aircraft contracts, the combining of various deposits on unfulfilled contracts and the sale of at least three jet planes, Slinin believes that Defendants received in excess of Thirteen Million Dollars ($13,000,000,00) of which he is entitled to half.

14. Although Slinin and/or ACF has duly demanded an accounting, reimbursement of various advances and payment of one half the profits from these transactions, Defendants have refused all such requests. As a result, Plaintiff has sought relief in this Court.

## BACKGROUND

### A. The Agreement Between the Parties and Formation of their Joint Venture

15. Slinin and Shnaider first met in or about 2004. Both were former residents of the Soviet Union. Prior to the formation of their partnership, in or about 2005, they engaged in a number of business transactions together, including real estate transactions in Odessa, Ukraine.

16. By virtue of their former dealings Slinin trusted Shnaider as a business partner.

17. During the course of their relationship, Shnaider the owner of a private jet aircraft advised Slinin that he had a special relationship with Bombardier and its corporate executives. Shnaider represented to Slinin that this "special relationship" provided him with the opportunity to purchase an aircraft at the lowest price at which it was offered for sale by Bombardier and that he was otherwise given preferential treatment in that he had a certain priority in terms of purchasing planes.

18. In or about 2007 Slinin, though his worldwide business dealings was aware of businesspeople who were interested in purchasing mid-range jet aircraft such as the Challenger.

19. Shnaider and Slinin, realizing that there were profitable opportunities, agreed to establish the JV wherein Shnaider would use his relationship with Bombardier and enter into contracts with Bombardier on behalf of the JV for the purpose of selling them to Slinin's contacts. The parties agreed to meet in New York City (Manhattan) to discuss and negotiate the terms of a potential joint venture/partnership.

20. In or about the Spring or Summer of 2007, Slinin and Shnaider met in Manhattan to discuss, negotiate and finalize their joint venture for the sale of Bombardier aircraft to Slinin's contacts (the "Meeting").

21. During the course of the Meeting, the terms of the JV were negotiated, agreed to and the JV established. According to the agreement reached by the parties during this meeting in Manhattan: (i) Shnaider would obtain the Bonbardier contracts for the JV; (ii) Slinin would provide interested purchasers; (iii) the contracts would be assigned/sold to the third party purchasers brought in by Slinin; (iv) profits derived from the sale/assignment of the contracts would be shared equally by Slinin and Shnaider; (v) any other profits derived from the JV contracts or the aircraft that was the subject of said contracts would likewise be shared equally between the parties; and (vi) any costs and/or investments required for the furtherance of the JV would likewise be shared by the parties in proportion to their profit interests.

22. The JV was an association of two persons to carry on as co-owners of a business for profit.

23. On Shnaider's recommendation, Slinin and Shnaider agreed that a separate Special Purpose Vehicle/Entity ("SPV") would be formed for the purpose of entering into each contract with Bombardier. It was agreed by the parties that the SPVs would be owned and operated by the JV and for the purposes of the JV.

24. In light of the prior business relationship between Slinin and Shnaider, the JV agreement was verbal and not reduced to a formal writing.

### B. Operation of the Joint Venture

25. In terms of the extent of potential profits, at the Meeting, ,Shnaider represented to Slinin that he could contract for the purchase of a Challenger, Global or Learjet for a price in U.S. Dollars, below what it would sell for in the international marketplace, including the Ukraine and Russia.

26. In turn, Slinin advised Shnaider that he could "flip" these contracts to his various contacts, many of whom were successful business people in the Ukraine and Russia. Based on the business demands, Slinin and Shnaider estimated that the profits derived from the assignment/selling of the contracts would be anywhere from $3 million to $5 million per contract.

27. Shnaider recommended to Slinin that a prospective buyer should form a limited liability company in a foreign county, such as Cypress or the British Virgin Islands, which would ultimately take ownership of the plane ("Acquisition Company"). A separate Acquisition Company should be formed for each plane to be purchased.

28. Once the Acquisition Company was established and Shnaider was satisfied that the purchaser had sufficient assets to fund the purchase of the aircraft, he and Slinin would form a company or companies, in which each held a fifty percent (50%) interest, to enter into a contract with Bombardier for the purchase of the desired jet ("Bombardier Contract").

29. As envisioned, the initial payment and all future payments due under the Bombardier Contracts would come from the ultimate purchaser.

30. As part of the JV and in furtherance of its objectives, Slinin obtained from his contacts commitments for the purchase of eight (8) Bombardier aircraft, six (6) Challengers, one (1) Global and one (1) Learjet.

31. In furtherance of the understanding between Slinin and Shnaider, Slinin had the prospective purchasers incorporate or acquire eight (8) entities to act as Acquisition Companies.

32. In turn, Shanider and Slinin created or acquired two (2) companies, Challenger Aircraft Company, Ltd ("CAC") and CL850 Aircraft Investments, Ltd. ("CL850") to contract with Bombardier for the purchase of the Challenger, Global and Learjet jets.

33. Slinin and Shnaider each held a fifty percent (50%) interest in both CAC and CL850.

34. Of the eight (8) Bombardier Contracts and corresponding Acquisition Contracts, seven (7) are at issue in this case.

35. Each of the Bombardier Contracts are identified by a specific number assigned by Bombardier which was also used to identify the corresponding Acquisition Contract.

    (i)   **Contract 161**

36. In or about October 2007, CL850 and Bombardier entered into Bombardier Contract No. C850-0161 ("Contract 161") which provided for the purchase of a Challenger for the price of $25 million.

37. In turn, CL850 assigned this contract to CAC which entered into an Acquisition Contract with an entity known as Olave Equities Ltd. ("Olave") to sell the Challenger for the price of $26 million.

38. The initial down payment of $2 million due on the Bombardier Contract 161 was paid by Slinin.

    (ii)  **Contract 162**

39. In or about October 2007, CAC and Bombardier entered into Bombardier Contract No. C850-0162 ("Contract 162") which provided for the purchase of a Challenger for the price of $25 million.

40. In turn, CAC entered into an Acquisition Contract with an entity known as Colley International Marketing, S.A., ("Colley") to sell the Challenger for the price of $26 million.

5

41. Like the payment due on Contract 161, the initial down payment of $2 million due on Bombardier Contract 162 was paid by Slinin.

### (iii) Contract 169

42. In or about November 2007, CAC and Bombardier entered into Bombardier Contract No. C850-0169 ("Contract 169") which provided for the purchase of a Challenger for the price of $24,550,000.00.

43. In turn, CAC entered into an Acquisition Contract with an entity known as Blue Industrial Skies, Inc. ("Blue Skies") to sell the Challenger for the price of $26,550,000.00.

44. When Blue Skies was unable to make the required additional installment payments due under its agreement with CAC, Blue Skies transferred its interest in the contract back to CAC which in turn entered into a new Acquisition Contract with an entity known as Woren, Inc. ("Woren").

45. Upon information and belief, Woren purchased the aircraft for a price which resulted in a profit of $4.3 million for CAC.

### (iv) Contract 170

46. In or about November 2007, CAC and Bombardier entered into Bombardier Contract No. C850-0170 ("Contract 170") which provided for the purchase of a Challenger for the price of $24,550,000.00.

47. In turn, CAC entered into an Acquisition Contract with an entity known as Jofan Holding Ltd. ("Jofan") to sell the Challenger for the price of $26,550,000.00.

48. Like the payment due on Contracts 161 and 162 the initial down payment of $2 million due on Bombardier Contract 170 was paid by Slinin.

### (v) Contract 171

49. In or about November 2007, CAC and Bombardier entered into Bombardier Contract No. C850-0171 ("Contract 171") which provided for the purchase of a Challenger for the price of $24,550,000.00.

50. In turn, CAC entered into an Acquisition Contract with an entity known as Setius Technologies, Ltd. ("Setius") to sell the Challenger for the price of $26,550,000.00.

51. Like the payment due on Contracts 161, 162 and 170 the initial down payment of $2 million due on Bombardier Contract 171 was paid by Slinin.

### (vi) Contract 207

52. Upon information and belief in or about November 2007 CAC and Bombardier entered into Bombardier Contract No. L60-207 ("Contract 207") which provided for the purchase of a Learjet 60XR for the price of approximately $10,500,000.00.

53. In turn, CAC entered into an Acquisition Contract with a third party.

54. The initial down payment of $1 million due to Bombardier under Contract 207 was paid by Slinin.

### (vii) Contract 298

55. In or about November 2007, CL850 and Bombardier entered into Bombardier Contract No. GXRS-0298 ("Contract 171") which provided for the purchase of a Global for the price of $48,500,000.00.

56. In turn, CAC entered into an Acquisition Contract with an entity known as Stogan Assests Incorporated ("Stogan") to sell the Global for the price of $56,000,000.00.

57. Like the payment due on Contracts 161, 162, 170 and 171 the initial down payment of $2.5 million due on Bombardier Contract 298 was paid by Slinin.

### C. The Disposition of the Contracts

58. As set forth above, Slinin paid $11.5 million in deposits to Bombardier under Bombardier Contracts 161, 162, 170,171, 207 and 298.

59. Unfortunately, shortly after all of these contracts were entered into the 2008 financial crisis struck and the end purchasers of each of the above identified contracts were unable to meet their financial obligations.

60. This situation placed Slinin's deposits in jeopardy but also placed Shnaider in a difficult position with Bombardier, with whom he has used his personal relationship to secure these contracts.

61. As a result of negotiations between Slinin, Shnaider and Bombardier, Slinin agreed to allow Shnaider to apply the $11.5 million he had made in deposits on the aforementioned contracts to be combined into three (3) new contracts.

62. These new contracts would allow Shnaider save his relationship with Bombardier as well as attempt to sell the new planes so that Slinin could recoup his advances and the partners could share any profit.

63. Pursuant to the new contracts Shnaider took possession of a Challenger and a second Challenger know as a "Green Model" ("Green Challenger") because its interior was not furnished.

64. Shnaider also took possession of another Learjet ( pursuant to Bombardier Contract 206) using Slinin's deposit as a credit toward the purchase price of this aircraft.

65. Upon information and belief, after taking possession of the Challenger, Shnaider sold it back to Bombardier for a profit believed to be in excess of $1 million.

66. Upon information and belief, the Green Challenger was furnished by a company owned by Shnaider and then sold to a Chinese company for $23 million, resulting in a profit believed to be in excess of $3 million.

67. Upon information and belief, although the Learjet was sold to a third party for a loss Slinin was nonetheless entitled to a return of $400,000.00 of his initial contribution towards the purchase price.

68. As set forth above the Challenger manufactured under Contract 169 was sold to a third party for a profit of $4.3 million.

69. At all times herein relevant, the financial records related to each of these Contracts and transactions were kept CAC, CL850 or related companies. However, the daily activities of these companies were controlled by Shnaider.

70. Slinin's and/or ACF's efforts to obtain information regarding each of the aforementioned contracts and related transactions have been rebuffed.

71. Upon information and belief, CAC's and CL850's assets were transferred by Shnaider to Defendant MHR.

72  As a result, Slinin has been unable to fix his damages but believes them to be approximately $13 million.

## AS AND FOR A FIRST CAUSE OF ACTION
## FOR BREACH OF FIDUCIARY DUTY

73. Plaintiff repeats, reiterates and realleges each and every allegation set forth in paragraphs "1" through "72" of the Complaint as if fully set for hereafter.

74. By virtue of the JV being formed, the parties owed to each other fiduciary duties pursuant to New York Partnership Law Sec. 43.

75. By ousting Slinin from the JV and by unlawfully retaining JV assets and profits to the exclusion of Slinin, Defendant Shnaider breached his fiduciary duties to Slinin.

76. By virtue of the foregoing, Shnaider should be held liable to Slinin and ordered to pay Slinin his share of JV profits, one-half of JV assets or proceeds derived from the sale or exchange thereof in amount to be determined at trial of the action but Plaintiff reasonably believes to exceed Thirteen Million Dollars ($13,000,000), treble damages in amount of Thirty Nine Million Dollars ($39,000,000), together with interest thereon, reasonable legal fees, costs, and any other relief that the Court deems fair, just and reasonable.

## AS AND FOR A SECOND CAUSE OF ACTION
## AGAINST THE DEFENDANTS ON CONTRACT 161

77. Plaintiffs repeat, reiterate and reallege each and every allegation set forth in paragraphs "1" through "76" of the Complaint as if fully set forth hereat.

78. As set forth above, Slinin and Shnaider entered into a agreement whereby the formed CAC and CL850 the purpose of which was to contract with Bombardier for the purchase of jet aircraft.

79. With respect to Contract 161 Slinin advanced the sum of $2 million on account of the contract between Bombardier and CL850.

80. Thereafter this deposit was combined with other deposits into three separate contracts by which Shnaider purchased and then resold two planes at a profit believed to be in excess of $3 million.

81. By virtue of the foregoing, Slinin is entitled to judgment in an amount of at least $2 million, plus interest with respect to Contract 161.

## AS AND FOR A THIRD CAUSE OF ACTION
## AGAINST THE DEFENDANTS ON CONTRACT 162

82. Plaintiffs repeat, reiterate and reallege each and every allegation set forth in paragraphs "1" through "81" of the Complaint as if fully set forth hereat.

83. As set forth above, Slinin and Shnaider entered into a agreement whereby the formed CAC and CL850 the purpose of which was to contract with Bombardier for the purchase of jet aircraft.

84. With respect to Contract 162 Slinin advanced the sum of $2 million on account of the contract between Bombardier and CAC.

85. Thereafter this deposit was combined with other deposits into three separate contracts by which Shnaider purchased and then resold two planes at a profit believed to be in excess of $3 million.

86. By virtue of the foregoing, Slinin is entitled to judgment in an amount of at least $2 million, plus interest, with respect to Contract 162.

## AS AND FOR A FOURTH CAUSE OF ACTION
## AGAINST THE DEFENDANTS ON CONTRACT 169

87. Plaintiffs repeat, reiterate and reallege each and every allegation set forth in paragraphs "1" through "86" of the Complaint as if fully set forth hereat.

88. As set forth above, Slinin and Shnaider entered into a agreement whereby the formed CAC and CL850 the purpose of which was to contract with Bombardier for the purchase of jet aircraft.

89. With respect to Contract 169, CAC sold the Challenger to a third party for a price which generated a profit of $4.3 million.

90. By virtue of the foregoing, Slinin is entitled to judgment in an amount of at least $2.15 million, plus interest, with respect to Contract 169.

## AS AND FOR A FIFTH CAUSE OF ACTION
## AGAINST THE DEFENDANTS ON CONTRACT 170

91. Plaintiffs repeat, reiterate and reallege each and every allegation set forth in paragraphs "1" through "90" of the Complaint as if fully set forth hereat.

92. As set forth above, Slinin and Shnaider entered into a agreement whereby the formed CAC and CL850 the purpose of which was to contract with Bombardier for the purchase of jet aircraft.

93. With respect to Contract 170 Slinin advanced the sum of $2 million on account of the contract between Bombardier and CAC.

94. Thereafter this deposit was combined with other deposits into three separate contracts by which Shnaider purchased and then resold two planes at a profit believed to be in excess of $3 million.

95. By virtue of the foregoing, Slinin is entitled to judgment in an amount of at least $2 million, plus interest, with respect to Contract 170.

## AS AND FOR A SIXTH CAUSE OF ACTION
## AGAINST THE DEFENDANTS ON CONTRACT 171

96. Plaintiffs repeat, reiterate and reallege each and every allegation set forth in paragraphs "1" through "95" of the Complaint as if fully set forth hereat.

97. As set forth above, Slinin and Shnaider entered into a agreement whereby the formed CAC and CL850 the purpose of which was to contract with Bombardier for the purchase of jet aircraft.

98. With respect to Contract 171 Slinin advanced the sum of $2 million on account of the contract between Bombardier and CAC.

99. Thereafter this deposit was combined with other deposits into three separate contracts by which Shnaider purchased and then resold two planes at a profit believed to be in excess of $3 million.

100. By virtue of the foregoing, Slinin is entitled to judgment in an amount of at least $2 million, plus interest, with respect to Contract 171.

## AS AND FOR A SEVENTH CAUSE OF ACTION
## AGAINST THE DEFENDANTS ON CONTRACT 207

101. Plaintiffs repeat, reiterate and reallege each and every allegation set forth in paragraphs "1" through "100" of the Complaint as if fully set forth hereat.

102. As set forth above, Slinin and Shnaider entered into a agreement whereby the formed CAC and CL850 the purpose of which was to contract with Bombardier for the purchase of jet aircraft.

103. With respect to Contract 207 Slinin advanced the sum of $1 million on account of the contract between Bombardier and CAC.

104. Thereafter this deposit was combined with another deposit by which Shnaider purchased and then resold a Learjet plane resulting in a net loss.

105. Although the Learjet was sold to a third party for a loss Slinin was nonetheless entitled to a return of $400,000.00 of his initial $1 million contribution towards the purchase price.

106. By virtue of the foregoing, Slinin is entitled to judgment in an amount of at least $400,000.00, plus interest, with respect to Contract 207.

### AS AND FOR AN EIGHTH CAUSE OF ACTION
### AGAINST THE DEFENDANTS ON CONTRACT 298

107. Plaintiffs repeat, reiterate and reallege each and every allegation set forth in paragraphs "1" through "106" of the Complaint as if fully set forth hereat.

108. As set forth above, Slinin and Shnaider entered into a agreement whereby the formed CAC and CL850 the purpose of which was to contract with Bombardier for the purchase of jet aircraft.

109. With respect to Contract 298 Slinin advanced the sum of $2.5 million on account of the contract between Bombardier and CAC.

110. Thereafter this deposit was combined with other deposits into three separate contracts by which Shnaider purchased and then resold two planes at a profit believe to be in excess of $3 million.

111. By virtue of the foregoing, Slinin is entitled to judgment in an amount of at least $2.5 million, plus interest, with respect to Contract 298.

### AS AND FOR AN NINTH CAUSE OF ACTION
### AGAINST THE DEFENDANTS ON SHNAIDER'S NEW CONTRACTS

112. Plaintiffs repeat, reiterate and reallege each and every allegation set forth in paragraphs "1" through "111" of the Complaint as if fully set forth hereat.

113. As set forth above, Slinin and Shnaider entered into a agreement whereby the formed CAC and CL850 the purpose of which was to contract with Bombardier for the purchase of jet aircraft.

114. As a result of the world financial crisis which began in 2008, the Acquisition Contract purchasers under Contracts 161, 162, 170, 171, 207 and 298 were unable to meet their obligations to either CAC or CL850.

115. As a result of then foregoing, CAC and CL850 were unable to complete the purchase of the respective jets under Bombardier Contracts 161, 162, 170, 171. 207 and 298.

116. As a result of negotiations between Slinin, Shnaider and Bombardier, Slinin agreed to allow Shnaider to apply the $11.5 million he had made in deposits on the aforementioned Bombardier Contracts to be combined into two new contracts.

117. These new contracts would allow Shnaider save his relationship with Bombardier as well as attempt to sell the new planes so that Slinin could recoup his advances and the partners could share any profit.

118. Upon information and belief, pursuant to the new contracts Shnaider took possession of a Challenger and a second Challenger know as a "Green Model" ("Green Challenger") because its interior was not furnished.

119. Shnaider also combined contracts to take possession of a Learjet.

120. Upon information and belief, after taking possession of the Challenger, Shnaider sold it back to Bombardier for a profit believed to be in excess of $1 million.

121. Upon information and belief, the Green Challenger was furnished by a company owned or controlled by Shnaider and then sold to a Chinese company for $23 million.

122. The amount of the profit made from the re-sale of the Green Challenger back to a Chinese company is believed to be in excess of $3 million.

123. The sale of the Learjet was for less than the actual cost but still resulting in Shanider recouping $800,000.00 of his original down payment, half of which belonged to Slinin.

124. By reason of the foregoing, ACF as Slinin's assignee is entitled to judgment in the amount of at least $13 million resulting from the repayment of his combined deposits of $11 million and an additional amount of at least $2 million based upon the profit from the sale of the two aircraft.

## AS AND FOR A TENTH CAUSE OF ACTION FOR AN ACCOUNTING UNDER NEW YORK PARTNERSHIP LAW SECTION 44

125. Plaintiffs repeat, reiterate and reallege each and every allegation set forth in paragraphs "1" through "124" of the Complaint as if fully set for hereafter.

126. By virtue of the agreement reach by the parties at the Meeting, a partnership was formed in New York pursuant to McKinney's Partnership Law Section 11.

127. Plaintiff is entitled to an accounting of all partnership activities, books and records.

128. During the period between October 2007 and the 2012 Defendant Shnaider managed the financial affairs of CAC, CL850 and Defendant MHR.

129. By virtue of New York Partnership Law Section 44, Slinin's is entitled to an accounting of expenses and profits related to all activities of the JV, including each of the above mentioned contracts and all related aircraft sales and an appropriate judgment upon such accounting.

### AS AND FOR AN ELEVENTH CAUSE OF ACTION FOR LEGAL FEES

130. Plaintiffs repeat, reiterate and reallege each and every allegation set forth in paragraphs "1" through "129" of the Complaint as if fully set for hereafter.

131. By virtue of Shnaider breaching his fiduciary duties, ousting Plaintiff and otherwise acting willfully, Plaintiff is entitled to reasonable legal fees and costs connected with this action.

### AS AND FOR A TWELFTH CAUSE OF ACTION AGAINST DEFENDANT MRH

132. Plaintiffs repeat, reiterate and reallege each and every allegation set forth in paragraphs "1" through "131" of the Complaint as if fully set for hereafter.

133. Upon information and belief, Shnaider used his entity, MRH, to funnel and convert the JV assets.

134. Upon information and belief, MRH is presently in possession of JV assets that were funneled into it by Shnaider.

135. Upon information and belief, MRH aided and abetted Shnaider in Shnaider's breaching his fiduciary duties to Plaintiff and in embezzling JV assets.

136. By virtue of the foregoing, Plaintiff is entitled to judgment against MRH in amount of the JV assets that it received, which amount is to be determined at trial but is believed to exceed Thirteen Million Dollars ($13,000,000), and should by virtue of its accomplice liability, should be held jointly and severally with Shnaider for all of the damages to which he is deemed liable, together with reasonable attorneys fees and costs of suit.

### AS AND FOR A THIRTEENTH CAUSE OF ACTION AGAINST DEFENDANTS FOR UNJUST ENRICHMENT

137. Plaintiffs repeat, reiterate and reallege each and every allegation set forth in paragraphs "1" through "136" of the Complaint as if fully set for hereafter.

138. Defendants shall be unjustly enriched if they are permitted to retain JV assets/profits that belong to Slinin.

139. By virtue of the foregoing, Defendants should be ordered to disgorge to Plaintiff his share of the JV assets/profits, which amount is to be determined at trial but is believed to exceed Thirteen Million Dollars ($13,000,000), together with reasonable attorneys fees and costs of suit.

## DEMAND FOR JURY TRIAL

140. Plaintiffs demand trial by jury on all causes of action to which it is entitled..

WHEREFORE, Plaintiffs demand judgment as follows:

A) On the First Cause of Action, in the amount of Thirteen Million Dollars ($13,000,000.00), trebled to Thirty Nine Million Dollars ($39,000,000.00);

B) On the Second Cause of Action, in the amount of Two Million Dollars, plus interest;

C) On the Third Cause of Action, in the amount of Two Million Dollars, plus interest;

D) On the Fourth Cause of Action, in the amount of Two Million, One Hundred Fifteen Thousand Dollars, plus interest;

E) On the Fifth Cause of Action, in the amount of Two Million Dollars, plus interest;

F) On the Sixth Cause of Action, in the amount of Two Million Dollars, plus interest;

G) On the Seventh Cause of Action, in the amount of Four Hundred Thousand Dollars, plus interest;

H) On the Eighth Cause of Action, in the amount of Two Million, Five Hundred Thousand Dollars, plus interest;

I) On the Ninth Cause of Action in the amount of Thirteen Million Dollars, plus interest

J) On the Tenth Cause of Action for an Accounting;

K) On the Eleventh Cause of Action, legal fees in an amount to be determined by the Court;

L) On the Twelfth Cause of Action, in the amount of Thirteen Million Dollars, plus interest;

M) On the Thirteen Cause of Action, in the amount of Thirteen Million Dollars, plus interest; and

N)      For such other and further relief as the Court deems just and proper.

Dated: New York, New York
       October 20, 2015

                Yours, etc.

                Dealy Silberstein & Braverman, LLP
                Attorneys for Plaintiffs
                By: _____
                   Laurence J. Lebowitz (LL 6816)
                225 Broadway - Suite 1405
                New York, New York 10007
                (212) 385-0066
                llebowitz@dsblawny.com