Exhibit A

Page 6

2  and
3
4  THAT the questioning attorney shall provide
5  counsel for the witness examined herein with a
6  copy of this examination at no charge.

Page 7

2      THE VIDEOGRAPHER: We are
3  now on the record. This begins
4  DVD number 1 in the deposition of
5  Eduard Slinin in the matter of
6  Eduard Slinin against Alex
7  Shnaider in the United States
8  District Court, Southern District
9  of New York. The deposition is
10 being held at the law office of
11 Boies, Schiller & Flexner, LLP,
12 located at 575 Lexington Avenue
13 New York, New York. Today's date
14 is September 26th, 2017, and it
15 is approximately 11:03 a.m. My
16 name is Rodolfo Duran, I am the
17 videographer. The court reporter
18 is Paige Hayden. We are both in
19 association with Magna Legal
20 Services. Will all parties
21 present please state their names
22 and whom they represent.
23     MR. LEBOWITZ: For the
24 Plaintiff, Eduard Slinin,
25 Laurence Lebowitz, 225 Broadway,

Page 8

2  New York, New York.
3      MS. DYER: For the
4  Defendant, Alex Shnaider, Karen
5  Dyer, Boies, Schiller & Flexner.
6  Also, with me is my colleague
7  Reece Dameron.
8      THE VIDEOGRAPHER: Will the
9  court reporter please swear in
10 the Witness?
11 E D U A R D   S L I N I N, the
12 WITNESS herein, having been first
13 duly sworn by a Notary Public of
14 the State of New York, was
15 examined and testified as
16 follows:
17 EXAMINATION BY
18 MS. DYER:
19     Q. State your name for the
20 record, please.
21     A. Eduard Slinin.
22     Q. State your address for the
23 record, please.
24     A. 42 Dora Lane, Holmdel, New
25 Jersey 07733.

Page 9

1      E. SLININ
2      MR. LEBOWITZ: I will be
3  requesting a copy of the
4  transcript.
5      Q. Mr. Slinin, good morning.
6  We have met before.
7      Have you ever been deposed
8  before?
9      A. Yes.
10     Q. How many times?
11     A. A couple of times.
12     Q. Do you recall when the last
13 time was that you were deposed?
14     A. It was a labor case about
15 two years ago.
16     Q. Was it a labor case
17 involving a company that you have any
18 ownership interest in?
19     A. Yes, Corporate
20 Transportation Group.
21     Q. And were you a party to that
22 case?
23     A. Yes, it was a lawsuit --
24 drivers against my company, drivers
25 versus independent contractors.



Page 14

```
 1         E. SLININ
 2   We made a deal, Alex
 3   Shnaider and me, okay, it's
 4   self-explanatory. We were partners on
 5   specific business by buying aircrafts
 6   from Bombardier and selling them to
 7   customers. We were partners and there
 8   was a clear picture that where we were
 9   receiving the deposits we were going
10   50/50, and then when the economy
11   turned around, some of the buyers
12   decided to come out of the contracts.
13   We then had spoken on the phone, and
14   Alex came across to me and said,
15   "Look, this is how we are going to do
16   this. We will work with the
17   Bombardier, and we will return those
18   contracts back, and we will end up
19   buying one Challenger 850 green, and
20   one Lear 60 XR, and then once we able
21   to sell those two aircrafts, we will
22   then calculate everything, we will
23   then split the money 50/50." It was
24   always like that.
25       Q.  So, I want to focus on the
```

Page 15

```
 1         E. SLININ
 2   damages because that maybe goes a
 3   little more to your theory of
 4   liability. I am just focusing on how
 5   you arrived at the amount of the 6.5
 6   million.
 7       Is it your testimony that
 8   the 6.5 million that you are claiming
 9   in this lawsuit is your share of the
10   profits from the two aircrafts that
11   ultimately were delivered, that you
12   just described, one being a green 850,
13   and one being a Learjet?
14       A.  Correct.
15       Q.  Let me just ask you, who
16   actually did the calculation to arrive
17   at that 6.5 million; if you know?
18       A.  It was Alex Shnaider, Rob
19   Lee, and myself.
20       Q.  Do you know when this
21   calculation was done?
22       A.  We are on the telephone
23   doing all the calculations.
24       Q.  Did anybody put those
25   calculations in writing; to your
```

Page 16

```
 1         E. SLININ
 2   knowledge?
 3       A.  Um, I believe Rob Lee put
 4   them in writing.
 5       Q.  As you sit here today, do
 6   you recall how that 6.5 million
 7   dollars broke down?
 8       A.  Yes, I can give you a full
 9   breakdown.
10      Q.  Okay.
11      A.  I end up buying one of the
12   aircrafts from one of the buyers with
13   Alex discussions. When we were in
14   Switzerland, I called Alex, I said,
15   "Alex, this is the circumstance, the
16   guy wants to sell one position." He
17   said, "No problem, let's buy it back."
18   He said, "I tell you what, you buy it
19   back, and I will sell it pretty quick
20   because I do have a buyer for it." At
21   that time I laid out my own money, my
22   own capital, and I purchased the
23   aircraft. Then the buyer did not
24   proceed. When things went bad, Alex
25   called me up and said, "How about
```

Page 17

```
 1         E. SLININ
 2   this, you sign this over to me, we
 3   will return this part of the
 4   negotiations to Bombardier. We will
 5   be able to get all the money applied
 6   to the green aircraft. When the green
 7   aircraft will be sold, I will return
 8   all the money back to you so you are
 9   not losing anything." I said, "Alex,
10   it's perfectly fine with me, we can do
11   that." That's how whole thing
12   started. So, the calculation stands
13   the following, he owes me
14   $2,000,000.00 on my aircraft.
15      Q.  When you say, "my aircraft"
16   --
17      A.  The Challenger 850 that I
18   purchased from the buyer.
19      Q.  The one you were referring
20   to?
21      A.  I think the contract number
22   -- you can probably take a look, I
23   think it's 169 to the best of my
24   knowledge. And he said the following,
25   "You return this back to me. You sign
```



Page 42

E. SLININ

1  any of that. For furthermore, if I
2  brought the buyer, or any transaction
3  took place, I would call Alex
4  Shnaider, he will then put Rob Lee,
5  and they both will do paperwork
6  because I was not handling any of the
7  paperwork.
8      Q.  That is fine.
9          I just asked if you
10 recognize the document.
11     A.  No. I mean, the company
12 Xaman I recognize. They were one of
13 the aircrafts contracts holder.
14     Q.  When you say, "Xaman," where
15 are you reading from, sir?
16     A.  Right at top, "beneficial
17 owner of Xaman Holdings Limited."
18     Q.  J-o-f-a-n?
19     A.  X-a --
20     Q.  I'm sorry.
21         MR. LEBOWITZ: You have
22 given us a document with a Bates
23 number PO10752.
24     Q.  So, before you as Slinin

Page 43

E. SLININ

1  Exhibit 2, is a reference to Xaman.
2      Are you familiar with that
3  company at all?
4      A.  That was one of the
5  companies that Alex Shnaider and Rob
6  Lee I think created, whatever they
7  were doing. All the paperwork, all
8  the contractuals, all the legal, all
9  the administerial we call it, Alex
10 Shnaider and Rob Lee was handling that
11 all along, and George Rependa.
12     Q.  It indicates here that Jets
13 Worldwide, LLC, owns 30 percent of
14 Xaman; right?
15     A.  I don't recall that.
16     Q.  I am asking if it is
17 indicated on the document?
18     A.  That is correct.
19     Q.  It also indicates that Mr.
20 Pirumov is the beneficial owner,
21 owning 70 percent of Xaman; correct?
22     A.  Correct.
23     Q.  Let me show you what we will
24 mark as -- let me ask you, are you

Page 44

E. SLININ

1  familiar with an entity by the name
2  Jofan Holding?
3      A.  It's one of the aircrafts
4  contracts holding.
5      Q.  Do you know if Jets
6  Worldwide, LLC, ever held any
7  ownership interest in Jofan?
8      A.  I would not know. I would
9  not remember. The correct answer can
10 be given to you by Rob Lee and Alex
11 Shnaider.
12     Q.  Try to focus on the question
13 so the record is clear. If you need
14 to say anything else, I am sure your
15 Counsel will bring that up.
16         What about Setius,
17 S-E-T-I-U-S Technologies Limited; are
18 you familiar with that company?
19     A.  I don't remember.
20     Q.  Do you know if Jets
21 Worldwide had an ownership interest in
22 Setius Technologies Limited?
23     A.  I don't remember. I don't
24 recall.

Page 45

E. SLININ

1      Q.  What about Stogan Assets
2  Incorporated?
3      A.  Stogan is one of the
4  contracts for Bombardier.
5      Q.  You are familiar with --
6      A.  Stogan was, I remember, just
7  slightly that was a name that was
8  utilized that Alex has given to me.
9      Q.  Let me mark as Exhibit 3,
10 Slinin Exhibit 3.
11         (Whereupon, a confirmation
12     letter was marked as Slinin
13     Exhibit 3, for identification, as
14     of this date.)
15     Q.  I placed before you sir,
16 Slinin 3, which is a confirmation
17 letter. It appears unsigned, and it
18 says, "Jets Worldwide, LLC," being the
19 shareholder of Stogan Assets
20 Incorporated, defined as the company,
21 owns 30 percent of the company's
22 shares.
23         Do you see that?
24     A.  Yes, I do.



Page 50

```
 1         E. SLININ
 2   Worldwide, LLC --
 3      A.  Yes.
 4      Q.  Let me just finish the
 5   question.
 6         "Mr. Eduard Slinin,
 7   beneficial owner;" correct?
 8      A.  Yes.
 9      Q.  And then on the fourth page,
10   is that your signature there?
11      A.  That is correct.
12      Q.  It says, "name" underneath
13   your signature, Eduard Slinin, Jets
14   Worldwide, LLC, of the State of the
15   Delaware; correct?
16      A.  Correct.
17      Q.  If you go back to page two
18   of the document, sir. The first
19   paragraph, it indicates that you are
20   the beneficial owner as the
21   undersigned of Xaman Holdings Limited;
22   correct?
23      A.  That's correct.
24      Q.  Okay.
25         And you are instructing that
```

Page 51

```
 1         E. SLININ
 2   the beneficial ownership of the shares
 3   in Xaman Holdings be transferred to
 4   Mr. Pirumov; correct?
 5      A.  Correct.
 6      Q.  If you look at the third
 7   page, you resign as beneficial owner
 8   of the company; is that correct?
 9      A.  That what -- that I
10   resigned?
11      Q.  Yes, "Please accept this
12   letter as my resignation as beneficial
13   owner of the above named company with
14   the effect from the above date
15   hereof."
16         Do you see that?
17      A.  Yes.
18      Q.  So, you are resigning as the
19   beneficial owner of Xaman Holdings as
20   of August 15th, 2008; correct?
21      A.  Correct.
22      Q.  Do you know why you
23   transferred -- well -- strike that.
24         Do you know how you got
25   ownership of Xaman Holdings Limited?
```

Page 52

```
 1         E. SLININ
 2      A.  I don't remember. Again,
 3   everything was commended by Alex
 4   Shnaider and Rob Lee.
 5      Q.  Do you know why you
 6   transferred ownership back to Mr.
 7   Pirumov of Xaman Holdings Limited,
 8   sir?
 9      A.  I don't remember.
10      Q.  I think you told me a few
11   moments ago, you didn't recognize the
12   name Jets Worldwide, LLC; is that
13   correct?
14      A.  I can't remember. It's too
15   many years ago that is why it did not
16   come up. Maybe one of the companies
17   was done for purpose of this
18   transaction for Mr. Pirumov. I don't
19   -- again, I was not involved in the
20   administrative paperwork, it was done
21   between Rob Lee, Alex Shnaider, and
22   some proportion of Mr. Vadim
23   Zilberman.
24      Q.  But for example, with regard
25   to Exhibit 5 that we were just looking
```

Page 53

```
 1         E. SLININ
 2   at, you are not disputing that that is
 3   your signature on this document?
 4      A.  It is my signature. I mean,
 5   that looks like my signature, but
 6   anything else, I can't remember.
 7   Again, Alex Shnaider would call me on
 8   the phone, "Eddy this is how we are
 9   going to do things. I need you to do
10   this, this, and this," and I followed
11   his instructions.
12      Q.  So, you don't have any
13   reason to believe that you didn't
14   sign, for example, the documents that
15   are part of Exhibit 5?
16      A.  I can't remember.
17      Q.  Let me show you what we will
18   mark as Slinin Exhibit 6.
19         (Whereupon, a Limited
20   Liability Company Agreement for
21   Jets Worldwide, LLC, was marked
22   as Slinin Exhibit 6, for
23   identification, as of this date.)
24      Q.  Let me ask you to take a
25   look at Slinin Exhibit 6, which for
```



```
                                               Page 98
 1              E. SLININ
 2   cars, then you would reach out to one
 3   of these other entities; correct?
 4       A.   Correct.
 5       Q.   Do you know if Corporate
 6   Transportation Group Limited pays them
 7   a set fee to that transportation
 8   company to carry your passengers, or
 9   if they pay in some other fashion?
10       A.   It's per market. It's all
11   in the market, and every marketplace
12   has its own rates.
13       Q.   For each marketplace you pay
14   a set rate then to the transportation
15   company that you contract with; is
16   that correct?
17       A.   Correct. In other words,
18   when the job comes in we already know
19   who is who. There will be a minimum,
20   let's say of $50.00 or $45.00, depends
21   on where it is, how far it is from the
22   airport to the hotel, or to the
23   residence to the office. We have
24   everything -- it's a computerize
25   database that we have in our system.
```

```
                                               Page 99
 1              E. SLININ
 2       Q.   Do you share in the profits
 3   of any of these other companies that
 4   you contract for services with?
 5       A.   Of course we share the
 6   profit.
 7       Q.   Do you actually share in the
 8   overall end profits of that entity?
 9       A.   No, no, no. It's per ride,
10   it's per ride. Per transaction we
11   make whatever the spread is.
12       Q.   You don't have an ownership
13   interest in any of the other entities
14   that you refer to as "affiliate
15   partners;" correct?
16       A.   No.
17       Q.   And you don't share in the
18   cost of any of the affiliate partners;
19   correct?
20       A.   No.
21       Q.   You have alleged in this
22   lawsuit that there is a partnership
23   between you and Mr. Shnaider; correct?
24       A.   That is correct.
25       Q.   Okay.
```

```
                                              Page 100
 1              E. SLININ
 2            What is the name of that
 3   partnership?
 4       A.   Eduard Slinin and Alex
 5   Shnaider.
 6       Q.   And where is that
 7   partnership located?
 8       A.   It was a verbal agreement in
 9   New York City.
10       Q.   Do you know if any documents
11   were ever filed with any governmental
12   entity in New York regarding that
13   partnership?
14       A.   No.
15       Q.   They were not, or you don't
16   know?
17       A.   I don't know.
18       Q.   What is the ownership of the
19   Eduard Slinin/Alex Shnaider
20   partnership?
21       A.   It was a 50/50 total
22   agreement on all profits to be made.
23       Q.   Do you know if the Eduard
24   Slinin/Alex Shnaider partnership ever
25   obtained any type of certificate to
```

```
                                              Page 101
 1              E. SLININ
 2   operate in New York?
 3       A.   No.
 4       Q.   Do you know if it was
 5   required to obtain any type of
 6   certificate to operate?
 7       A.   No.
 8       Q.   You don't know?
 9       A.   I don't know.
10       Q.   Okay.
11            Do you know if the Eduard
12   Slinin/Alex Shnaider partnership that
13   you referred to ever filed any type of
14   tax returns with the federal
15   authorities?
16       A.   No.
17       Q.   You don't know?
18       A.   No.
19       Q.   Do you know if the Eduard
20   Slinin/Alex Shnaider partnership that
21   you have alleged, ever filed any tax
22   return with any state authority?
23       A.   I don't know.
24       Q.   Do you know if the Eduard
25   Slinin/Alex Shnaider partnership ever
```

