# Exhibit B

Page 154

```
 1              E. SLININ
 2      Q.   That would be $2,000,000;
 3   correct?
 4      A.   Correct.
 5      Q.   So, you pledged $2,000,000
 6   --
 7      A.   Additional.
 8      Q.   Under the guarantee here?
 9      A.   That is correct.
10      Q.   When you say, "additional"
11   --
12      A.   Because technically, if me
13   and him -- me and Alex Shnaider are
14   50/50. He holds those two positions,
15   which total $4,000,000 already in his
16   possession worth of contracts for the
17   planes. He said to me the following,
18   "If I were not able to liquidate the
19   two positions, you will be liable for
20   this money." I said, "Alex I have no
21   problem." He said, "Because you have
22   to have the skin in the game. You are
23   my partner. If you don't have the
24   cash available this time, I am willing
25   to provide you that -- that money, but
```

Page 155

```
 1              E. SLININ
 2   we are 50/50 until we liquidate those
 3   positions. If we take a loss, I want
 4   you to hold responsible for the
 5   losses."
 6      Q.   Okay.
 7           So, if there was not a
 8   liquidation of these --
 9      A.   I would have been liable.
10      Q.   Hold on.
11           If there was not a
12   liquidation of Contract 161 and 162,
13   it's your belief that Mr. Shnaider
14   told you that you would have been
15   liable for the $4,450,000 under the
16   promissory note?
17      A.   It was only 4,000,000. 450
18   got paid right away, right there and
19   then.
20      Q.   Okay.
21           You would have been liable
22   for $4,000,000 under these two
23   contracts?
24      A.   Yes.
25      Q.   You would have been liable
```

Page 156

```
 1              E. SLININ
 2   for the full 2,000,000 under each
 3   contract; correct?
 4      A.   Yes.
 5      Q.   2,000,000 under Contract
 6   161?
 7      A.   Yes.
 8      Q.   And 2,000,000 under Contract
 9   162?
10      A.   Correct.
11      Q.   So, you pledged one hundred
12   percent of the interest in each of the
13   two contracts; correct?
14      A.   Correct.
15      Q.   What did you do with the
16   $4,000,000 or $4,450,000 under this
17   promissory note?
18      A.   Alex received 450,000 right
19   there and then.
20      Q.   So, you paid Mr. Shnaider
21   450 --
22      A.   Yes. 4,000,000 he refunded
23   back to Mr. Sheikhametov.
24      Q.   4,000,000 was refunded back
25   to Mr. Sheikhametov?
```

Page 157

```
 1              E. SLININ
 2      A.   Mr. Sheikhametov.
 3      Q.   Okay.
 4      A.   It was refunded more because
 5   we took him from 5,000,000 -- over
 6   5,000,000 in deposits. I refunded --
 7   whatever the profit margin was there,
 8   Alex kept his profit margin. I end up
 9   returning to Mr. Sheikhametov the
10   profit margin, and then the $4,000,000
11   was repaid back to him from Alex.
12      Q.   That's my next question.
13           Where did the 4,000,000 come
14   from to pay Mr. Sheikhametov back?
15      A.   From Alex Shnaider.
16      Q.   And so in exchange for this
17   promissory note, that you signed on
18   behalf of All City Funding, Mr.
19   Shnaider repaid the $4,000,000 in
20   deposits that Mr. Sheikhametov had
21   paid; correct?
22      A.   Correct.
23      Q.   Okay.
24           Mr. Sheikhametov had made
25   those deposits to purchase an
```

### Page 162

E. SLININ

your interest in Contract 207, do you know how much, dollars wise, you had --

A. $1,000,000.

Q. Do you know -- going back to Contract 161 and 162, do you know why the deposits to Mr. Sheikhametov were returned?

A. He didn't want to buy it because he didn't like the fact that um, those contracts were not directly from Bombardier to his company because he wanted to make sure it's a direct contract to him, and Alex said, "I am not going to give to him because the delta of the profits in the future days we will not make money. He will most likely not pay. So, therefore I am not doing this deal." I said, "Alex, then we have to return the money," and at that time Alex said, "Okay. We are going to return him the money and we are going to try to sell the planes somewhere else."

### Page 163

E. SLININ

Q. You understood though, that the contract that CL850 or CAC had with Mr. Sheikhametov, did not require the return of the money; correct?

A. I understood that, but we felt that we needed to return the money.

Q. Okay.

Same thing for Contract 162, you understood that the contract that Mr. Sheikhametov had with either CL850 or CAC, did not require the.

Return of the money?

A. We understood that.

Q. And the $2,000,000 deposit for Contracts 161 and 162 were returned then to the purchaser; correct?

A. Correct, it was a total of $4,000,000, two and two. He had 2,000,000 on each deposit -- on each contract. He put 2.5 I think, or 2.6 where -- initially, and we refund him everything. Mr. Shnaider kept his

### Page 164

E. SLININ

share of the profit, just to let you know again. He kept his share of the profit, and initially from the beginning that was his delta he kept it.

Q. Mr. Sheikhametov actually put more than $4,000,000 in total on -- let me finish, Contracts 161 and 162; correct?

A. Correct.

Q. And he was refunded more than 4,000,000, but less than what he paid in total; correct?

A. He got refunded everything, penny to penny, whatever he put down.

Q. What happened with regard to Contract 162; if you know?

A. Everything was refunded back to the factory.

Q. And was the contract terminated?

A. Yes. All the contracts were returned to the factory and terminated, and we received all the --

### Page 165

E. SLININ

all the money towards the Contract 169.

Q. Well --

A. I think 169; correct?

MR. LEBOWITZ: 161.

A. The green.

Q. 161.

And that's what I am trying to understand. So, you returned 4,000,000 or more on Contract 161 and 162; correct?

A. Okay.

Let me just -- again, the entire seven positions that were purchased, including my position, and Alex Shnaider's position --

Q. When you say, "my position and Mr. Schnaider's position," you are referring to Contracts 207 and 206; correct?

A. That's correct. Everything was made a global negotiation with Bombardier, that they will take everything back, and then we will take



Page 166

```
 1        E. SLININ
 2   a delivery of one green Challenger 850
 3   and one Lear 60 XR.
 4        Q.  I understand.
 5            I am trying to make sure
 6   that the record is clear. So bear
 7   with me and my questions, and try to
 8   listen to my question, and answer my
 9   question, sir.
10            So, was there any money left
11   on Contract 161 after you repaid Mr.
12   Sheikhametov to contribute towards the
13   actual aircraft that was taken
14   delivery of in green form?
15        A.  Of course it was left
16   because Sheikhametov -- no, actually
17   in Sheikhametov's position was nothing
18   left, except whatever Mr. Shnaider
19   profited from the initial deposit,
20   probably 450 or $500,000.
21        Q.  Was there any money from
22   Contract 162 once you returned the
23   money to Mr. Sheikhametov to
24   contribute towards the aircraft that
25   was delivered green?
```

Page 167

```
 1        E. SLININ
 2        A.  No, except Mr. Shnaider,
 3   whatever he left his deposit -- I mean
 4   his profit margin from the initial
 5   deposit.
 6        Q.  Was money then in the form
 7   of deposits available from other
 8   contracts that are the subject of this
 9   lawsuit, to contribute towards the
10   green plane?
11        A.  Yes, absolutely.
12        Q.  Do you know how much was
13   contributed?
14        A.  Give me one second. Let me
15   calculate it.
16        Q.  If you --
17        A.  I can calculate it. Right
18   from my recollection. It was --
19   10,000,500 was applied towards the
20   green plane.
21        Q.  Do you know where the
22   10,000,500 in deposits came from?
23        A.  It came from Mr. Pirumov,
24   okay, and also of that 10.5 is my
25   $2,000,000, which I own the plane that
```

Page 168

```
 1        E. SLININ
 2   I bought from Pirumov, so the
 3   calculations, and -- one Lear 60,
 4   which is $1,000,000.
 5        Q.  Was that Contract 206 or
 6   207?
 7        A.  One of them. I don't
 8   remember exactly.
 9        Q.  Well, was it yours, or was
10   it Mr. Shnaider's?
11        A.  It was either mine or
12   Mr. Shnaider's; one of ours. We made
13   the deal with Mr. Shnaider. If we
14   will take a loss on Lear 60, we will
15   split this loss equally 50/50.
16        Q.  Okay.
17            Did you ever take a loss on
18   any of the aircraft that are the
19   subject of this lawsuit?
20        A.  Yes, on my Lear 60.
21        Q.  Did you record a loss on any
22   of your financial statements?
23        A.  I don't remember. I don't
24   remember.
25        Q.  So, you don't know if you
```

Page 169

```
 1        E. SLININ
 2   ever reported a loss on the Lear 60?
 3        A.  I don't remember.
 4        Q.  Who would know?
 5        A.  I guess my accountant.
 6        Q.  At the time that the
 7   deposits that you just referred to
 8   were attributed to the purchase of
 9   Contract 161, which we also refer to
10   as Serial number 8100, which is also
11   the green plane, what is your
12   position, as to what interest, if any,
13   you had in Contract 169, which is
14   shown on page three of the promissory
15   note?
16            MR. LEBOWITZ: Can you read
17        that back?
18            (Whereupon, the record was
19        read by the reporter.)
20            MR. LEBOWITZ: Objection to
21        the form of the question.
22        A.  Correct, I was a partner.
23        Q.  What interest do you belive
24   you had in Contract 169 when you
25   pledged it?
```



43 (Pages 166 to 169)

Page 190

```
 1              E. SLININ
 2   we will mark as Slinin Exhibit 12.
 3         (Whereupon, an aircraft
 4      purchase agreement was marked as
 5      Slinin Exhibit 12, for
 6      identification, as of this date.)
 7      Q.  Sir, this document that I
 8   placed before you as Slinin Exhibit 12
 9   is Bates stamped POOO167 through
10   POOO208. It's a composite exhibit of
11   more than one document.
12         MS. DYER: And for the
13      record, it was previously marked
14      yesterday in composite form as
15      Zilberman Exhibit 9 as well.
16      Q.  I am going to be directing
17   your attention to certain pages, but
18   feel free to look over it if you would
19   like.
20         My first question is, with
21   regard to the first document in this
22   composite exhibit, comprised of
23   POOO167 through P000173, do you
24   recognize that document, sir, the
25   first document?
```

Page 191

```
 1              E. SLININ
 2      A.  It's um, a contract between
 3   Bombardier and Challenger Aircraft
 4   Company, LTD.
 5      Q.  And it's for the purchase of
 6   a Challenger 850; correct?
 7      A.  Yes.
 8      Q.  And it's for 24,550,00;
 9   correct?
10      A.  Correct.
11      Q.  And it provides, in Article
12   2.1, for a $2,000,000 initial payment;
13   correct?
14      A.  Correct.
15      Q.  And if you look at the
16   amount of liquidated damages under
17   section 9.5, which is on P00171; do
18   you see that, sir?
19      A.  Yes.
20      Q.  It provides for $2,300,000
21   of the purchase price of liquidated
22   damages in the event of a default;
23   correct?
24      A.  Counsel, where are we going
25   with that?
```

Page 192

```
 1              E. SLININ
 2      Q.  That is my question.
 3      A.  The question is, it's there,
 4   but this contract was negotiated.
 5      Q.  That's all I am asking.
 6      A.  No, no, no, Ma'am.
 7      Q.  Is it there?
 8      A.  It's there, but it's not
 9   reflecting these deals, at all, in any
10   way, shape, or form. I can show you
11   at the trial -- I will demonstrate to
12   you --
13      Q.  Sir --
14      A.  Everybody from Bombardier
15   will come to that.
16      Q.  That's fine.
17      A.  No, I want to make it clear
18   that it will be at the trial. I will
19   make sure I will present everybody
20   from Bombardier. Where you are going
21   with that has nothing to do because --
22         (Simultaneous speaking)
23      Q.  Mr. Slinin --
24      A.  No, but I say what it is.
25      Q.  Mr. Slinin, please.
```

Page 193

```
 1              E. SLININ
 2      A.  I want to make sure it is on
 3   the record.
 4         MS. DYER: I am being as
 5      polite as I can.
 6         MR. LEBOWITZ: You are.
 7         MS. DYER: I really am
 8      usually not this patient with
 9      people.
10      A.  It doesn't mean anything.
11   It has no reference to this deal.
12         MR. LEBOWITZ: I know,
13      maybe so, but Ms. Dyer is
14      entitled to ask whatever
15      questions she wants as long as
16      they are proper, and you are
17      required to respond. So, we will
18      be done more quickly if you just
19      answer her questions, and then if
20      necessary, I can always ask you
21      additional questions once she
22      completes her examination.
23         Let us continue.
24         MS. DYER: Okay.
25      Q.  So, under Article 9.5 there
```



49 (Pages 190 to 193)

Page 194

```
 1          E. SLININ
 2   is a liquidated damages amount set
 3   forth of 2.3 million dollars; correct?
 4       A.   Correct.
 5       Q.   And if you look at P000182
 6   there is a signature block for Blue
 7   Industrial Skies, Inc.; correct?
 8       A.   Correct.
 9       Q.   And there is a signature
10   underneath of Mr. Pirumov; correct?
11       A.   Georgy Pirumov, correct.
12       Q.   Correct.
13            Was he the owner, at the
14   time, of Blue Industrial Skies, Inc.?
15       A.   Yes.
16       Q.   If you look back then at
17   P000176; do you see that?
18       A.   Yes, I do see that.
19       Q.   Okay.
20            So, we were just looking at
21   a signature of Mr. Pirumov, correct,
22   on this document, which is an
23   agreement between Challenger Aircraft
24   Company Limited and Blue Industrial
25   Skies, Inc.; correct?
```

Page 195

```
 1          E. SLININ
 2       A.   Correct.
 3       Q.   And it provides that Mr.
 4   Pirumov is going to pay an initial
 5   payment of $3,450,000 under section
 6   2.11; is that correct?
 7       A.   Correct.
 8       Q.   Did you or one of your
 9   companies receive that payment from
10   Mr. Pirumov of 3.45 million?
11       A.   I don't recall.
12       Q.   Looking back at the first
13   page of this document, 2,000,000 of
14   that 3.45 million went to Bombardier;
15   is that correct?
16       A.   How much you say went to
17   Bombardier?
18       Q.   2,000,000.
19            If you look back at the
20   first page of the entire document.
21       A.   Yes, the 2,000,000 went to
22   Bombardier.
23       Q.   Do you recall when you first
24   learned that Mr. Pirumov wanted to
25   exit this contract?
```

Page 196

```
 1          E. SLININ
 2       A.   Sometime in 2008.
 3       Q.   Okay.
 4            And if you look at within
 5   this document PO2O -- strike that.
 6            Let me show you document --
 7   actually, before we do that, do you
 8   know if Jets Worldwide, LLC, ever
 9   bought Blue Industrial Skies, Inc.?
10       A.   I don't remember.
11       Q.   Well, if you look at
12   P000190; do you see that?
13       A.   (No verbal response.)
14       Q.   Do you see that sir?
15       A.   Yes.
16       Q.   You see you are signing as a
17   member of Jets Worldwide, LLC;
18   correct?
19       A.   That is correct. That's the
20   position we bought it.
21       Q.   It says at the beginning of
22   this letter, "Dear sir, you are hereby
23   appointed by the undersigned, being
24   all of the shareholders of Blue
25   Industrial Skies, Inc.;" do you see
```

Page 197

```
 1          E. SLININ
 2   that?
 3       A.   Correct.
 4       Q.   Does that refresh your
 5   recollection --
 6       A.   Yes.
 7       Q.   -- that Jets Worldwide, LLC,
 8   owned Blue Industrial Skies, Inc.?
 9       A.   Yes, yes. Now I remember,
10   that, yes.
11       Q.   Alright.
12       A.   We bought this contract from
13   Mr. Pirumov. I spoke to Alex
14   Shnaider, and we agreed I need to buy
15   him out to demonstrate because he had
16   some reservation of those contracts
17   were incorrect. I said, "Why don't
18   you take it, and I would resell it?"
19       Q.   Okay.
20            Look if you would at
21   P0001129 in this composite exhibit.
22       A.   Settlement agreement July
23   2008, yep.
24       Q.   Correct.
25            Right.
```



Page 198

```
 1            E. SLININ
 2       If you look at the following
 3   page, which is 193; do you see that,
 4   sir?
 5       A.   Okay.
 6       Q.   Okay.
 7            This is a settlement
 8   agreement dated July 3rd, 2008,
 9   between Challenger Aircraft Company
10   Limited and Blue Industrial Skies,
11   Inc.; correct?
12       A.   Yes.
13       Q.   It's a settlement agreement
14   between a company that is owned by
15   you, and Challenger Aircraft Company
16   Limited; correct?
17       A.   Correct.
18       Q.   Do you know why the parties
19   entered into this settlement
20   agreement?
21       A.   Because I purchased the
22   contract back, the contract back from
23   Pirumov, as I told you before.
24       Q.   What was the effect of this
25   settlement agreement?
```

Page 199

```
 1            E. SLININ
 2       A.   What do you mean, "effect?"
 3       Q.   What was the effect --
 4       A.   The outcome?
 5       Q.   What was this settlement
 6   agreement doing?
 7       A.   Alex wanted to make sure
 8   that everything was done correctly,
 9   because I think his attorney Marechal
10   was handling all that transactions.
11   Basically, what we did, I bought this
12   with my own money, I bought this
13   aircraft where Alex said, "Don't
14   worry, we will sell this aircraft. I
15   have a buyer for it." That was it.
16   This is part of my money, which I
17   described to you a couple of minutes
18   ago. You asked me, "How did I arrive
19   to this money?" That was the
20   agreement that demonstrates when I
21   bought this aircraft from Pirumov, and
22   I became an owner of this aircraft,
23   and then I gave it back to Alex to
24   give it back to the Bombardier, part
25   of the whole 161 green.
```

Page 200

```
 1            E. SLININ
 2       Q.   Okay.
 3            Please look at POOO198
 4   please.
 5            Do you see that this is
 6   entitled --
 7            (Simultaneous speaking)
 8       Q.   Exhibit A, Aircraft Purchase
 9   Agreement.
10       A.   Yeah, I see that.
11       Q.   Okay.
12            You see that? That's an
13   exhibit to the settlement agreement
14   that we were just referencing;
15   correct?
16       A.   Correct.
17       Q.   Okay.
18            If you look at the actual
19   exhibit on the first page POOO199, you
20   see that it is aircraft purchase
21   agreement between Challenger Aircraft
22   Company Limited as the seller, and
23   Blue Industrial Skies, Inc., as the
24   buyer; do you see that?
25       A.   Yes.
```

Page 201

```
 1            E. SLININ
 2       Q.   You were the owner of Blue
 3   Industrial Skies, Inc.; correct?
 4       A.   Yes.
 5       Q.   At this time?
 6       A.   Yep.
 7       Q.   If you look back at the
 8   settlement agreement, if you look at
 9   POOO194 --
10       A.   Hold on.
11            Yeah.
12       Q.   It says in section 4.1, "The
13   parties agree that the settlement
14   agreement terminates all liabilities
15   (whether accrued or not), rights,
16   duties, and obligations of any party
17   under the APA;" correct?
18       A.   What does that mean?
19       Q.   I am just asking you if it
20   says that?
21       A.   I don't know what it says
22   here. I am not a lawyer.
23       Q.   I am just reading it. I
24   read it verbatim.
25            Is that what the agreement
```



E. SLININ
says?
   A. That's what it says, but again --
   Q. I'm not --
   A. Hold on a second. On page -- page 197.
   Q. Sir --
   A. You missed it. Rob Lee --
   Q. I am asking you if that is what the agreement says?
   A. That's what it says.
   Q. And you referenced page POO197, and Rob Lee has his signature --
   A. His input.
   Q. As Challenger -- on behalf of Challenger Aircraft Company Limited; correct?
   A. Correct, which you missed that one. Yes, okay.
   Q. No, I didn't.
      This settlement agreement doesn't provide that CAC is going to return any payments to Blue Industrial

E. SLININ
   Q. So, I disagree with you about whether everything was done verbally, and I think that is wrong, but what I am asking you about right now is what this document either does or doesn't provide. There was a settlement agreement, and I am simply trying to ask you about it.
      Do you know if this settlement agreement provided that any money would be returned to either Mr. Pirumov or you?
   A. According to the agreement, and according to my understanding with all the dealings, Mr. Pirumov lost all his deposits. Those deposits became ownership of me and Alex Shnaider. We became the owner of those deposits. That's the way we understood it. We spoke on the phone, and there is also you can see some sort of a text messages back and forth via Blackberry. We clearly understood that, and that's how we proceeded

E. SLININ
Skies; correct?
   A. It was clearly spoken --
   Q. I am asking --
   A. On the phone.
   Q. Sir -- sir. I am asking you --
   A. I don't know what -- I am not an attorney. I cannot be precisely reading this. This is -- the attorney can read this, what language is here, but everything was done on a trustworthy, word by mouth, verbal agreement with me --
   Q. It wasn't, sir, because we are sitting here --
      MR. LEBOWITZ: Let's not be argumentive.
   Q. I understand your position that things were done verbally. I am entitled to show you, and ask you questions about the things that were done in writing because there is a lot of stuff in writing.
   A. I perfectly understand.

E. SLININ
further to do this business by returning all those aircraft in exchange for one delivery of Challenger 850 green 161.
      MS. DYER: Move to strike.
   Q. Sir, my question is, is there anywhere in this settlement agreement that I have placed before you as POOO193 through -- with exhibits, POOO2085, where it provides that any monies would be returned to either Mr. Pirumov or you? That's all I am asking.
   A. It's a standard boiler plate agreement.
   Q. I am not asking what it is. I am just asking --
   A. It doesn't matter. I don't understand. This is too grammar for me.
   Q. Okay.
      So, you don't know one way or another whether it --
   A. I understand one thing.
