# Exhibit C

[illegible]



[illegible]



ALEX SHNAIDER

A L E X S H N A I D E R, 14600 Westin Road, King City, Ontario 17B1K4, being first duly sworn by Jowell Falsetta, a Notary Public of the State of New York, was examined and testified as follows:

EXAMINATION BY MR. LEBOWITZ:

Q. Good morning, Mr. Shnaider.

A. Good morning.

Q. My name is Larry Lebowitz. I know we were introduced in the hall by Ms. Dyer. I am the attorney for Mr. Slinin.

To my right is Ethan Gerber, who is co-counsel in this case. To his left is Mr. Slinin and to Mr. Slinin's left is Olga Aleinik, who is also associated with Mr. Gerber's firm.

Ms. Dyer to your right is your attorney; right?

A. Correct.

Q. I am here today to ask you certain questions regarding the case that Mr. Slinin has brought against



ALEX SHNAIDER

you. And during the course of the deposition as we go forward, if I ask you a question, which you do not understand, please let me know and I'll repeat the question.

A couple of other rules, if you want to take a break at any time, let me know. I will be happy to accommodate you. However if there is an open question, I will ask that you answer it before we take a break.

Same thing with respect to speaking with your attorney, if you wish to take a break to consult with her, no problem, let me know.

Again the only caveat, if there is an open question, I ask you to complete the answer before we take a break. Have you understood everything I have said?

A. Yes.

Q. Do you speak and understand English fluently?

A. Yes.

dealing with and whether they will execute a deal or not, I didn't know.

He said that he had and I took it at face value and I said okay, if you have, then let's see what are the pricing, what are the terms. And I could see if there is a margin there, we could do a deal.

**Q. So when you say let's see what the pricing is and whether there is money to be made, can you explain in greater detail what you mean in terms of let's see what the pricing is.**

**Isn't there a base price if I want to buy for instance a Challenger 850?**

MS. DYER: Objection to the form.

Q. You could answer.

A. There is, let's say the retail price. There is also a price for Russia. There is a price for if it is available now versus available in three years. So there is different





pricing for different circumstances, under different circumstances.

**Q. So let me ask you about your statement that -- and I understand that depending on all those variables the price might vary.**

**But with respect to Russia, you said there was a different price. Were you being facetious or was there a different price point for planes that were sold in Russia?**

A. There was a different price point because there was a agent as I explained before in Russia. Bombardier was selling through this agent. And the agent would add on his commission.

And the price for the Russian market would be higher than same aircraft that would be sold in other markets, such as Canada.

**Q. But pardon my ignorance but wouldn't Bombardier have sales agents throughout the world?**

A. In certain markets they have





agents and in certain markets they have their own sales staff. In Russia from what I recall and China they have a sales agent.

**Q. Independent agent?**

A. Yes, like a distributor type of thing.

**Q. Do you know who that person in Russia was?**

A. I don't recall the name of the person but the name of the company was called Lift Tech. I don't know how it is spelled.

**Q. So can you tell me then if Mr. Slinin came to you and said he had prospective buyers in Russia.**

**Did you undertake to do anything with respect to establishing a relationship with him that would be profitable for the both of you?**

MS. DYER: Objection to the form. You could answer.

A. Yes, I wanted to understand at what price it could be sold. What





would be the deposit structures. I gave him an idea of what Bombardier needs as a deposit. And what would be the approximately the price that I could get the aircraft from.

And I told him go and see if you could sell it at a certain price that would obviously be profitable for me to do. So we would come to an arrangement where he would get a commission.

**Q. So if I understand you correctly, you based on the discussions with him, being Mr. Slinin, made some inquiries of Bombardier with respect to how much they would want if you were going to enter into contracts, let's say for the sale of an 850 to someone in Russia?**

A. They only, they didn't care where the aircraft was going to be sold.

**Q. They didn't care?**

A. They didn't care because when I was buying it, for them I was a

Canadian. One of their Canadian customers, long term customers. So I had a preferential pricing and terms.

Q. And once you bought it, what you chose to do with the plane was entirely your business?

A. That is correct.

MR. LEBOWITZ: How about if we take a five minute break.

(A recess was taken.)

MR. LEBOWITZ: Read back the last question, please.

(The requested portion was read.)

Q. So based on your discussions with Mr. Slinin, did you in fact inquire of Bombardier as to what prices they would charge you for the prices of an 850 jet aircraft?

A. Yes, I did.

Q. And what were you told?

A. They gave me a price.

Q. And was that --

A. Approximate price.





Q. And was that price subject to negotiation if you purchased more than one plane?

A. In normal circumstances it would have been but under the current market circumstances, it was very difficult to get any planes. So it was not any -- there wasn't any advantage of having more planes than less.

Q. We are talking about at the time when you were talking about them?

A. That is correct. Today they would give you a very large discount if you come to purchase multiple positions but not then.

Q. So and did you then after speaking with Bombardier, did you speak further with Mr. Slinin regarding what you had learned from Bombardier with respect to the prices that they would offer you on these planes?

A. Yes, of course I spoke to Mr. Slinin very often or we text each other, e-mailed.





Q. And when you advised him -- by the way, do you have some sense of what the price was that Bombardier gave you generally as to what it would cost for the purchase of a Challenger 850?

A. I don't recall right now what was the -- I mean I see you have in front you all of the contracts. So those were the prices that we ended up with.

Q. And based upon the prices that you were told, did you come to some understanding as to whether or not you could flip the planes at the price you could buy them at for a profit?

MS. DYER: Objection to the form.

Q. You could answer.

A. I mean it was work in progress, it was not an immediate thing.

Q. Okay.

And did you and Mr. Slinin -- when you say it was a "work in





progress", would it be fair to say you had a number of conversations or meetings with Mr. Slinin over this work in progress?

A. We had many conversations on the phone.

Q. Did you meet with him in person?

A. No.

Q. And did there ultimately, did you and he come to an understanding with respect to -- well, withdrawn.

Did he ultimately come to you and say he had buyers that were ready, willing and able to purchase planes?

A. Well during this time he came and he said look, I have one buyer, potentially another buyer. I said okay, if your buyers are willing and able and they will put a deposit and they have the funding to put a deposit and the price is going to be interesting, okay let me know what it is and we will go from there.

ALEX SHNAIDER

correctly, that commission did not go to him personally, it was paid to a third person?

MS. DYER: Give me an opportunity to object before you answer. Go ahead, objection to the form.

A. I don't know whether it was actually paid to a third party or not.

Q. But it was your understanding that it was?

MS. DYER: Objection to the form.

A. At the time I believed that it was.

Q. And why is it now as you sit here today that leads you to suspect that it might not have been?

MS. DYER: Objection to the form.

Q. You can answer.

A. Because when these, when these contracts started to be cancelled and these customers that Mr. Slinin had



ALEX SHNAIDER

wanted to get their deposits back, this gentleman that was, that received a lot of money was nowhere to be found to pay back any of these deposits to the buyers.

And Mr. Slinin ran to me in order for me to lend him money $4 million in order to satisfy one of his buyers, while you know this supposedly third party collected -- I don't know how much it collected but it collected quite a bit of money from all of these contracts.

Q. It is based on what happened after the fact which -- withdrawn.

Did you raise that issue with Mr. Slinin at the time?

A. At which time are you referring?

Q. When the contracts are being cancelled, did you ask him --

A. Of course I ask.

MS. DYER: Hold on, let him finish the question so the



ALEX SHNAIDER

record is clear. Let Mr. Lebowitz finish the question and then answer.

Q. Did you specifically ask him to try and get the commissions back from the individual who had assisted him in soliciting the buyers?

A. Yes, I did.

Q. Is there any e-mail or text that you are familiar with which would reflect such a request?

A. I don't have one.

Q. Let's go back to the initiation of this relationship. You had, would it be fair to say that you had experience in setting up the transactions; correct?

A. To a certain degree.

Q. And would it be fair to state that your understanding was that the deal would operate in the following way and please correct me if I am wrong in any aspect of this.

A company would be established



ALEX SHNAIDER

by you and Mr. Slinin to enter into contracts with Bombardier to purchase aircraft?

MS. DYER: Objection to the form.

Q. Is that an accurate statement as to how this transaction would work?

A. Only myself would establish that company. Mr. Slinin had nothing to do with the companies that would be the contracting party with Bombardier. They would only do business with me.

Q. Were such companies established?

A. Yes, I believe.

Q. And do you recall what the names of those companies were?

A. Challenger Aircraft and the second one, I don't remember.

Q. If I said to you the two companies were Challenger Aircraft and CL 850, would that refresh your recollection?

ALEX SHNAIDER

A. Could be, I am just looking at this exhibit that you gave me earlier. It just says buyer number one, CL 850 Aircraft Investments Limited and then second line to be assigned to Challenger Aircraft Company Limited. So I don't understand what this means.

Q. Why don't you take a look at the first exhibit there, okay. And the second exhibit, which would have the names of two contracting parties.

I'll ask if that just refreshes your recollection as to the names of companies that were formed to deal with Bombardier?

MS. DYER: Objection to the form.

A. Yes, so this CL 850 Aviation Holdings Limited and the other one is Challenger Aircraft Company Limited, correct?

Q. Correct -- well I know that is correct but you got to tell me



ALEX SHNAIDER

whether or not that is correct?

A. Yes.

MS. DYER: Only what you recall.

Q. And so tell me what was your understanding as to how these transactions with Mr. Slinin were going to be structured?

A. I would contract for the aircraft with Bombardier. Then for each aircraft there will be a company that would be set up for the buyers, for the individual buyers.

And then once the funds arrive, these companies would be assigned the contract from the contracting companies. That is as far as I can recall it.

I never dealt with the mechanics of it. It was done with Rob Lee together with Bombardier and George Rependa. So I don't really remember how it was done. I have never done it myself but that is high level.



ALEX SHNAIDER

MS. DYER: Mr. Lebowitz, I have to take a break for a very quick phone call. I am not trying to slow things up. But I'll note for the record, I don't have with me in this room all of the exhibits that you marked yesterday. I have a portion of them. I'll also note there were a few exhibits I did not have copies of, I looked on with Mr. Lee. And I believe perhaps Exhibit 26 is one of them.

Would you give me the opportunity to go to my office and at least get what I got. 10 minute break, I apologize but thank you.

(A recess was taken.)

MR. LEBOWITZ: Please read back the last question and answer.

(The requested portion was read.)



ALEX SHNAIDER

Q. Would it be accurate to state that Mr. Lee was acting pursuant to your authority to engage in all of these transactions?

A. Yes.

MS. DYER: Objection to the form.

Q. When the arrangement between you and Mr. Slinin was originally contemplated, whose money was it anticipated would be used to fund the contracts between Bombardier and either CL 850 or CAC?

MS. DYER: Objection to the form but you could answer if you understood.

A. Are you referring to the deposits?

Q. Let's start with the deposits.

A. The deposits would come from the buyers.

Q. The end buyer; correct?

A. Well I don't know who the

end buyer is. From the buyers that Mr. Slinin had. I don't know if they were end buyers. I understood that Mr. Slinin together with the buyer's at the time would later flip the planes again. So I don't know who would be the end buyers at the time.

Q. But to the extent that there was a buyer brought to the table by Mr. Slinin, it was going to be that buyer's money that was going to be used to pay the initial deposits?

A. That is correct.

Q. Would it be correct that the initial deposit that was going to be asked of that buyer was going to exceed the amount that was going to be required to be paid to Bombardier as its initial deposit?

A. That is correct.

Q. And that after the payment of whatever expenses existed, that difference between what the buyer paid and what was due Bombardier, would be





split between you and Mr. Slinin?

MS. DYER: Objection to the form.

A. Which expenses?

Q. Whatever expenses there might have been?

MS. DYER: Same objection.

A. I don't think that this is entirely correct. I covered some of the expenses or I was planing to cover some of the expenses myself.

Q. Did you ever ask to have the expenses that you put out on behalf of the partnership covered at that time?

MS. DYER: Objection to the form.

A. Probably those expenses that had to do with setting up the companies for the buyers of Mr. Slinin, yes.

Q. So it would be -- well let me show you -- why don't you take a look at what has been marked as Exhibits 1 and 2 from yesterday.

A. So do I put this one back





(indicating)?

Q. Yes, sir, thank you.

So would you take a look at those documents and I am really going to ask you just a couple of questions. And they relate primarily to article 2, the payment schedule under both contracts.

Do you see that?

A. Yes.

Q. Okay, so let's look at Exhibit 2, which was identified yesterday by Mr. Lee as a contract between Bombardier and CL 850 Aviation Holdings for the purchase of a Challenger 850 executive jet.

Do you see the purchase price of that plane is $25 million in paragraph 2.1?

A. Yes.

Q. And that the initial down payment that was due under that contract was $2 million?

A. Yes.





Q. And that there was a second payment of $17.5 million due and a final payment of $5.5 million due.

Do you see that?

A. Yes.

Q. And would you look at Exhibit 1.

A. Okay, yes.

Q. Would you see that price for the plane here in this contract is $26 million?

A. Yes.

Q. What was your understanding as to how the million dollar difference in price was going to be split?

MS. DYER: Objection to the form.

A. The $600,000 you're asking?

Q. No, I am asking you there was a million dollar difference with respect to contract two and contract one?

A. Right.

Q. The ultimate purchase price

contemplated?

MS. DYER: Objection to the form.

Q. You could answer.

A. I don't remember how it was done exactly. I don't remember the flow, how the money flowed and through which companies. And at what point of time these companies, the ownership of these companies was transferred to the buyer that Mr. Slinin introduced. So Mr. Slinin did not contract anything.

Q. That was not my question.

A. You said in the beginning Mr. Slinin contracted something.

Q. Well, then let me rephrase the question.

What made this deal attractive to you was that all of the money that was going to fund your contractor or the CL 850 contract or CAC contract with Bombardier, was going to come from the buyer and that at the end of the day you and Mr. Slinin would split the





premium that that buyer was paying utilizing his own money; isn't that correct?

MS. DYER: Objection to the form.

Q. You could answer.

A. Well I entered into this transaction because Mr. Slinin asked me to assist him in getting these aircraft because he couldn't get them.

And I said that I will do it if it was profitable for me. And then we came to an arrangement and we moved forward with it.

Q. I'll ask you again because I don't think you answered my question with all due respect.

MS. DYER: Move to strike.

Q. The way you anticipated that these transactions would operate was that all of the money that would be paid to Bombardier, would not come from you or Mr. Slinin but would come from the buyer; is that correct?





A. Correct.

Q. And that the buyer was paying a premium over the Bombardier contract price and that you and Mr. Slinin would then split that premium; correct?

MS. DYER: Objection to the form.

A. Correct.

Q. Okay, thank you. We could move on now.

Do you recall whether or not Bombardier entered into -- I'm sorry.

Whether CL 850 or CAC entered into contracts with Bombardier before the contracts were signed between either CL 850 or CAC and the buying entity?

A. I don't know.

Q. Was it your understanding that those contracts with a buying entity were to be entered into before CL 850 or CAC entered into a contract with Bombardier?





MS. DYER: Can I hear that back?

(The requested portion was read.)

MS. DYER: Objection to the form.

A. I am not sure that this is what we were waiting for. I believe we were waiting to have the funds or some sort of guarantee that the funds would be forthcoming. So I'm not sure when all this transacted in terms of timelines.

Q. However the expectation was that the original deposits that were required to be made on the Bombardier contracts, were going to be funded by the buyers; correct? You could answer.

MS. DYER: If you understand.

A. Yes.

Q. That initial down payment by the buyers contained a premium which would be split between you and