# Exhibit D

ROBERT LEE - 09/14/2017                    Pages 2..5

Page 2

```
1
2   A P P E A R A N C E S
3
4
     DEALY GILBERSTEIN & BRAVERMAN, LLP
5        Attorneys for Plaintiff
         225 Broadway, Suite 1405
6        New York, New York 10007
7   BY: LAWRENCE J. LEBOWITZ, ESQ
         -and-
9   ABRAMS, FENSTERMAN, FENSTERMAN, EISMAN
    FORMATO, FERRARA WOLF & CARONE, LLP
10       Attorneys for Plaintiff
         One Metro Tech Center, Suite 1701
11       Brooklyn, New York 11201
12  BY: JOHN S. CAHALAN, ESQ.
13
14
    BOIES, SCHILLER & FLEXNER, LLP.
15       Attorneys for Defendant
         575 Lexington Avenue, 7th Floor
16       New York, New York 10022
17  BY: KAREN DYER, ESQ
         (KDYER@BSFLLP.COM)
18
19
    ALSO PRESENT:
20       Edward Slinin
21
22
23
24
25
```

Page 3

```
1
2
3         S T I P U L A T I O N S
4
    IT IS HEREBY STIPULATED AND AGREED by
    and between the attorneys for the
    respective parties hereto, that this
5   examination may be sworn to before any
    Notary Public.
6
    IT IS FURTHER STIPULATED AND AGREED that
    the filing and certification of the said
    examination shall be waived
7
    IT IS FURTHER STIPULATED AND AGREED that
9   all objections to questions, except as to
    the form of the question, shall be
    reserved for the time of trial.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
1              ROBERT LEE
2   R O B E R T   L E E,
3   being first duly sworn by Jowell Falsetta,
4   a Notary Public of the State of New York,
5   was examined and testified as follows:
6   EXAMINATION BY MR. LEBOWITZ:
7       Q.   Good morning, Mr. Lee.
8       A.   Good morning.
9       Q.   I know I have introduced
10  myself a few minutes ago and we chatted
11  but my name is Larry Lebowitz.  I am
12  the attorney for Mr. Slinin in this
13  litigation.  I am here this morning to
14  ask you some questions with respect to
15  various transactions related to the
16  purchase and sale of various aircraft
17  that took place between 2006 and 2012
18  or 2013. Couple of ground rules -- well
19  let me begin by asking, have you ever
20  been deposed before?
21      A.   No.
22      Q.   I'm going to be asking you a
23  number of questions.  If at some point
24  in time I ask you a question and you
25  don't understand it, please let me
```

Page 5

```
1              ROBERT LEE
2   know.  I'll be happy to rephrase it.
3   Hopefully we won't have to do that but
4   you never know.
5       If at any time you want to take
6   a break, we can take a break.  The only
7   caveat is if there is an open question,
8   I'll ask you to answer the question and
9   then we can take a break. I think
10  pretty much that is it for the moment.
11      Would you be kind enough to
12  state your address for the record?
13      A.   It is 305 Roe Hampton
14  Avenue, Toronto, Ontario, Canada.
15      Q.   Mr. Lee, there is person
16  sitting to your immediate right, that
17  is Ms. Dyer of course.
18      Is she representing you here
19  today?
20      A.   Yes.
21      Q.   So then I'll add one more
22  caveat which is, if you wish to consult
23  with Ms. Dyer, of course that is your
24  privilege.  But again if there is an
25  open question, I'll ask that you answer
```

ROBERT LEE - 09/14/2017                    Pages 14..17

Page 14

```
1              ROBERT LEE
2      Q.    Is it fair to say that is
3  how you segued into working for
4  Midland?
5      A.    It would be fair.
6      Q.    Do you know an individual
7  named Alex Shnaider?
8      A.    I do.
9      Q.    Did Mr. Shnaider hold any
10 role at Midland Canada?
11     A.    Yes.
12     Q.    Can you tell me what it is,
13 please?
14     A.    He is the president.
15     Q.    I believe you said that
16 Midland Canada is a corporation; is
17 that correct?
18     A.    Yes.
19     Q.    Is it a publicly traded
20 corporation?
21     A.    No.
22     Q.    Closely held?
23          MS. DYER:   Objection to
24     the form.
25     Q.    Do you know whether or not
```

Page 16

```
1              ROBERT LEE
2      A.    Can you define closely held
3  for me because it means different
4  things in different jurisdictions?
5      Q.    Your point is well taken.
6          Who are the shareholders of
7  Midland Canada?
8      A.    Alex Shnaider.
9      Q.    With respect to Midland
10 Resources, based on your prior answer,
11 would it be correct to say that Mr.
12 Shnaider is a 50 percent owner of
13 Resources?
14     A.    Ultimate beneficial.
15     Q.    So now I'll ask you, can you
16 tell me what you mean when you utilize
17 that term ultimate beneficial?
18     A.    There is a structure in
19 place that is not uncommon in these
20 circumstances and he is at the end of
21 that structure.
22     Q.    So when we get to the desk
23 where it says the buck stops here,
24 Mr. Shnaider is sitting at that desk?
25          MS. DYER:   Objection.
```

Page 15

```
1              ROBERT LEE
2  it was a closely held corporation?
3          MS. DYER:   Same objection.
4      Q.    You could answer.  So that
5  we understand, Ms. Dyer can object to
6  form.  It is an objection that she
7  places on the record.  But unless she
8  has some other objection which she
9  would voice, you would have to answer
10 the question.
11          MS. DYER:   Mr. Lee is
12     aware that I will throw myself on
13     the court reporter if he should
14     not answer the question.  Off the
15     record.
16          (Off the record.)
17          MS. DYER:   Mr. Lee is
18     aware the objection to form is
19     something that he will continue
20     to answer unless I very
21     specifically instruct him to
22     answer.  Don't worry Madam court
23     reporter, I will not do that but
24     it will be very clear.
25     Q.    So --
```

Page 17

```
1              ROBERT LEE
2          MR. LEBOWITZ:   Withdrawn.
3      Q.    Can you tell me who is the
4  other if you know, the other beneficial
5  owner of Resources?
6          MS. DYER:   Just objection
7     to the form.  But he could
8     answer.  I don't know, I think it
9     presumes there might be another.
10     Q.    Is there another beneficial
11 owner of Resources?
12     A.    Yes, there is.
13     Q.    Can you tell me, who is it?
14     A.    It is a guy called Edward
15 Shyfrin.
16     Q.    Does Mr. Shyfrin have any
17 involvement in or ownership in --
18 withdrawn.  Never mind.
19     Let me now ask you, do you have
20 any familiarity with an entity known as
21 Challenger Aircraft Company Limited?
22     A.    I do.
23     Q.    First can you tell me what
24 is your familiarity with that entity?
25     A.    It was a subsidiary of
```

DTI Court Reporting Solutions - New York

Page 18

```
1              ROBERT LEE
2  Midland Resources Holdings Limited.
3       Q.    And did you have any
4  involvement -- withdrawn.
5       Do you recall when that company
6  was created?
7       A.    I'm --
8       Q.    Approximately.
9       A.    Yes, around -- it was
10 around, it was in 2007, middle of the
11 year.
12      Q.    And did you have any
13 involvement in the creation of that
14 company?
15      A.    I did.
16      Q.    And can you tell us, what
17 was your involvement in the creation of
18 that company?
19      A.    I essentially ordered it.
20      Q.    You ordered its creation?
21      A.    Yes.
22      Q.    And for what purpose was
23 that company created?
24      A.    To buy and sell aircraft.
25      Q.    And can you tell me what was
```

Page 19

```
1              ROBERT LEE
2  it -- withdrawn.
3       Where is and if we could refer
4  to it for the sake of brevity as CAC
5  because we will be discussing another
6  company shortly as well.
7       Where was CAC incorporated?
8       A.    I am sorry when?
9       Q.    Where?
10      A.    The British Virgin Islands.
11      Q.    Was there a particular
12 reason the company was incorporated in
13 BVI?
14           MS. DYER:    Objection to
15      the form.
16      Q.    You could answer.
17      A.    There was no particular
18 reason.
19      Q.    I believe you said the
20 purpose of the corporation was to, the
21 purpose of the creation of the company
22 was to purchase aircraft?
23      A.    Uh-huh, yes. Excuse me, I
24 think I said to purchase and sell
25 aircraft.
```

Page 20

```
1              ROBERT LEE
2       Q.    Okay.
3       Are you familiar with a company
4  called CL 850, I believe is the name,
5  CL 850 Aircraft Investment Limited?
6       A.    Yes, I am.
7       Q.    What is your understanding
8  of what that company did or does?
9       A.    The same as CAC.
10      Q.    And do you recall when CL
11 850 was created?
12      A.    At or around the same time.
13      Q.    Was that also created in
14 BVI?
15      A.    I believe so, yes.
16      Q.    Was the purpose of opening
17 -- was the purpose of the creation of
18 this company the same to purchase and
19 sell aircraft?
20      A.    Yes.
21      Q.    At the time that you, would
22 it be fair to state you were also
23 involved in setting up the company?
24      A.    Yes.
25      Q.    So were you directed by
```

Page 21

```
1              ROBERT LEE
2  anybody to take the steps necessary to
3  have these companies created?
4       A.    Yes.
5       Q.    And who was it that directed
6  you to do that?
7       A.    Alex Shnaider.
8       Q.    And at the time these
9  companies were created in 2007, I
10 believe you said you were the CFO of
11 Midland Canada; correct?
12      A.    And of Midland Resources.
13      Q.    And of Midland Resources?
14      A.    Okay.
15      Q.    Can you tell me what did Mr.
16 Shnaider tell you with respect to the
17 creation of these companies --
18 withdrawn.
19      What did Mr. Shnaider tell you
20 with respect to the creation of these
21 companies?
22           MS. DYER:    Objection to
23      the form. You could answer if
24      you can.
25      A.    That he would like me to
```

Page 22

```
 1              ROBERT LEE
 2   incorporate some companies in order to
 3   purchase and sell aircraft.
 4       Q.   Did he tell you any of the
 5   underlying, any other facts with
 6   respect to the purchase or sale of
 7   these aircraft?
 8          MS. DYER:   Objection to
 9       the form but you could answer if
10       you can.
11       A.   He told me some more
12   underlying facts.
13       Q.   What were the underlying
14   facts that he told you with respect to
15   the purchase and sale of aircraft?
16       A.   I don't recall precisely but
17   it would have been that he had a
18   business opportunity to purchase
19   aircraft at reasonable prices based on
20   his relationship with the manufacturer.
21       And that there was an
22   expectation that there would be an
23   opportunity to resell those aircraft at
24   greater prices, at a different risk
25   profile.
```

Page 23

```
 1              ROBERT LEE
 2       Q.   So sitting to my left is a
 3   gentleman, a rather handsome gentleman,
 4   distinguished, do you know him?
 5       A.   I have seen him before.
 6       Q.   You know him as Eduard
 7   Slinin; correct?
 8       A.   Yes.
 9       Q.   And obviously you know he is
10   the plaintiff in this case?
11       A.   I do.
12       Q.   And at the time in 2007 when
13   Mr. Shnaider asked you to create CAC
14   and CL 850, did he mention that
15   Mr. Slinin was in any way involved in
16   what these transactions were intended
17   to be?
18          MS. DYER:   I'm going to
19       object to the form but you could
20       answer.
21       A.   I don't recall whether he
22   mentioned it at that time.  At that
23   time I had not met Mr. Slinin.
24       Q.   By the way do you recall
25   when you first did meet Mr. Slinin?
```

Page 24

```
 1              ROBERT LEE
 2       A.   I believe that it was Alex's
 3   birthday party in 2008.
 4       Q.   Was there a particular
 5   reason that two companies were
 6   established as opposed to simply
 7   establishing one company?
 8       A.   In fact we established three
 9   at the time and it was to ring fence
10   liability, it was to isolate
11   liabilities based on the concept of
12   corporate limited liability.
13       Q.   So you mentioned a third
14   company which was created, would that
15   be at or about the same time?
16       A.   Yes.
17       Q.   Can you tell me what the
18   name of that company was, if you
19   recall?
20       A.   I don't recall it right now
21   but it was similar.  So it was
22   Challenger -- something along those
23   lines.
24       Q.   Did you at any time hold any
25   position in the CAC company?
```

Page 25

```
 1              ROBERT LEE
 2       A.   You mean as an officer of
 3   the company?
 4       Q.   As an officer, director?
 5       A.   No, I didn't.
 6       Q.   And did you at any time hold
 7   any position as an officer, director of
 8   CL 850?
 9       A.   No, I didn't.
10       Q.   Were you ever employed by
11   either of those companies?
12       A.   No, I wasn't.
13       Q.   Do you know who, who was the
14   ultimate -- withdrawn.
15       Do you know who the ultimate
16   beneficial owner of CAC was?
17       A.   Yes, it was Alex Shnaider.
18       Q.   What about CL 850?
19       A.   The same.
20       Q.   Did do you know whether or
21   not Mr. Slinin ever had any interest
22   whatsoever in either CL 850 or CAC?
23          MS. DYER:   Just I don't
24       mean to be a pain, if you could
25       take them one at a time.
```

ROBERT LEE - 09/14/2017                    Pages 26..29

Page 26

ROBERT LEE

1   ROBERT LEE
2   Q.    Do you know whether or not
3   Mr. Slinin ever had any interest in
4   CAC?
5        A.    Can you define what you mean
6   by interest?
7        Q.    Any indicia of ownership or
8   right to share in the profits or
9   losses, any indicia of ownership?
10       A.    No.
11       Q.    Any right to share in the
12   profits or losses?
13       A.    No.
14       Q.    How about with respect to CL
15   850, with respect to Mr. Slinin, any
16   interest in ownership?
17       A.    No.
18       Q.    Any interest in share of the
19   profits or loss?
20       A.    No.
21       Q.    Now did there come a time
22   that CAC or CL 850 entered into a
23   series of contracts for the purchase of
24   various airplanes?
25       A.    They did.

Page 27

ROBERT LEE

1   ROBERT LEE
2        Q.    I got a few contracts.
3             MR. LEBOWITZ:  Let's go
4   off the record for a second.
5             (Off the record.)
6             MR. LEBOWITZ:  Let's mark
7   this as Lee Exhibit 1.
8             (Aircraft purchase
9   agreement marked for
10   identification, Lee Exhibit 1.)
11       Q.    I am going to ask you to
12   take a look at that document and ask
13   you if you recognize what it is.
14       A.    Yes, I recognize what it is.
15       Q.    Can you tell me please what
16   you recognize it to be?
17       A.    It is an aircraft purchase
18   agreement between Challenger Aircraft
19   Company Limited as seller and Olave
20   Equities as buyer.
21       Q.    I'm going to direct your
22   attention in the first instance to page
23   seven of nine.  And ask you if under
24   Challenger Aircraft Corporation, is
25   that your signature?

Page 28

ROBERT LEE

1   ROBERT LEE
2        A.    No, it is not.
3        Q.    Do you know whose signature
4   that is?
5        A.    I do.
6        Q.    Can you tell me whose it is?
7        A.    It is the signature of a
8   co-worker of mine by the name of Daniel
9   Tilis.
10       Q.    And who would have
11   authorized Mr. Tilis to execute this
12   document on behalf of Challenger?
13             MS. DYER:  Objection to
14   the form.
15       Q.    If you know.
16       A.    I don't recall precisely but
17   I expect it was me.
18       Q.    And before having signed
19   this contract, would you have spoken to
20   Mr. Shnaider about it?
21             MS. DYER:  Objection to
22   the form.
23       Q.    You could answer.
24       A.    Before Mr. Tilis signed?
25       Q.    Yes, let me rephrase it.

Page 29

ROBERT LEE

1   ROBERT LEE
2        You authorized Mr. Tilis to
3   execute the agreement?
4        A.    I don't recall precisely but
5   I expect so.
6        Q.    Would it be fair to say
7   Mr. Tilis would not have executed it
8   without authority from either yourself
9   or from some other person?
10       A.    It would be fair.
11       Q.    So I'll ask you before you
12   then authorized Mr. Tilis to execute
13   the agreement, would you have discussed
14   this contract with Mr. Shnaider?
15             MS. DYER:  Objection to
16   the form.  You could answer.
17       A.    It is -- I certainly
18   discussed this contract in general
19   terms with Mr. Shnaider before it was
20   executed.
21       Q.    And prior to the execution
22   of this contract, did you have any
23   discussions with Mr. Slinin?
24       A.    I don't recall.
25       Q.    Do you know, did you --

Page 30

```
 1            ROBERT LEE
 2        MS. DYER:  Let me just
 3    object to the form on the last
 4    question.  Just to the extent it
 5    assumes that he authorized the
 6    execution of the contract.
 7        I am not sure that is
 8    consistent with the record but
 9    please go ahead.
10    Q.   Do you have any knowledge of
11  whom or what Olave Equities Limited is?
12    A.   I do.
13    Q.   Can you tell me what is your
14  understanding of what it is?
15    A.   It is one of a group of
16  other companies that were purchased off
17  the shelf, if you understand the
18  expression in around the same time, in
19  around the same way.
20    Q.   Was Olave a company that
21  when you say purchased off the shelf,
22  was it purchased by you -- when I say
23  you, I mean an entity.  I don't mean
24  you personally but Midland or Midland
25  Canada or Midland Resources?
```

Page 31

```
 1            ROBERT LEE
 2    A.   Yes.  As it was first
 3  ordered, yes.
 4    Q.   And what was the ultimate
 5  disposition of that entity Olave going
 6  to be?
 7        MS. DYER:  Objection to
 8    the form.
 9    Q.   Do you understand my
10  question?
11    A.   When you say disposition,
12  can you define --
13    Q.   Yes, well was it not the
14  intent of Midland or the entity that
15  purchased Olave off the shelf, to use
16  your term, did it assign its shares or
17  ownership interest to a third person?
18        MS. DYER:  Objection to
19    the form.
20    Q.   You can answer.
21    A.   At the time, I'm not certain
22  that was the intention but ultimately
23  it was the intention.
24    Q.   Let's be clear, Challenger
25  was signing a contract with a company
```

Page 32

```
 1            ROBERT LEE
 2  called Olave to purchase an 850 plane
 3  for $26 million, correct, that is what
 4  this contract says?
 5    A.   Correct.
 6    Q.   In the end the ultimate
 7  Challenger was not selling this plane
 8  to a company it bought off the shelf
 9  and expecting to get $26 million from
10  itself or another entity affiliated
11  with Midland; correct?
12        MS. DYER:  Objection.
13    Q.   You could answer.
14    A.   That is correct.
15    Q.   And in the end -- withdrawn.
16    Olave was purchased as a shell
17  company to ultimately be assigned to an
18  end purchaser, is that accurate, you
19  could answer?
20        MR. LEBOWITZ:  You could
21    object.
22        MS. DYER:  Objection to
23    the form.
24    A.   I am not sure.
25        MR. LEBOWITZ:  I didn't
```

Page 33

```
 1            ROBERT LEE
 2  mean to cut you off.
 3        MS. DYER:  No, no, I don't
 4    mean to be difficult and I don't
 5    have a -- but when you say Olave
 6    was purchased as a shell company,
 7    I think if you asked if it was a
 8    shell company.  I think if you
 9    took the word purchase out.
10    Q.   Was Olave a shell company
11  that was ultimately going to be
12  assigned to the end purchaser of the
13  plane?
14    A.   Broadly speaking, yes.  I
15  have a little problem with the word
16  assigned because in everyday parlance
17  if that was correct, meaning it was
18  allocated, there was no, in that case
19  legal assignment of rights.  But there
20  was a transfer of shares as I
21  understand it.
22    Q.   So we are clear and please
23  correct me if my statement is incorrect
24  with your understanding.
25        Ultimately, the ownership
```

Page 34

ROBERT LEE

1     ROBERT LEE
2 interest of Olave would be transferred
3 to the end buyer of the airplane;
4 correct?
5     A.    Correct.
6     Q.    And the end buyer would take
7 title to the airplane in the name of
8 Olave?
9     A.    When you say would, they did
10 not take --
11     Q.    I understand but if the
12 contract, this one as well as all the
13 others if I am correct, we have not
14 gotten there so let me withdraw that.
15     This contract, had it been
16 fulfilled, the anticipation of its
17 execution would have been that the
18 shares of Olave would have been
19 transferred to the end buyer, who would
20 have taken title to the airplane under
21 the Olave name?
22     MS. DYER:    Objection to
23 the form.
24     A.    That, okay, that is correct.
25 It was important to us to use these

Page 35

ROBERT LEE

1     ROBERT LEE
2 contracts to set out terms under which
3 ultimate beneficial transfer of title
4 to the aircraft on delivery would be
5 transferred.
6     And I was informed at the time
7 that the end buyers and the people
8 working on the purchase side didn't
9 have the capabilities to put this kind
10 of structure in place.  But it was a
11 prerequisite of the seller, the terms
12 were set out clearly, well as clearly
13 as possible.  And that is why this
14 structure was adopted.
15     Q.    So are you familiar with the
16 term turn key operation?
17     A.    I have heard it before.
18     Q.    In effect this was
19 essentially a turn key operation, was
20 it not, wasn't that the way it was set
21 up?
22     MS. DYER:    Objection to
23 the form.
24     A.    I am not familiar enough
25 with the term turn key operation.  We

Page 36

ROBERT LEE

1 ROBERT LEE
2 never used that.
3     Q.    That is fine.
4     Do you know who the ultimate end
5 buyer, the individual end buyer of this
6 airplane was supposed to be?
7     A.    I don't --
8     Q.    I'll direct your attention
9 to the last page.
10     A.    I don't know.  I never met
11 Mr. Oleg Sheikhametov.
12     Q.    Do you know who was that
13 introduced Mr. Sheikhametov to this
14 purchase?
15     A.    I believe it was Mr. Slinin.
16     MR. LEBOWITZ:    Okay, let's
17 mark this document as Lee 2.
18     (Aircraft purchase
19 agreement marked for
20 identification, Lee Exhibit 2.)
21     Q.    I am going to ask you to
22 take a look at that and let me know if
23 you recognize what that document is?
24     A.    This is also an aircraft
25 purchase agreement, in this case

Page 37

ROBERT LEE

1 ROBERT LEE
2 between Bombardier, Inc. as seller and
3 CL 850 Aviation Holdings Limited as the
4 buyer.
5     Q.    Now I'm going to ask you to
6 take a look at page seven of nine of
7 this contract and ask you if your
8 signature appears on this page?
9     A.    My signature does appear on
10 this page.
11     Q.    That would be as the
12 authorized signatory for CL 850?
13     A.    Correct.
14     Q.    Do you know who signed this
15 contract on behalf of Bombardier?
16     A.    I don't know.  Although I
17 have a pretty good idea, I can't see
18 his name written here.  It is only his
19 title.
20     Q.    Do you have a recollection
21 of who it was?
22     A.    It is likely to be Frank
23 Ercolanese.
24     Q.    Now would you take a look at
25 the date this contract was signed, you