ROBERT LEE - 09/14/2017        Pages 46..49

Page 46

ROBERT LEE

the form.
Q. You can answer.
A. My understanding is that the $600,000 excess was, my understanding is that Mr. Slinin or his associates dealt, handled the payment, handled the money and retained $300,000 of the excess and passed on $300,000 of the excess at the direction of Midland.
Q. Do you know if that, are you familiar with an account or a company called Yugo?
A. I have heard of it.
Q. Do you know whether or not the $300,000 that was passed from Mr. Slinin to Mr. Shnaider was paid to the Yugo account?
        MS. DYER: Objection to the form.
Q. If you know.
A. I don't know that.
Q. What is your understanding as to why Mr. Slinin retained $300,000 of the excess and then paid $300,000 at

Page 47

ROBERT LEE

Mr. Shnaider's direction to some entity under his control?
        MS. DYER: Objection to the form.
Q. You could answer.
A. Well we don't know that that is what happened but it is my general understanding. And I don't know the reason why, although I also understand that it is likely to be that that is what Mr. Slinin and Mr. Shnaider agreed.
Q. Okay, let's put this aside for a moment. We'll come back to 161 later. I'm going to try to go through this a little more quickly.
        MR. LEBOWITZ: Can we have this marked as 3 and let's have this marked as 4.
        (Aircraft purchase agreement marked for identification, Lee Exhibit 3.)
        (Aircraft purchase agreement marked for

Page 48

ROBERT LEE

identification, Lee Exhibit 4.)
Q. I am going to ask you to please take a look at contracts three and four, let's start with number three and I'll ask you if you recognize what that is.
A. Yes, it is an aircraft purchase agreement between Challenger Aircraft Company and Colley International Market.
Q. For the sake of brevity, would Colley be another off the shelf company purchased by Midland?
        MS. DYER: Objection to the form.
A. It was a similar off the shelf company which initially I ordered off the shelf.
Q. And this was a contract between CAC and Colley and what was CAC going to sell to Colley pursuant to the terms of this agreement?
A. A Challenger aircraft 850 model similarly to the previous

Page 49

ROBERT LEE

Exhibits 1 and 2.
Q. And does this contract have a designation in the lower left hand corner?
A. C 850-0162.
Q. Can you again look at page seven of nine here.
    Do you recognize the signature on behalf of Challenger?
A. Yes, I do.
Q. Can you tell us who that is, please?
A. Daniel Tilis.
Q. I believe if you look at the last page, it is number 158, you will see it appears to be the signature of Mr. Sheikhametov here again on this page?
A. It does.
Q. I'm now going to ask you to take a look at Exhibit number 4. And can you tell me what this is?
A. It is an aircraft purchase agreement between CL 850 Aviation

ROBERT LEE - 09/14/2017              Pages 54..57

Page 54

 1      ROBERT LEE
 2  understanding?
 3      A.   Yes.
 4      Q.   Now, I just want to mark
 5  this for the sake of clarity.
 6          MR. LEBOWITZ:  Can we mark
 7      this as Exhibit 5, please.
 8          (Instrument of transfer
 9  of shares marked for
10  identification, Lee Exhibit 5.)
11      Q.   Do you recognize what that
12  document is?
13      A.   Do I recognize what it is?
14      Q.   Yes, can you tell me what it
15  is?
16      A.   It appears to be an
17  instrument of transfer of shares.
18      Q.   And that would be
19  transferring the shares of Colley
20  International from Midland to
21  Mr. Sheikhametov; correct?
22      A.   Correct.
23      Q.   And would this be the type
24  of document that would be utilized for
25  the transfer of shares of the off the

Page 55

 1      ROBERT LEE
 2  shelf company to the end buyer that we
 3  discussed with respect to the prior
 4  contract?
 5          MS. DYER:  Objection to
 6      the form.
 7      A.   I wasn't involved in this.
 8  I was aware that the intention was to
 9  transfer shares to in this case
10  Mr. Sheikhametov.
11      Q.   So this would be the, what
12  is your understanding then of what this
13  did?
14      A.   It appears to transfer the
15  entire issued share capital of Colley
16  to Mr. Sheikhametov.
17      Q.   So it transferred ownership
18  of your off the shelf company to the
19  end buyer; correct?
20      A.   Correct.
21      Q.   Thank you.
22      Now one other question with
23  respect to three and four.  Contract
24  three is between Challenger and Colley
25  and contract four is between Bombardier

Page 56

 1      ROBERT LEE
 2  and CL 850.
 3      Again two different entities
 4  involved in each contract.  Would that
 5  also had been in error as you testified
 6  in 162?
 7      A.   That is my recollection.
 8      Q.   Do you know was this
 9  contract number 162 ultimately
10  fulfilled?
11          MS. DYER:  Objection to
12      the form.
13      A.   We have two contracts with
14  the same number.
15      Q.   Let's start with the
16  Bombardier contract between CL 850 and
17  Bombardier, was a plane delivered on
18  the contract 162?
19          MS. DYER:  Objection.
20      Q.   Do you know if a plane was
21  delivered?
22          MS. DYER:  Can you refer
23      to it as exhibit number?
24          MR. LEBOWITZ:  I'm sorry.
25      Q.   Exhibit 4, contract 162.

Page 57

 1      ROBERT LEE
 2      A.   Ultimately of the series of
 3  contracts, one Challenger 850
 4  delivered, the others were not.
 5      Q.   Do you know what disposition
 6  was made of any deposit -- withdrawn.
 7      I believe you said it was your
 8  understanding that the $2 million was
 9  delivered to Bombardier pursuant to
10  contract 162.
11      Do you know what this, what
12  disposition was made of that $2
13  million?
14      A.   After the contract was
15  terminated and in accordance with its
16  terms, Bombardier retained the deposit
17  as was their right.
18      Q.   Isn't it correct to state
19  that they credited that deposit to
20  another contract?
21          MS. DYER:  Objection to
22      the form.
23      A.   It is, that was Bombardier's
24  decision it indeed it happened.  It
25  didn't work that way.  It is not the

ROBERT LEE - 09/14/2017  Pages 58..61

Page 58

1  ROBERT LEE
2  same $2 million.
3       MR. LEBOWITZ:  Let's find
4  out.  Can you mark this as number
5  6.
6       (Agreement marked for
7  identification, Lee Exhibit 6.)
8       Q.  If you take a look at that
9  document and when you are finished
10 reading it, please let me know.
11      A.  Okay.
12      Q.  Let's begin on the last
13 page.  Is your signature anywhere on
14 that document?
15      A.  It is.
16      Q.  And that's under CL 850
17 Aviation Holdings?
18      A.  Right.
19      Q.  This agreement was also
20 executed by Mr. Ercolanese of
21 Bombardier; right?
22      A.  Correct.
23      Q.  Tell me what this
24 termination agreement does as you
25 understand it?

Page 59

1  ROBERT LEE
2       A.  It terminates the contract,
3  which we have at Exhibit Lee 4.  So
4  that it's finished.
5       Q.  And it acknowledges that a
6  $2 million payment was received on that
7  contract and transfers it as a credit
8  to contract number one or better
9  described here as contract C 850-0161,
10 which we previously marked as Exhibit
11 2; correct?
12      MS. DYER:  Where are you
13 looking?
14      MR. LEBOWITZ:  I'm looking
15 in the body of the first page.
16      MS. DYER:  Okay.
17      MR. LEBOWITZ:  Third
18 whereas, second to third whereas.
19      A.  Right so --
20      Q.  I'm not asking --
21      MS. DYER:  Let him finish.
22      Q.  I didn't mean to interrupt.
23      A.  It says that the buyer and
24 seller have agreed to terminate the
25 agreement without receipt by seller of

Page 60

1  ROBERT LEE
2  liquidated damage.
3       Q.  Seller meaning Bombardier;
4  correct?
5       A.  Bombardier, and they have
6  agreed to apply the advance payment to
7  a certain Challenger CL 850 161 among
8  other things.
9       Q.  So you would agree with me
10 then or would you agree with me that
11 contract 162, Exhibit 4 was terminated
12 and the $2 million received pursuant to
13 that contract was transferred to
14 contract 161 as a credit against the
15 ultimate purchase price of that plane?
16      A.  Yes.
17      Q.  I didn't mean to suggest it
18 was the same $2 million and whether or
19 not any actual cash was actually
20 transmitted, is really of no
21 consequence.  There was a credit
22 received for this money pursuant to
23 this termination agreement for the
24 ultimate purchase of the airplane under
25 contract 161; correct?

Page 61

1  ROBERT LEE
2       A.  Among the other amendments
3  that were made.
4       Q.  Right.
5       A.  To contract 161.
6       Q.  Thank you.
7       MS. DYER:  Would this be
8  an okay time to take a five
9  minute break?
10      MR. LEBOWITZ:  Sure.
11      (A recess was taken.)
12      Q.  I'll give you another set of
13 contracts to look at.
14      MS. DYER:  And these are?
15      MR. LEBOWITZ:  7 and 8.
16      MS. DYER:  Thank you.
17      (Contract marked for
18 identification, Lee Exhibit 7.)
19      (Contract marked for
20 identification, Lee Exhibit 8.)
21      ==Q.  Mr. Lee, I'll ask you to==
22 ==take a look at, let's begin with the==
23 ==agreement that is marked as number 7,==
24 ==which appears to be a contract between==
25 ==Challenger and an entity called Blue==

ROBERT LEE - 09/14/2017                Pages 62..65

### Page 62

1   ROBERT LEE
2   Industrial Skies.
3       I'll ask you to take a look at
4   that and let me know when you are done.
5       A.   Okay, I'm familiar with this
6   contract.
7       Q.   I'll ask you to take a look
8   at page seven of this agreement and ask
9   you if you recognize your signature
10  anywhere on that page?
11      A.   Yes, it is there for
12  Challenger Aircraft Company.
13      Q.   And the individual who
14  signed on behalf of Blue Skies, do you
15  know who that is?
16      A.   Again I have heard of this
17  individual.  I never met him.  It is
18  Mr. Georgiy Pirumov.
19      Q.   With respect to the entity
20  with whom Challenger entered into this
21  agreement Blue Industrial Skies, would
22  it be correct to state this would be
23  another off the shelf company as you
24  previously testified?
25           MS. DYER:   Objection to

### Page 63

1   ROBERT LEE
2   the form.
3       A.   Yes.
4       Q.   Let's go to article two, if
5   you would with me and can you tell me
6   what is the purchase price of this --
7   excuse me, let's start with what is the
8   airplane, which is the subject of this
9   contract?
10      A.   It is as for the previous
11  contract, it is a Challenger 850
12  executive.
13      Q.   And then can you tell me is
14  this contract, if you look at the lower
15  left hand corner, delineated by a
16  contract number?
17      A.   Yes.
18      Q.   And can you tell me what
19  that is?
20      A.   CL 850-0169.
21      Q.   Let's go to article two
22  regarding the purchase price.
23           Can you tell me what is the
24  price for which this plane was going to
25  be sold by Challenger to Blue

### Page 64

1   ROBERT LEE
2   Industrial Skies?
3       A.   26.55 million US dollars.
4       Q.   And this contract also has a
5   payment schedule pursuant to section
6   2.1?
7       A.   Yes it does.
8       Q.   And if I could summarize, it
9   calls for installment payments of
10  $3,450,000, $19 million and $4,100,000;
11  is that correct?
12      A.   That is correct.
13      Q.   Now I would like you to take
14  a look at Exhibit 8.  And ask you if
15  you would take a look at that and let
16  me know when you are done.  And then
17  I'll ask you a few questions about
18  that.
19      A.   Yes, I'm familiar with this
20  contract.
21      Q.   Okay.  Would you turn to
22  page seven.  Can you tell me does your
23  name appear anywhere on page seven?
24      A.   Yes, it does.
25      Q.   And is that your signature

### Page 65

1   ROBERT LEE
2   under Challenger Aircraft, signing as
3   an authorized signatory?
4       A.   It is.
5       Q.   Is that Mr. Ercolanese
6   signing for Bombardier?
7       A.   It appears to be /STPHRO.
8       Q.   Does this contract bear an
9   identification number in the lower left
10  hand corner?
11      A.   It does, CL 850-0169.
12      Q.   So would the contract that
13  has been marked as 8 be the plane that
14  was to be manufactured by Bombardier
15  and then flipped to Blue Skies
16  Industrial pursuant to Exhibit 7?
17           MS. DYER:   Objection to
18  the form.  You can answer it.
19      A.   The contract reference is a
20  contract reference.  The intention was
21  that these two contracts mirror each
22  other and represent the same aircraft
23  at fruition should it have gone to that
24  setting.
25      Q.   That would be true of the

ROBERT LEE - 09/14/2017                    Pages 122..125

Page 122

ROBERT LEE

    A.    I don't recall but I believe so.
    Q.    Do you recall whether or not Mr. Slinin had a contract for the purchase of the Learjet?
    MS. DYER:  Objection to form.
    Q.    Do you know whether or not Mr. Slinin had a contract for the purchase of a Learjet?
    MS. DYER:  Same objection.
    A.    I understand that a company that he controls by the name, if I recall correctly KSR, Inc. also had a contract to purchase a Learjet.
    Q.    And do you recall whether or not that contract was terminated?
    A.    I believe it was terminated.
    Q.    And do you recall whether or not any deposits paid pursuant to that contract were then credited to this contract 206?
    A.    I believe that the liquidated damages to which Bombardier

Page 123

ROBERT LEE

were entitled, were retained by them and were taken into account in a subsequent renegotiation of a number of positions.
    Q.    And do you recall how much money that was that was credited, if I mentioned the figure of $1 million, would that refresh your recollection?
    A.    It is just the use of the word credited that I was struggling with. I understand that $1 million was taken into account later.
    Q.    I want to show you because I thought I had an additional copy but I don't, I want to show you what has been marked at Mr. -- by the way, do you know an individual by the name of George Rapenda?
    A.    I do know George.
    Q.    I am going to represent to you that he was previously deposed and this was an exhibit identified as Exhibit 8 that was marked at his deposition and I am going to show this

Page 124

ROBERT LEE

to you and ask if this refreshes your recollection with respect to whether or not $1 million was credited from contract 207 --
    MS. DYER:  And you don't have additional copies of that?
    MR. LEBOWITZ:  I apologize. That was marked at Rapenda, so I actually have another copy but --
    MS. DYER:  If you will give me a moment.
    MR. LEBOWITZ:  It is Rapenda eight.
    MS. DYER:  Let me see if I can either look on or find a copy. I would have it. Give me the first bates page number, please.
    Q.    Mr. Lee, if you look at the first page --
    THE WITNESS:  296.
    MS. DYER:  Okay, is there a pending question?

Page 125

ROBERT LEE

    MR. LEBOWITZ:  No, he is looking at the document to refresh his recollection.
    A.    I have looked at it.
    Q.    Now that you looked at it, does that refresh your recollection in regard to whether or not any additional funds besides the $1.3 million was credited to contract 206?
    MS. DYER:  Objection to the form.
    Q.    You could answer.
    A.    Well, I see that under this agreement that KSR Jet agreed and instructed Bombardier to transfer the advance payment, which was that $1 million to the Midland Resources Learjet 60 purchase agreement, which I understand is 0206.
    Q.    Is it your understanding that that did in fact occur?
    A.    Yes.
    Q.    Okay.
    MR. LEBOWITZ:  Okay, this

ROBERT LEE - 09/14/2017          Pages 130..133

Page 130

1  ROBERT LEE
2  850. Now liquidated damages previously
3  10 percent of the purchase price on the
4  new 850 in the event of non performance
5  has changed to 15.5 million.
6      Revised price for this 850 green
7  is $17,643,100, fully covered by the
8  transfer of down payments from other
9  positions."
10     If I am to understand that
11 correct, that means that the price to
12 be paid to Bombardier for this aircraft
13 under 161 has been fully paid for by
14 the transfer of all of the deposits for
15 this contract; is that accurate?
16     A.   It is not entirely accurate
17 because you are only looking for a
18 certain number of contracts.
19     If you look over the e-mail, you
20 will see, on to the second page
21 amended, three Global XRSs, we already
22 discussed this morning one.
23     Q.   Right.
24     A.   So Midland had other
25 positions with Bombardier in addition

Page 131

1  ROBERT LEE
2  to the ones that we have discussed.
3      Q.   So we discussed the one XRS
4  which involved the transfer of, I
5  believe $1.1 million to this contract
6  161.
7      So the other two XRSs are saying
8  they had nothing to do with Mr. Slinin
9  or any of his arrangements?
10     MS. DYER:   Objection to
11 the form.
12     A.   I am saying they were not
13 contracts that we discussed this
14 morning.
15     Q.   Do you know what particular
16 -- withdrawn.
17     Are those other two contracts
18 identified by number like the ones we
19 discussed this morning?
20     A.   They do have numbers but I
21 don't know today here what those
22 numbers are.
23     Q.   So and do we know of those
24 two other contracts, how much of the
25 deposit for those contracts was

Page 132

1  ROBERT LEE
2  transferred to the 161 contract?
3      A.   It is here in the e-mails.
4  It is essentially $2.4 million.
5      Q.   So is it $2.4 million total
6  from those three contracts that is
7  being transferred, I am not trying to
8  trick you --
9      A.   It is $2.4 million per plane
10 because if we go back to the 298 that
11 we discussed earlier, $2.4 million of
12 that plane was discussed, 1.3 on one
13 and 1.1 on another, for a total of 2.4.
14     The two other positions that
15 Midland had, had 2.4 million down on
16 each of them, that were transferred.
17     Q.   All right, so would it be
18 accurate to state that the last line on
19 the first page, one cancelled Global
20 XRS for delivery 2010 refers to the
21 contract we spoke about this morning?
22     MS. DYER:   Objection to
23 the form.
24     A.   I don't believe it does.
25 That is another -- I'll have to check

Page 133

1  ROBERT LEE
2  when we could find the document. But I
3  believe there is another position that
4  we did not discuss this morning and the
5  one that we did discuss this morning is
6  one of the three that are mentioned I
7  believe because the numbers $2.4
8  million stack up.
9      Q.   So were the three Global
10 contracts, I am a little confused,
11 please excuse me. It says in the last
12 sentence there in each case next
13 payment is January 15, 2011 at $3.4
14 million previously $1 million.
15     Is that in respect to the Global
16 XRS contracts, were they still in
17 effect or were they entirely
18 terminated?
19     MS. DYER:   Objection to
20 the form.
21     A.   Can you repeat the question,
22 please?
23     Q.   Yes.
24     The last sentence of that
25 paragraph where you wrote amended, says

ROBERT LEE - 09/14/2017          Pages 174..177

Page 174

1    ROBERT LEE
2    Q.    After you repaid GE, did you
3    substitute in another lender?
4    A.    Not immediately.  There was
5    a credit crisis and earlier access to
6    credit was much more difficult.
7    Q.    Did there come a time when
8    someone did step into GE's shoes so to
9    speak?
10         MS. DYER:   Objection.
11   A.    We entered later financing
12   arrangements.
13   Q.    Was that before these
14   contracts were ultimately settled on
15   the 8100?
16        MS. DYER:   Objection to
17   the form.
18   A.    I believe the next round of
19   financing of new financing we were able
20   to get was after 8100.
21   Q.    After the 8100 was sold?
22   Well I should say after the 8100 was
23   delivered, is a better way to put it?
24   A.    Delivered by whom to whom?
25   Q.    Good point.  Let me go back

Page 175

1    ROBERT LEE
2    and see if I could clarify this.
3         Did GE continue to provide
4    financing for the 8100 up to and
5    including the time that it was
6    delivered to I guess CAC or Midland,
7    whoever the ultimate assigning of the
8    contract was from Bombardier?
9    A.    I don't recall.  It was
10   around that time.
11   Q.    And then there were
12   additional, after Bombardier delivered
13   the 8100, additional work was done to
14   it to change it from a green plane to a
15   finished plane, if you will?
16   A.    That is correct.
17   Q.    And was there anybody
18   providing financing, was there anybody
19   providing financing for that?
20   A.    I don't recall.  There was a
21   new lender that came in and it could
22   have been at that stage or a little
23   later.
24   Q.    Can you tell me, when the
25   plane was being, in the 8100 in

Page 176

1    ROBERT LEE
2    particular, after it was delivered by
3    Bombardier, it was sent to another
4    company to finish it; correct?
5    A.    To complete, yes.
6    Q.    And that was a company
7    called Flying Colors?
8    A.    That is correct, Flying
9    Colors Corp.
10   Q.    Was Flying Colors paid for
11   the work it did to finish the interior
12   and exterior of the planes?
13   A.    Of course.
14   Q.    And they would have been
15   paid on a payment schedule on a
16   contract similar to what we have here;
17   correct?
18        MS. DYER:   Objection to
19   the form.
20   A.    Similar but it is a stage
21   payment.  It has certain milestones are
22   met during the process of installation
23   of the interior of the aircraft and
24   painting and so on, that in a triggers
25   payment.

Page 177

1    ROBERT LEE
2    Q.    Do you have any affiliation
3    with Flying Colors?
4    A.    Flying Colors is a 50
5    percent subsidiary of Midland Group.
6    Q.    Do you do any of the, do you
7    have any involvement as a financial
8    officer with them?
9    A.    I am a director of Flying
10   Colors but I don't have an executive
11   role.
12   Q.    Okay, got you, okay.
13        MR. LEBOWITZ:   Let's mark
14   this as number 30.
15        (E-mails marked for
16   identification, Lee Exhibit 30.)
17   Q.    Have you had an opportunity
18   to look at the e-mails?
19   A.    I have.
20   Q.    Let's start at the one that
21   is at the bottom of the page first,
22   which appears to be from you to Alex
23   Shnaider dated August 6, 2008 and it is
24   subject Slinin planes.
25        Do you recall sending this

ROBERT LEE - 09/14/2017         Pages 178..181

Page 178

1      ROBERT LEE
2  e-mail to Mr. Slinin?
3      A.   Mr. Shnaider.
4      Q.   I'm sorry, Mr. Shnaider.
5      A.   I don't recall sending it
6  but I'm sure I did.
7      Q.   Well it says, "Slinin's
8  people are pushing for assignment of
9  the remaining Bombardier purchase
10 contracts."
11      Can you tell me what it is that
12 Slinin's people were exactly doing when
13 you wrote that?  What do you mean by
14 they were pushing for assignment of
15 contracts?
16     A.   I don't recall precisely but
17 I expect if you remember the Xaman
18 Holdings contract, rights under it were
19 assigned by either CAC or CL 850.  And
20 I expect a similar process was done
21 here for the other contracts.  Although
22 the Xaman assignment took place shortly
23 after this.
24     Q.   And it says, "Profit share
25 on each plane is not fully paid and to

Page 179

1      ROBERT LEE
2  assign would take away control over the
3  process.  I assume no assignment until
4  paid."
5      And then would it be correct to
6  state in the next e-mail above the one
7  I just read, Mr. Shnaider is telling
8  you that that is correct, that there
9  should be no assignment to the contract
10 until whatever payment is due is
11 received and that the profit is split
12 between him and Mr. Slinin?
13          MS. DYER:  Objection to
14      the form.
15     Q.   Is that correct?
16     A.   Midland was responsible for
17 sourcing the aircraft for which it was
18 to be paid.
19     Q.   Yes.
20     A.   And it had not been paid in
21 full and for assigning its rights under
22 those contracts, I understand that Mr.
23 Shnaider is telling me that he would
24 like to be paid in full before Midland
25 gives up its rights and he was asking

Page 180

1      ROBERT LEE
2  me who was calling.
3      Q.   And you told him it was
4  Vadim Zilberman?
5      A.   I did.
6      Q.   I am sorry, you said that
7  Midland was sourcing the plane.  When
8  you said sourcing it, do you mean
9  providing -- you tell me what you mean.
10 I don't want to put words in your
11 mouth.
12     A.   Midland was purchasing,
13 Midland or a Midland subsidiary was
14 purchasing the planes from Bombardier.
15     Q.   And then you say in this
16 e-mail at the bottom to Mr. Shnaider,
17 "Profit share on each plane was not
18 fully paid."
19     On this plane, what was the
20 profit sharing arrangement, do you
21 know?
22     A.   The amounts that were
23 payable to Midland are sent out in one
24 of the earlier exhibits.
25     Q.   In each of these, we don't

Page 181

1      ROBERT LEE
2  have to look, do you recall that 50
3  percent of the, I think you described
4  it as excess profit?
5      A.   No, excess proceeds.
6      Q.   Proceeds.
7          MS. DYER:  Is there is a
8      question?
9          MR. LEBOWITZ:  Yes.
10         MS. DYER:  What is the
11     question?
12     Q.   You are making reference to
13 a prior document and my recollection is
14 that that document as you prepared it
15 showed that 50 percent of the excess
16 proceeds is what would be payable to
17 Mr. Shnaider?
18         MS. DYER:  Objection to
19     the form.
20     A.   There is a description which
21 I think is gross profit and there is
22 commissions and then there is a I think
23 net profit is the way to describe, that
24 is the number of which 50 percent of
25 which is the amount payable to Midland.