# Exhibit 1

to Eduard Slinin's Opposition to
Alex Shnaider's Motions in Limine

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

EDUARD SLININ,

CASE NO. 1:15-cv-09674 (RJS)

Plaintiff,

v.

ALEX SHNAIDER,

Defendant.

## DIRECT TESTIMONY OF ALEX SHNAIDER

I, ALEX SHNAIDER, affirm the following to be true under penalties of perjury and provide this witness statement, based on my own personal knowledge, as my direct testimony in this action:

### A.  Introductory Statement

1.  I am the named defendant in this action.

2.  Plaintiff Eduard Slinin claims that he and I entered into a formal partnership under New York law to sell Bombardier aircraft to buyers he identified in Russia. That is not true.

3.  We are not partners. At no time did I enter into partnership with Mr. Slinin. I never stated or signaled an intent to form such a partnership. Nothing I said or did could reasonably be construed to have formed any partnership with him. Moreover, Mr. Slinin never said anything to me, either explicitly or implicitly, to communicate his desire or intent to form a partnership.

4.  Nor did we operate as a partnership. We did not share expenses or exercise reciprocal supervision over our respective business activities concerning the aircraft purchase

1

and sale contracts at issue. Nor did we report on our activities to each other, consolidate expenses, or prepare the type of financial statements, tax forms and returns or other governmental filings as a business partnership would do. With respect to the aircraft contracts at issue, I acted through my company Midland Resources Holding, Ltd. ("Midland"), part of the Midland group of companies that are currently winding-down. I owned Midland in equal shares with my former business partner, Eduard Shyfrin – not Mr. Slinin. At all times, Midland alone was exposed to legal and economic risk of loss related to the aircraft sales – not Mr. Slinin.

5.     The business agreement Midland had with Mr. Slinin was for sales commission: I agreed that Midland would split equally with him any profits generated by the sale of a new Bombardier aircraft from one of Midland's companies as seller to any buyer procured by Mr. Slinin. If he failed to find a buyer who completed the transaction and purchased finished aircraft, he was entitled to no share of any profits or any other payment. Likewise, he was not entitled to any payment for Bombardier aircraft sales that Midland companies made without his involvement.

6.     None of Mr. Slinin's buyers completed the transaction for any aircraft. Each of them defaulted and failed to pay the full contract price for the planes, forfeiting substantial deposits. Moreover, after those defaults, Mr. Slinin executed a Promissory Note (Exhibit D-1, and discussed below), in which he expressly agreed that he was not entitled to any further payment from me or Midland related to the aircraft contracts at issue in this action. For those reasons, among others, Mr. Slinin is not entitled to any commission or other payment related to any Bombardier aircraft transaction.

## B.    Personal Background

7.      I am a Canadian citizen.  My family emigrated from Russia in 1972 to Israel, and then moved to Canada in 1982, when I was 13 years old.  I do not read or write Russian with any proficiency, although I do speak Russian, which is my third language.  I was educated in Canadian schools and am fluent in English, which is my primary language.

8.      I hold a BA Honours degree in Economics from York University, Toronto, completed in 1992.

9.      After schooling, I have worked and owned businesses in various fields, including steel trading and manufacturing, mining, shipping (bulk carrier vessels), retail, real estate development and aircraft completion and trading.

10.     One of my principal businesses is Midland.  As noted above, my business partner in Midland was Eduard Shyfrin.

11.     Through Midland, I developed a good business relationship with Bombardier, buying and selling newly manufactured aircraft or purchase contracts for such aircraft.  I first started transacting in Bombardier aircraft in 2001, and have been involved in over 30 such transactions over the years.

12.     Based on my interest in private planes, Midland purchased a minority (49%) indirect interest in Flying Colours Corp., a company that finishes "green" planes by installing the interior and customized exterior details, like painting and logos.  A "green" plane is one that has been assembled with engines, mechanical controls and avionics, to the point that it is operational and capable of flight, but has no finished interior, like passenger seating, kitchens or storage bins, in-flight entertainment, lounges, sleeping quarters, etc.

## C.    Prior Business Dealings with Eduard Slinin

13.    I met Mr. Slinin through a mutual social acquaintance and befriended him sometime around 2004 or so. Mr. Slinin and I discussed our various businesses and, from time to time, shared investment ideas.

14.    In 2005 or so, Mr. Slinin asked me whether he could invest in a real estate project in Odessa, Ukraine operated by Midland and Igor Avramenko. Mr. Slinin mentioned to me that he and his family used to live in Odessa and he liked the location and potential of the property. Midland and Mr. Avramenko agreed to permit Mr. Slinin to co-invest in that development project. Mr. Slinin was not a "partner" in that transaction. He was a minority investor. He had no operational or even supervisory role. Midland and Mr. Avramenko later bought him out in or around 2006. He made a significant profit on his investment.

## D.    Purchase and Sale Agreements for the Bombardier Aircraft

15.    For a number of years before 2007, Mr. Slinin had told me about his interest in buying a plane to use in the United States. He told me he wanted to get into the business of chartering aircraft in the United States as part of his Executive Transportation Services business. In these discussions, I told him about Midland's experiences buying and selling Bombardier private jets and that Midland had such good will with Bombardier that I was able to get favorable pricing on new jets. Earlier, I believe around 2003, I had introduced one of Mr. Slinin's business partners in Russia, Alexander Vershowski, to George Rependa.

16.    At the time, Mr. Rependa was an independent aircraft broker and consultant. I met Mr. Rependa around 2001. Since that time, I have worked with Mr. Rependa exclusively as Midland's agent and representative in buying and selling aircraft. Based on my involvement of Mr. Rependa in Midland's extensive dealings with Bombardier over the years, he was able to

form a close business relationship with Bombardier executives. I understand from Mr. Rependa, that he was hired by Bombardier a few years ago and currently works as a senior sales representative for North America sales.

17. In the summer of 2007, Mr. Slinin told me he had been contacted by buyers in Russia who were interested in purchasing a Bombardier jet. I first referred him to Mr. Rependa. Mr. Slinin later told me that, after discussing it with Mr. Rependa, he was unable to deal directly with Bombardier for some reason. He asked whether I could assist him.

18. I asked Mr. Slinin what prices had been quoted to his Russian buyers. Based on what Mr. Slinin told me, the purchase price those buyers had been quoted was significantly higher than the purchase price that I could obtain from Bombardier.

19. I learned at some point that Bombardier had an exclusive sales agent in Russia. Because of a high commission charged by that sales agent, the purchase price for new Bombardier planes in Russia was higher than price quotes in North America. Because Midland dealt directly with Bombardier's head office, Midland could usually obtain favorable pricing since no third-party sales agents and attendant commissions were involved. In addition, because I was based in Canada and Midland was a long-standing customer of Bombardier's head office, Midland was able to negotiate a better price than would generally be available to buyers based in Russia buying through the Russian sales agent.

20. I discussed with Mr. Slinin the idea that we could profit from this arbitrage if we could buy the aircraft from Bombardier and simultaneously sell it to the ultimate buyer in Russia.

### D.1. Commission Agreement

21. Despite having some doubts as to whether Mr. Slinin would be able to procure committed, qualified buyers, I told Mr. Slinin I was willing to proceed. Mr. Slinin and I agreed

that if he found able and willing buyers who were willing to pay market or close to market rates in Russia, I would work to obtain the aircraft for a lower price using Midland's good will with Bombardier and that he and Midland would split the difference. Mr. Slinin agreed. It was as simple as that.

22.     There was no discussion at that time, or at any other time, about forming a partnership or documenting a more detailed and specific commercial arrangement. This agreement was nothing more than an *ad hoc* sales commission agreement. Mr. Slinin had no best-efforts obligations or any other obligation to obtain buyers or to invest any capital in sales or marketing efforts in Russia or anywhere else. He had no obligation to do anything, much less expend any of his own resources or funds. But if he did obtain a buyer who was willing to pay close to the prevailing prices in Russia for a Bombardier plane, I would use my good will with Bombardier to obtain the plane at a lower purchase price so that Mr. Slinin and I could profit from the difference.

23.     Starting in in the summer of 2007, Mr. Slinin told me he had a buyer for two planes, Challenger 850s. In my experience, and based on my consultation with Mr. Rependa, I understood that Bombardier would sell these planes to me, during that time, for approximately $25 million and potentially less. I understood from Mr. Slinin that the prevailing prices in Russia for the same plane were significantly higher, somewhere in the neighborhood of $26 to 28 million. Based on that price discrepancy, Mr. Slinin and I discussed back-to-back purchase and sale contracts, through which a Midland company would buy the plane from Bombardier for $25 million, which would then be sold through a corresponding contract from the Midland company to Mr. Slinin's buyer for $26 million. The difference of $1 million would be split between Midland and Mr. Slinin.

24. In July 2007, I arranged a dinner meeting at Milos, a restaurant in New York City, attended by me, Mr. Slinin, George Rependa, and Jahid Fazal-Kamir, head of Bombardier Global Sales. By this time, I had had extensive dealings with Mr. Fazal-Karim. The New York meeting was originally arranged because Mr. Fazal-Karim told me he was in New York on other business and he agreed to meet with me and George Rependa to discuss the market and new business. I asked Slinin to join so he could hear first-hand information from Bombardier about the current market. I wanted him to hear from Mr. Fazal-Karim information about the pricing and the difficulties in aircraft allocations at that time, especially in light of the then-booming market, so that he could relay to his buyers the benefit they would gain in purchasing planes through Midland.

25. During that dinner we exchanged some pricing ideas for the Challenger 850 and the Global XRS, and both I (on behalf of Midland) and Mr. Slinin agreed to buy one Lear jet each. I understood from that meeting that Mr. Slinin wanted to purchase a Lear jet for his own use. My intent was that Midland would buy a Lear jet on speculation in order to sell it later. In this meeting Mr. Fazal-Karim agreed that Bombardier/Lear would accept a $1 million deposit for each Lear jet, which was less than what Bombardier/Lear normally required.

26. At this meeting, in describing the general market conditions, Mr. Fazal-Karim made clear that prices for aircraft available for prompt delivery were expected to continue to increase.

27. At this dinner meeting, Mr. Slinin was quiet. He generally did not participate in most of the discussion, except he did ask questions about the Lear jet and he agreed to purchase one.

### D.2    **Slinin's Broker Kiril**

28.     While Mr. Slinin and I had agreed that we would split equally any net profits from completed sales, Mr. Slinin later asked for an increased share of the profit in order to pay a third party "broker" by the name of "Kiril." Mr. Slinin told me that Kiril is a "friend" of the buyers in Russia and that he hired Kiril to supervise the buyers to ensure all the installment payments under the aircraft contracts were timely and regularly paid. He specifically requested, and I agreed, that Kiril would be paid out of the gross payments from the buyer. Whatever margin was left after Kiril was paid was the amount to be split between Midland and Mr. Slinin.

29.     I have no knowledge whether Kiril was actually paid. After the buyers defaulted on their contracts, and at my request, Mr. Slinin connected me by telephone to a man who said he was Kiril. That person told me he refused to refund his fees and that he was broke. Mr. Slinin has never shown any proof, and I am unaware that any has been produced in this litigation, that any payments were ever in fact made to Kiril.

### D.3    **Purchase Contracts for Seven Aircraft**

30.     I delegated the details of forming the entities to effect the purchases and sales and the drafting and execution of the necessary contracts to Rob Lee, the CFO of Midland. I was not involved in drafting or reviewing these documents at the time. I have reviewed the contracts that are Exhibits D-3 through D-8 and D-11. These are consistent with my recollection of the sequence of events and my recollection that Mr. Slinin arranged for two buyers in Russia, Oleg Sheikhametov, who agreed to contract for two Challenger 850s (contract numbers 161 and 162) and Georgy Pirumov, who agreed to contract for four Challenger 850s and one Global XRS (contract numbers 169, 170, 171, 172 and GXRS 298).

31.     As these documents show, Rob Lee created special purpose vehicles (SPVs) at my direction that were owned by Midland and, as to which, Midland was the ultimate owner and beneficiary. These companies are Challenger Aircraft Company Ltd. ("CAC"), CL 850 Aviation Holdings Ltd. ("CL850") and CL 850 Aircraft Investments Ltd. Midland used these entities to contract with Bombardier for the aircraft at issue.

32.     At or near the time that each contract with Bombardier was executed, Midland's SPV also contracted with the buyer or an entity that was owned ultimately by the buyer in question. So, for example, on contract 162, which corresponds to one of the Challenger 850s ordered by Mr. Sheikhametov, CL850 entered into a purchase contract with Bombardier (Exhibit D-4A) and simultaneously CAC entered into a corresponding (or "mirror") contract (Exhibit D-4) to sell the aircraft to the end buyer, in this case an entity called Colley International Marketing SA. That buyer entity was created by Rob Lee at my direction and the shares were transferred to the buyer, as reflected in Exhibit D-4B. Comparison of the Bombardier sale contract (D-4A), with a total purchase price of $25 million, with the CAC sale contract (D-4), with a total purchase price of $26 million, shows the "spread" of $1 million. Upon completion, and after accounting for any commissions, including supposed payments to Kiril, Mr. Slinin and I would split whatever was left of the $1 million.

33.     My understanding of the spreads, including allocations for Kiril is as follows. On the two planes purchased by Mr. Sheikhametov, the total profit split was expected to be $575,000 to Slinin/Kiril and $425,000 to me, with an initial deposit split of $375,000 to Slinin/Kiril and $225,000 to me. On the four Challenger 850s purchased by Pirumov, the total profit split as to each plane was expected to be $1.25 million to Slinin/Kiril and $750,000 to me, with the initial deposit split of $975,000 to Slinin/Kiril and $475,000 to me. With respect to the

Global XRS purchased by Pirumov, the total profit split was expected to be $4.55 million to Slinin/Kiril and $2.95 million to me, with an initial deposit split of $2.35 million to Slinin/Kiril and $750,000 to me.

### D.4    Initial Contract Deposits

34.    Under each of the contracts for the seven aircraft, Bombardier required initial nonrefundable deposits. For many of the contracts, a portion of the nonrefundable deposit was paid at the signing of a letter of intent (usually $250,000), and the remainder was sent at or shortly after the two mirror contracts were executed by the parties. In addition, Midland required a higher initial nonrefundable deposit from the end buyers than the deposit that Bombardier required from the Midland companies CAC and CL850.

35.    Thus, for example, on contract 161, Bombardier required a $2 million deposit, which was paid directly to Bombardier. Midland's company CAC, however, required a nonrefundable deposit of $2.6 million from the buyer (in this example, Mr. Sheikhametov). The difference, $600,000, was divided between me, Mr. Slinin and Mr. Slinin's broker "Kiril," with $150,000 supposedly paid by Mr. Slinin to Kiril and the balance ($450,000) divided between me and Mr. Slinin ($225,000 each). See Exhibits D-3A and D-3.

### D.5    Downstream "Flip"

36.    Shortly after the initial deposits were paid on these seven aircraft, Mr. Slinin told me that his two buyers, Mr. Pirumov and Mr. Sheikhametov, were going to try to "flip" at least some of these planes to other third-party buyers for an additional profit. Based on what he said, I understood that he had some other business arrangement with one or both of these buyers to "flip" one or more of these planes. I was unaware of this plan by Mr. Slinin when the deposits

10

were paid, and I had no involvement with any deal he made with his buyers for resale of the planes.

37.     In fact, I never had any direct dealings with Mr. Slinin's buyers. I did not ask Mr. Slinin any questions about any arrangement he had with them. To my thinking, that was between him and his buyers and had nothing to do with me.

### D.6     Lear Contracts

38.     In December 2007, both Mr. Slinin and I separately contracted to buy Lear 60 jets from Lear, a Bombardier subsidiary. Again, I was not involved in the paperwork, but Exhibits D-9 and D-10 are consistent with what I remember about the agreements to purchase the Lear 60 jets.

39.     Lear/Bombardier required nonrefundable deposits for each of the Lear 60 jets. I arranged to pay a $1 million deposit on the Lear jet that I contracted for (contract number 206). And to my knowledge, Mr. Slinin paid a $1 million deposit on his Lear jet contract (number 207).

### E.     The Promissory Note and Personal Guaranty

### E.1     Slinin's Failure to Split Certain Deposits

40.     Problems with the Russian buyers arranged by Mr. Slinin occurred from the outset. At the time initial deposits were due on the Challenger 850s ordered by Mr. Pirumov, Mr. Slinin was late in obtaining the deposit amounts to pay to Bombardier. He also failed to give me a straight answer on what the "split" amount was that was owed to me on the initial deposits as of October 30, 2007, after factoring in amounts he supposedly wanted to pay his broker, Kiril.

41.     While I don't remember all of these email or text messages, the communications reflected in Exhibit D-20 at pp. P000411, 415 and 430, are consistent with my independent

recollection. As this exhibit confirms, and as I recall, Mr. Slinin admitted that he owed Midland an additional $450,000 from the initial deposits or from the disposition of some of these contracts. See Exhibit D-20 at P000415. He never paid it. It was later addressed in the Promissory Note, discussed below.

### E.2    2008 Financial Crisis

42.     The financial crisis of 2008 disrupted the contracts for the seven aircraft. By the fall of 2008, both of Mr. Slinin's buyers indicated they would not honor their purchase agreements with CAC. I told Mr. Slinin to tell the buyers that they would forfeit their nonrefundable deposits. Under the contracts between the Midland companies and Bombardier, the deposits to Bombardier were nonrefundable and would be forfeited to Bombardier. The Bombardier contracts also had liquidated damages provisions, which exposed Midland (through CAC and CL850) to potential liability to Bombardier in an amount greater than the nonrefundable deposits.

43.     An example of the liquidated damages provision is Section 9.5 of Exhibit D-3A. The amount provided for in that contract as liquidated damages, $2.3 million, is greater than the $2 million deposit on that contract.

44.     I negotiated on behalf of Midland with Bombardier to try to work out a solution to the cancelled contracts. In those discussions, Bombardier eventually agreed to extend a credit to Midland based on the forfeited deposits so long as Midland agreed to buy additional planes, some now and others later. I eventually got Bombardier to agree to apply the credits to two planes.

### E.3  Slinin's Return of Nonrefundable Deposits

45.     In the summer of 2008, Mr. Slinin told me that he felt compelled to take over at least some of his buyers' positions – meaning he wanted to refund them their nonrefundable deposits on at least some of the aircraft contracts so that he would become the ultimate buyer instead of Mr. Pirumov and Mr. Sheikhametov. He told me that he had decided to take these "positions" and to try to sell them at a profit. This was entirely his own decision and I had no involvement in it. Nor did I take part in any of his dealings or negotiations with the buyers in Russia or his efforts to obtain new buyers for these contract positions.

46.     He informed me that he purchased one of Mr. Pirumov's contracts, contract number 169, for a Challenger 850. Mr. Slinin asked me to help him sell the position. I told him I would ask around. I eventually arranged for an acquaintance to buy it, although he eventually defaulted as well (as discussed below).

47.     In December 2008, right before Christmas, Mr. Slinin told me that he was "desperate" and needed to refund Mr. Sheikhametov for his deposits on the two Challenger 850s that he had contracted to buy (contract numbers 161 and 162). Because he did not have the cash at hand, $4 million, to pay Mr. Sheikhametov, he asked to borrow that amount from me. He told me he needed this as a "huge favor." I responded by telling him that the initial deposits are nonrefundable and neither he nor Midland have any obligation to return any deposits to Mr. Sheikhametov or anyone else.

48.     Mr. Slinin was very emotional. He told me he had made promises to Mr. Sheikhametov that he was not able to keep. He told me he had promised Mr. Sheikhametov that the planes would be worth significantly more than the contract price that Mr. Sheikhametov had

agreed to pay CAC and that Mr. Slinin would arrange for a further sale of one or both of the planes after delivery to Mr. Sheikhametov for substantial profit.

### E.4    **$4 Million Loan and Promissory Note**

49.    I reluctantly agreed to loan Mr. Slinin the $4 million to pay Mr. Sheikhametov – only because Mr. Slinin emotionally pleaded desperation and appealed to our friendship. I agreed to do this, despite the looming financial crisis and my own need for liquidity to weather the financial meltdown. But I told Mr. Slinin that I would not loan the money without a formal written loan agreement and personal guarantees. In fact, I asked that he personally guarantee the loan and that his wife and limo company, All-City Funding, also sign guarantees. Because he claimed his wife would divorce him and that he was not a majority owner of All-City Funding, I relented and agreed to accept just his personal guarantee on the loan.

50.    In the course of discussing this loan, Mr. Slinin suggested to me that I should be able to convince Bombardier to give Midland some sort of credit on the forfeited, nonrefundable deposits and, in that way, salvage some of the seven contracts or Lear contracts. I told him that Bombardier had no obligation to do so and, given the state of the financial markets, that was far from certain.

51.    The Promissory Note and personal guaranty are Exhibit D-1 and D-2. These documents were prepared by U.S. lawyers that Midland retained. Both were executed by Mr. Slinin in late December 2008, which dates are reflected in the documents. These documents reflect both that I loaned $4 million to Mr. Slinin and that he also was already indebted to me for $450,000, as noted above. Exhibit D-1, at p. 1, ¶ 2.

52.    While I left most of the terms to the lawyers, Mr. Slinin and I negotiated, among other things, what personal guarantees were required, what collateral must be pledged by Mr.

Slinin and the interest rate. Based on the discussions between me and Mr. Slinin, he agreed to pledge the two contracts he still owned at that time (contract 169 and 207) as collateral, and we agreed to a 12% interest rate.

53.     In addition, I was adamant that the document make clear that Mr. Slinin would have to repay the principal of $4.45 million, plus interest, at the maturity date, December 29, 2011; or, alternatively, if Bombardier did convert some of the forfeited deposits into credits that Midland could use, then Midland would apply the value of those credits, in my discretion, to reduce the interest and/or principal amounts due under the Promissory Note. I made it clear to Mr. Slinin in our discussions that, given the uncertainties and Midland's exposure to liability to Bombardier on each of the seven Bombardier contracts, he would not be entitled to any further payment from Midland based on any "credits" that Midland managed to get from Bombardier in excess of the loan amount (principal and then-accrued interest).

54.     This agreement between Mr. Slinin and Midland is reflected in the plain terms of the Promissory Note:

> . . . the Lender agrees to apply to the unpaid balance of the Advance Principal Sum and any accrued and unpaid interest thereon, in such order as the Lender shall determine, the net amount (after deduction of any sales or similar taxes relating to, and any costs of completing, the Contract Disposition), of . . . (b) any credit given by Bombardier Inc., as consideration for any Contract Disposition, in reduction of the obligations of Lender or any affiliate of the lender under any other transaction between the Lender or any such affiliate and Bombardier Inc. but only as and when such credit is applied by Bombardier Inc. to such other obligations. **Any net proceeds by the Lender from the Contract Disposition in excess of the outstanding Advance Principal Sum and any accrued and unpaid interest thereon shall be retained by the Lender** . . .

Exhibit D-1, at p. 2 (bottom of Section entitled, "Payment from Contract Disposition Proceeds") (emphasis added).

55.     After Midland made this loan in December 2008, Mr. Slinin never repaid it. Not a cent. I was, however, able to work out "credits" with Bombardier (*i.e.*, related to the Contract Disposition specified in the Promissory Note). On behalf of Midland, I considered that as an offset against the amounts owed pursuant to the Promissory Note.

56.     Mr. Slinin never offered to assist with any negotiations with Bombardier or to shoulder any share of the exposure and liability that Midland had with Bombardier after Mr. Slinin's buyers defaulted. Nor did I expect him to. Since we were not partners in a partnership, I did not expect him to offer to share in Midland's potential liabilities due to the defaulted contracts related to his buyers. Because he never even offered to help – much less share in any expenses or potential liability – it is clear to me that he, too, never intended any partnership.

### E.5     Disposition of the Defaulted Contracts

57.     On behalf of Midland, I was able to reach an agreement with Bombardier in which Midland agreed to buy one Challenger 850 (pursuant to contract 161) and one Lear 60 (pursuant to contract 206). The other defaulted contracts were terminated. Under the agreement I reached with Bombardier, Bombardier applied the forfeited deposits related to all but one of the contracts associated with Mr. Slinin toward the purchase price on contracts 161 and 206. One of the Bombardier contracts for a Challenger 850 originally sold to Mr. Pirumov (contract 172) had been assigned from Midland/CAC directly to the third-party buyer, Xaman Holdings. Because that contract was no longer a responsibility of Midland, no credit from the forfeited deposit on that contract was applied to contracts 161 and 206 and Bombardier did not seek any additional liquidated damages on that contract from CAC or Midland.

58.     In addition to credits based on the plane contracts associated with Mr. Slinin, Bombardier also gave Midland credit for three other contracts that had nothing to do with Mr.

Slinin. These other three contracts were planes that I was buying with my business partner in Midland, Eduard Shyfrin.

59.     In exchange for these credits, Midland agreed with Bombardier to complete the payments on these two planes and agreed to substantially increased liquidated damages provisions on both contract 161 and 206.

60.     Contract 161 was amended so that any default, would result in liquidated damages and penalties in the amount of $15.5 million. This is reflected in Exhibit D-3C (Amend. No. 1, contract 161, dated July 2, 2009, at P000087). This is a substantial increase from the original liquidated damage amount of $2.3 million, discussed above (see Exhibit D-3, § 9.5).

61.     Likewise Contract 207 was amended so that the liquidated damages clause was increased from approximately $1.2 million (10% of the original contract price) to $8.7 million. This is reflected in Exhibit D-10B, § 5.1, and "Intervention" on p. 3 (July 2, 2009 KSR Termination Agreement). The original liquidated damages clause is reflected in Exhibit D-10.

62.     While Mr. Slinin had made an initial $1 million nonrefundable deposit on his Lear jet, he failed to make subsequent payments on that contract and wanted to terminate it because the cost of the contract was significantly more than the current market value of the finished Lear jet. As part of my global resolution of these contracts, Mr. Slinin agreed that his $1 million deposit on his cancelled contract (number 207) could be used as a credit on the contract for the Midland Lear jet (number 206), in which Midland agreed to a substantially greater liability in the form of liquidated damages upon any default. This arrangement is reflected in Exhibit D-10B.

63.     In making this disposition of Mr. Slinin's Lear contract, he avoided liquidated damages and capped his total potential loss on that contract at the amount of his forfeited deposit ($1 million). I told him that, if Midland was able to sell the Lear jet (contract 206) at a profit

(net of all expenses), we will share in that upside, if any. In these discussions, Mr. Slinin never said he wanted to complete performance under his contract 207 or that he had the financial means to do so. Nor did I promise or agree to give him anything; just as he was not obligated to bear any costs or potential liabilities on the remaining Lear contract (number 206).

64.     Finally, I also arranged for another third-party to buy Mr. Slinin's position in contract 169, which I mentioned above. That buyer, Evgeni Vasiliev (an acquaintance of mine) using an entity called Woren, Inc., agreed to buy that contract in July 2008 and agreed to make two scheduled payments to Mr. Slinin. The first payment was agreed to be $2 million, with a second payment of $2.3 million. I understand that the first payment was made. After that payment, however, that buyer, too, defaulted on that contract. Mr. Slinin never shared or offered to share any part of the $2 million he received, or to contribute it toward the remaining contracts. Nor did I expect him to do so since he was not in any partnership with me with respect to any of these planes or contract positions.

## F.     **Completed Challenger 850 and LearJet**

65.     As part of Midland's post-2008 deal with Bombardier, Midland (through CAC and CL850) agreed to pay the remaining payments on contracts 161 and 206, and became the ultimate buyer of these two planes from Bombardier. In addition, Bombardier agreed to alter contract 161 so that it required delivery of a "green" Challenger 850 at the purchase price of $17.5 million. The price to Midland for the Learjet was adjusted to a total of approximately $10.75 million. Once the green Challenger 850 was delivered in 2011, I arranged for Flying Colours to finish the interior and exterior details, for an additional cost of $4.8 million paid by Midland.

66.     The financial documents for these two planes, including costs of insurance, maintenance, interest and registration were maintained by Rob Lee. I do not recall seeing these documents at the time, but the documents produced by Rob Lee in this litigation are consistent with my recollection.

67.     Eventually, I arranged a buyer for the Challenger 850. The sale price was negotiated by Mr. Rependa and the buyer, Start Soar Limited, which was based in China. The sale contract between one of my companies, 2023225 Ontario, and Start Soar is Exhibit D-3D. Mr. Slinin had nothing to do with this ultimate buyer for the plane associated with contract 161.

68.     Midland was unable to sell the Learjet (contract 206). Despite my efforts and efforts by Mr. Rependa, we were unable to locate a buyer willing to pay any price for the Lear. I was told by Mr. Slinin that he, too, was trying to locate a buyer. Whether or not that is true, he never identified anyone willing to buy it.

## G.      The Russian Investigation

69.     In early 2009, Mr. Slinin told me that one of his buyers, Mr. Pirumov, had contacted Russian law enforcement agencies and made a criminal complaint against him. He also told me that I was an additional target of that criminal investigation, even though I had never met or talked to Mr. Pirumov. To my understanding, Mr. Pirumov told Russian law enforcement that Mr. Slinin had defrauded him and that, despite Mr. Slinin's representations to the contrary, no deposit had actually been made on Bombardier aircraft under the contracts related to Mr. Pirumov.

70.     Mr. Slinin asked me whether I had Russian legal counsel in Moscow who could handle the matter. I contacted Igor Kopenkin, who is my legal counsel based in Moscow. I also referred Mr. Slinin to Mr. Kopenkin. To my knowledge, Mr. Kopenkin represented both me and

Mr. Slinin in connection with this Russian investigation. I paid all of Mr. Kopenkin's fees. I am unaware of any legal invoices sent by Mr. Kopenkin to Mr. Slinin or any payments by Mr. Slinin to Mr. Kopenkin.

71.     I eventually traveled to Moscow to be interviewed by a Russian investigator, who was investigating Mr. Pirumov's claims. I later signed a written statement to the authorities, written in Russian, which I understood confirmed the main details of my interview. The investigator read to me the statement in Russian and I signed the Russian statement. I never saw any English translation of the document. No copy was provided to me, or to my counsel, so far as I know.

72.     To my knowledge, Rob Lee and George Rependa also went to Moscow to provide a statement. The gist of my statement and those of Mr. Lee and Mr. Rependa was that deposits were actually paid to Bombardier in connection with Mr. Pirumov's contracts.

73.     It is my understanding that the investigation did not close in 2012 and even until today has not yet been closed, although the Russian authorities are not actively pursuing it, so far as I can tell. I have not seen any official document closing the investigation.

**H.     The 2012 Settlement Agreement**

74.     At the end of 2011, Mr. Slinin, through his accountant, Vadim Zilberman, made a demand for payment of $6.75 million. To my understanding, he actually made a couple of different contradictory demands, first demanding $3.5 million, which was later increased to $6.75 million.

75.     To my mind, Mr. Slinin had no legal right to claim any money from me or Midland. Aside from the Promissory Note, the only agreement I or Midland had with Mr. Slinin was to pay him a commission calculated as an equal share of net profits from the completion of

the sale of aircraft to buyers that Mr. Slinin arranged. None of the Midland companies ever sold any finished aircraft to any buyer identified by Mr. Slinin. In fact, every buyer that Mr. Slinin introduced (Mr. Pirumov and Mr. Sheikhametov) defaulted and their contracts – far from being fully performed – were canceled years ago in 2008 and 2009. Nor did he find a buyer for the two remaining aircraft.

76.     With respect to the Lear jet (contract 206), that plane was not sold to any buyer. Although Bombardier took the aircraft back and extended Midland a credit of $9.5 million in return, that credit was contingent upon Midland buying an additional three Bombardier aircraft with the attendant market risks. Moreover, taking into account the expenses of carrying that Lear jet for the amount of time that we tried to sell it, there was no profit in that disposition of that plane.

77.     Nevertheless, I tried to compromise with Mr. Slinin. Recognizing that he had forfeited some of his funds related to contract 207 (and perhaps contract 169), I authorized Rob Lee to propose refunding him some of that money, after taking into account offsets set forth in the Promissory Note. Based on that calculation Midland offered to pay him $243,409.47, so long as he provided a full general release. The terms of this offer are set forth in Exhibits D-12 and D-14.

78.     Mr. Slinin rejected that offer.

79.     In February 2012, I attended a meeting in Toronto with Mr. Slinin to try to resolve the matter at the offices of a mutual friend, Simon Kronenfeld. Present at that meeting were me, Mr. Slinin, Michael Sapir and Mr. Kronenfeld. At that meeting we reached an oral agreement to settle all of Mr. Slinin's purported claims. The terms were simple: I agreed to pay Mr. Slinin $500,000 if and only if, within two months, he obtained written confirmation that the

Russian investigation was closed; if he failed to get that confirmation within that period, Mr. Slinin agreed he was entitled to nothing from me or Midland. At Mr. Slinin's request, I later agreed to extend the deadline to June 24, 2012.

80.     Although this settlement was not reduced to writing, Mr. Slinin acknowledged the settlement when, in September 2012, he arranged for Mr. Zilberman to send me an email invoking the settlement. In that email, Mr. Zilberman requested payment on Mr. Slinin's behalf "as agreed" because the Russian investigation had been closed. This email is at Exhibit D-19 (Zilberman Sept. 25, 2012 email, P000320), which states in part:

> Bombardier attorneys have been very helpful; they have confirmed precious information regarding the status of the criminal investigation – the objective, which is the closer [sic] of the investigation, has been reached.
>
> I am glad I can be a bearer of these good news, and trust it will enable you to positively resolve the remittance of the funds due to Mr. Slinin as agreed. Appreciated.

81.     I forwarded the email to Mr. Sapir, who responded by reminding Mr. Slinin that, under the terms of the settlement "as agreed," he was entitled to no payment at all because the investigation had not closed by June 2012, and in any event, it appeared the investigation was then still ongoing, his representations to the contrary notwithstanding.

**Conclusion**

In conclusion, given my understanding and intent, as demonstrated by my words and actions, as well as Mr. Slinin's intent revealed in his words and conduct, Mr. Slinin and I never had any partnership agreement. I do not owe him any money and his claims otherwise are simply not true.

*       *       *

*I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.*

Dated: *NOV. 6. 2018*

_____
Alex Shnaider