# Exhibit 2

to Eduard Slinin's Opposition to
Alex Shnaider's Motions in Limine

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
EDUARD SLININ,

                Plaintiff,

   -against-

ALEX SHNAIDER,

                Defendant.
-----------------------------------------------------------X

**Docket No. 15-cv-9674 (RJS)**

**DECLARATION OF
EDUARD SLININ**

I, Eduard Slinin, declare based on personal knowledge as follows:

1. I have lived in the New York area since 1977, when my parents and I immigrated from Ukraine. I resided in New York until 1994. In 1994, my wife and I moved to Holmdel, New Jersey, where we still reside and intend to reside for the indefinite future. My place of business is at 335 Bond St., Brooklyn, New York.

2. As a teenager, I dropped out of high school to work driving my father's car as a for-hire driver. By the time I was 20, I owned my own limousine company. Over the course of 35 years, I have built that business into one of the largest black car companies in the New York area. I also invest in real estate in Manhattan, where I purchase, refurbish, and own multi-family residential housing.

3. I met Alex Shnaider in 2003 or 2004 at Sunny Isles in Miami Beach. We were introduced by a mutual friend, Alexander Radunsky, who was a co-owner of a Formula One team with Shnaider.

4. Shnaider and I kept in touch and met for dinner regularly when he visited New York.

5. In 2005, Shnaider, Radunsky, and I invested together in a commercial real estate property in Odessa, Ukraine. Odessa was my hometown, so before we purchased the property, I traveled there to assure the three of us that the investment was legitimate. I sold my share of the property to Shnaider in 2006 at a profit.

6. Shnaider and I remained on good terms. We continued to meet for dinner when Shnaider was in New York. I attended his 40th birthday party in Toronto. My wife and I vacationed with him on his boat in Monaco. Shnaider and his wife at the time attended my daughter's Bat Mitzvah. Shnaider invited me to invest with him in a supermarket chain in Ukraine,

1

but I declined because I viewed my expertise to be in transportation and real estate, and did not know enough about the supermarket business to be comfortable with that investment.

7. In 2005, I flew with Shnaider on his private jet to Moscow. During the flight, Shnaider mentioned that he was able to buy private aircraft from Bombardier at a lower price than was available in Russia. He said that if I could use my connections to find buyers for the planes, we could sell them at a profit and make money together.

8. We continued to discuss the idea over the next few months by text messages and phone calls. I had many connections in Russia based on my transportation business and my travels. I told Shnaider that I thought I would be able to find buyers, but that we needed to get specific pricing terms for the planes.

9. In early 2006, Shnaider came to visit New York and stayed at the Four Seasons. We met there for breakfast and discussed the plan further. Shnaider explained how we could set up a company that we could use to enter into contracts with Bombardier and how that company could then sell the contracts to companies set up by the buyers I found. I told Shnaider I would defer to him on how to structure the transactions since that was his specialty, not mine.

10. Shnaider said he could bring Jahid Karim, the head of global sales for Bombardier, to New York so we could discuss pricing of the planes together.

11. Shnaider said that any expense we incurred would "come off the top" and that we would split the remaining profits "50/50." I agreed and felt at this point that we had a deal to work as partners to sell the planes. Shnaider never suggested at any time that I would be paid as a "broker" or through a "commission." If he had said that, I would not have gone ahead with the deal. I knew Shnaider as a trusted friend and expected that, as in our past business dealings, we would again be partners.

12. Shnaider and I never put the terms of our agreement in writing. I was comfortable with this because I trusted Shnaider and expected he would keep his word.

13. Immediately after our meeting at the Four Seasons, I began to work to sell planes. While I was trying to sell the planes, I paid my own expenses such as travel and entertainment costs.

14. Shnaider and I met in New York at least two more times to discuss our venture, once at Phillipe on East 60th St. and once at Cipriani on West Broadway.

15. Shnaider and I attended a global aircraft exhibition together in Geneva to learn about the business and to look for buyers.

16. As he had said he would, Shnaider brought Jahid Karim to New York so the three of us could discuss pricing of the planes. We discussed the issues over dinner at Estiatorio Milos on West 55th Street. Together, we negotiated a better price for Challenger 850 aircraft. A

buyer in Russia who purchased a Challenger 850 directly from Bombardier would likely have paid $28.5 million at that time. Karim agreed to sell Challenger 850s to us for $23.5 million. This would allow us to resell the planes for a better price than most buyers could get in Russia and still make a profit for ourselves.

17. Shnaider and I continued to communicate regularly by phone and text message.

18. In 2007, I was able to sell seven planes. I sold four Challenger 850s (Contract nos. 169, 170, 171, and 172) and one Global XRS (Contract no. 298) to Georgiy Pirumov, who was introduced to me by a real estate investor I knew in Moscow named Kharil Dubov.

19. I also sold two Challenger 850s to Oleg Sheikhametov (Contract nos. 161, 162), who owned a chain of sushi restaurants in Moscow and whom I had met while traveling in Moscow.

20. I made clear to both Pirumov and Sheikhametov that Shnaider and I were working together to sell the planes. I felt that Pirumov and Sheikhametov would not have agreed to purchase the planes from me alone, but were willing to do so because they trusted that Shnaider was the type of person who would have a special relationship with Bombardier and could deliver the planes.

21. Shnaider had a lawyer in Switzerland name Mr. Marichel do the paperwork for the sales. He also told me that he had set up a company to buy the planes for us from Bombardier and then sell them to the companies set up by Pirumov and Sheikhametov.

22. I collected deposits totaling $5 million from Sheikhametov. I then wired $4 million to Bombardier (based on instructions provided by Shnaider) to cover the initial deposits on Contracts 161 and 162 with Bombardier. After paying a commission to a broker, I split the remaining funds evenly between Shnaider and myself.

23. I collected deposits totaling $19.4 million from Pirumov. I then wired $10.5 million to Bombardier (based on instructions provided by Shnaider) to cover the initial deposits on Contracts 169, 170, 171, 172, and 298 with Bombardier. I split the remaining funds after commissions evenly between Shnaider and myself.

24. In 2008, both Sheikhametov and Pirumov decided that, given the economic downturn, they did not want to purchase the planes they had ordered.

25. Shnaider was upset because we were still obligated under the contracts with Bombardier and this put his relationship with Bombardier at risk.

26. Pirumov wanted his deposits back and, as negotiating tactic, questioned whether Shnaider and I had actually ordered the planes from Bombardier. So, based on arrangements by Shnaider, Pirumov and his attorney met with me at the aerospace show in Geneva as well as the broker we were working with, George Rependa, and Bob Horn, who was a senior executive at Bombardier, to confirm that the contracts were legitimate.

27. At Shnaider's suggestion, I used $3.5 million out of my share of the surplus from Pirumov's desposits to buy back one contract (Contract 169) from Pirumov. Shnaider and I believed this might appease Pirumov and convince him to purchase the remaining planes. Shnaider assured me that we would resell that plane and I would recover the money.

28. Shnaider found a buyer, Vasiliev, for Contract 169, who sent me $2 million. Vasiliev later defaulted as well, leaving me with $1.5 million invested in Contract 169.

29. Pirumov also arranged to fulfill one contract (Contract 172) directly with Bombardier. He defaulted on the remaining contracts (Contracts 170, 171, and 298).

30. Pirumov then opened a criminal investigation of Shnaider and me in Moscow. Shnaider and I both gave statements in Moscow as part of that investigation. I paid $800,000 in legal fees to defend both Shnaider and myself in the Moscow investigation.

31. Sheikhamatov also refused to proceed with the contracts and demanded that we refund his deposits. He contacted both Shnaider and me to demand his money back. After speaking with his business partner, Eduard Shifrin, Shnaider told me that Shiekamatov had a reputation as someone we should not cross. Shnaider and I therefore agreed to repay him his deposits.

32. Shnaider proposed a plan to combine the deposits that had already been made to Bombardier on Contracts 161, 162, 169, 170, 171, and 298, with other deposits he had made on separate contracts and apply these to one or two planes, which we could then sell to get back the value of the deposits and avoid greater liability to Bombardier.

33. However, Shnaider told me he did not want to put in the additional deposits and pay back Sheikhamatov's deposits by himself and that he wanted me to share the risk. He therefore demanded that I sign a promissory note gaurunteeing $4.45 million, which we would use to repay Sheikhamatov. Although the note was for $4.45 million, Shnaider ultimately gave me only $4 million and I used $1 million of my own funds to pay the $5 million to Sheikhamatov.

34. Regarding the loan, Shnaider told me: "You have to have skin in the game. You are my partner. If you don't have the cash available this time, I am willing to provide you that money, but we are 50/50 until we liquidate those positions."

35. Shnaider also asked me to contribute a $1 million deposit I had made on a Learjet (Contract 207) so that it could be combined with the others.

36. If I had thought that I was just a broker and that Shnaider was individually responsible for the contracts with Bombardier and Shiekamatov, I would not taken on $4.45 million in liability, repayed the additional $1 million to Sheikhamatov and contributed my $1 million deposit to restructure those contracts. However, my understanding from the beginning was that Shnaider and I had agreed to be partners, so I agreed to share the risk with Shnaider.

4

37. Shnaider and I negotiated a settlement with Bombardier. Bombardier agreed to let us out of all the contracts we had entered into (Contracts 161, 162, 169, 170, 171, 298), if we agreed to purchase one Challenger 850 (Contract 161) as a "green" (unfurnished) plane and one Learjet 60 (Contract 206).

38. Bombardier allowed us to put the $12.5 million in deposits for Contracts 161, 162, 169, 170, 171, 298 toward the purchase of the Challenger 850.

39. Bombardier also allowed us to put my $1 million deposit on Contract 207 together with a $1 million deposit from Shnaider toward Contract 206.

40. Of the $12.5 million in combined deposits, $11 million came from deposits that had been forfeited by buyers I lined up and $1.5 million came from funds I had paid to purchase Contract 169.

41. I also contributed the $1 million credit I had paid on Contract 207. This brought the total deposits up to $13.5 million.

42. Once the settlement with Bombardier was finalized, I continued to work to find buyers for both the Challenger 850 and the Learjet. Shnaider took delivery of the "green" Challenger 850 and completed it at his completion center in Canada, which is called Flying Colors. He told me that the completion would cost $3.5 million, which was consistent, based on my understanding of the industry, with what the completion should cost.

43. In 2011, I learned from George Rependa that Shnaider had found a buyer for the Challenger 850 and had sold it for $23.3 million.

44. Shnaider told me that the Learjet could not be sold and he was able to return it to Bombardier for a credit of $9.5 million, which he could use to purchase other planes. Since the Learjet had a purchase price of $10.6 million, we agreed that this would be counted as a loss of $1.1 million and shared equally.

45. After I learned of the sale of the Challenger 850, I tried to call Shnaider to ask about a settlement of the funds. After I could not reach him initially, I called Robert Lee.

46. Robert Lee confirmed that the plane had been sold and told me that he would put together an accounting. He said I would likely get around $6.5 million, but that he would need to check with Shnaider.

47. I later reached Shnaider and he told me he was on vacation on his boat in the Mediterranean and would call me back later. After he did not return my call for about a month, I continued to try to reach him and he did not pick up my calls.

48. In response to emails from my employee, Vadim Zilberman, Shnaider offered me a payment of $243,000, which I rejected. I explained that Shnaider owed me $6.5 million.

49. Shnaider invited me to come to Toronto in early 2012 to discuss the matter and I agreed to go there. Shnaider invited two of his friends, Michael Sapir and Simon Kronenfeld to attend the meeting.

50. In the meeting, Shnaider claimed he did not owe me money because a criminal investigation was still pending against him in Russia, and that this prevented him from traveling to Russia. I responded that the criminal investigation was not relevant to what he owed me. I had also heard that Shnaider still traveled regularly to Russia, so I viewed this as a false excuse. Shnaider said he would pay me $500,000 if the investigation in Russia was closed by a certain date. I responded that this was not what he owed me and that he needed to pay me the full amount he owed. I never agreed to accept $500,000 as satisfaction of what he owed me.

51. After I returned from Toronto, I called Shnaider to see if he had changed his position. Shnaider said that if the Russian investigation were closed, perhaps he would pay me $5 million.

52. In the fall of 2012, after I learned from an attorney for Bombardier that the investigation in Russia was no longer active, I reached out to Shnaider to see if he would finally be willing to pay what he owed. He continued to refuse.

I declare under penalty of perjury under the laws of the United States that the preceding facts are true.

November 8, 2018

_____
Eduard Slinin

6