**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| EDUARD SLININ, | CASE NO. 1:15-cv-09674 (RJS) |
| Plaintiff, | |
| v. | |
| ALEX SHNAIDER, | |
| Defendant. | |

**DEFENDANT'S POST-TRIAL MEMORANDUM**

KASOWITZ BENSON TORRES LLP
1633 Broadway
New York, New York 10019
(212) 506-1700

*Attorneys for Alex Shnaider*

# **TABLE OF CONTENTS**

**Page**

I.      SUMMATION ................................................................................................................... 1

II.     ARGUMENT .................................................................................................................. 14

        A.     The Disproven Oral Partnership .......................................................................... 14

        B.     Release and Settlement of Plaintiff's Claim ....................................................... 18

        C.     Doctrine of Unclean Hands.................................................................................. 21

CONCLUSION ............................................................................................................................ 23

**Page(s)**

**Cases**

*Artco, Inc. v. Kidde, Inc.*,
1993 U.S. Dist. LEXIS 21227 (S.D.N.Y. Dec. 28, 1993) .......................................................16

*Commercial Union Ins. Co. v. Lines*,
378 F.3d 204 (2d Cir. 2004)..........................................................................................22

*Devils Films, Inc. v. Nectar Video*,
29 F. Supp. 2d 174 (S.D.N.Y. 1998)..............................................................................22

*Dunlop-McCullen v. Local 1-S, AFL-CIO-CLC*,
149 F.3d 85 (2d Cir. 1998)............................................................................................21

*F & K Supply, Inc. v. Willowbrook Dev. Co.*,
759 N.Y.S.2d 194 (3d Dep't 2003)................................................................................16

*Fasolo v. Scarafile*,
991 N.Y.S.2d 820 (4th Dep't 2014)..........................................................................16, 18

*Hammond v. Smith*,
57 N.Y.S.3d 832 (4th Dep't 2017)............................................................................16, 18

*Kidz Cloz, Inc. v. Officially for Kids, Inc.*,
320 F. Supp. 2d 164 (S.D.N.Y. 2004)............................................................................15

*Slinin v. Shnaider*,
15-cv-9674 (RJS) (S.D.N.Y. July 18, 2018)...................................................................15

*St.-Works Dev. LLC v. Richman*,
2015 U.S. Dist. LEXIS 28291 (S.D.N.Y. Feb. 3, 2015).................................................16

*Stokely-Van Camp, Inc. v. Coca-Cola Co.*,
646 F. Supp. 2d 510 (S.D.N.Y. 2009)......................................................................21, 23

*United Paper-workers Int'l Union, AFL-CIO v. Misco, Inc.*,
484 U.S. 29 (1987)........................................................................................................22

**Other Authorities**

N.Y. Pship. L. § 41 .........................................................................................................21

# I.    <u>SUMMATION</u>

No credible evidence supports plaintiff's claim of an oral partnership.  The evidence at trial proved the opposite:  the parties never formed such a co-owned business entity.  Because plaintiff failed to carry his burden of proof, verdict should be rendered for defendant.

Both parties agree – and the evidence confirms – that no partnership was ever documented:  No partnership books and records were created; no business name was used; and no partnership tax forms or tax returns were prepared or filed.  Plaintiff, Eduard Slinin, conceded that he exercised no joint control over the business transactions, but rather did "whatever" Mr. Shnaider directed him to do.  Tr. 385:21 to 386:18 ("Q. So in your view, Mr. Shnaider was in control of everything?  A. Correct.  Q. In fact, you said in your sworn testimony that you did whatever Mr. Shnaider told you to do with respect to the contracts involving buying and selling airplanes involving Bombardier, right?  A. Correct.").  He also admitted he had nothing to do with the renegotiation with Bombardier after the cancellation of all of "his" buyers' contracts during the Great Recession.  Tr. 504:24 to 505:9 ("Q. But you had nothing to do with it?  A. I didn't speak to Bombardier, no.  Q. You had nothing to do with the actual negotiations?  A. No.").

Plaintiff also admitted that he himself had no intent to share in any business losses because, according to him, the business transactions were not expected to generate losses – despite the fact that the aircraft contracts at issue created contractual liabilities for affiliates of Midland Resources Holding, Ltd. ("Midland"), which is owned in part by Mr. Shnaider:  "THE COURT:  So when you say this was just a vehicle, you thought nobody would be liable, that this was just a perfect way to do business, that you could only make money, you could never lose money, is that what you're saying?  THE WITNESS:  That was my understanding."  Tr. 404:12-16.

In addition, plaintiff was forced to concede under cross-examination that he never used the term "partnership" during the discussions in which he claims the New York oral partnership was agreed to with Mr. Shnaider.  He admitted:

> Q. So the very first conversation you had with Mr. Shnaider about buying and selling planes, you concluded you had an oral partnership with Mr. Shnaider, is that right?
>
> A. Not what I concluded.  That's what he concluded.
>
> Q. I'm asking what you concluded –
>
> A. Yes.
>
> \*    \*    \*
>
> Q. So your testimony is he made the statement, "we're going to share this together"?
>
> A. Correct.
>
> Q. And that's a direct quote that you're saying Mr. Shnaider said?
>
> A. Correct.
>
> Q. He didn't say we're going to form a New York partnership, did he?
>
> A. No.
>
> Q. You didn't say let's form a New York partnership, did you?
>
> A. No.

Tr. 377:14-19; Tr. 381:18 to 382:3.  Mr. Slinin also never explained why the alleged agreement was to form a business based in New York when he resided in New Jersey (Tr. 364:19-25), Mr. Shnaider resided in Canada, Ex. D-300 (Shnaider Direct, ¶¶ 7, 19), and none of the other entities involved in the aircraft transactions, including Midland, Bombardier and the buyers, were New York entities or were based here.

Mr. Slinin even admitted that he had told his accountant, Mr. Levine, that there was no partnership, only payments owed.  Tr. 451:1 to 456:6; Slinin Dep. Desig. 103:11-19 ("It is not a partnership.  It's the money that is owed by Mr. Shnaider to me, he is aware of it.  My accountant is aware of it ….").

Thus, even on his own account at trial, no partnership agreement was ever reached, either explicitly or otherwise.

As the evidence at trial showed, the parties entered into an *ad hoc* series of business transactions in which Midland, represented by Mr. Shnaider, purchased Bombardier private jet aircraft and simultaneously sold the aircraft to Russia-based buyers who were solicited by Mr. Slinin. For those sales, the parties agreed that Mr. Slinin would keep the larger share of the sale proceeds left over after payments were made to Bombardier as compensation for him and for his Russian "broker," Kiril Dubov. He never had any contractual liability or other legal exposure either to the buyers or to Bombardier. That is undisputed. Plaintiff's effort to spin this arrangement into something else failed at trial.

Mr. Slinin has no cogent evidence of an "oral partnership." He has no direct written documentation or communications that come anywhere near suggesting a partnership existed. Instead, at trial he cobbled together remarks in disparate documents directed to third parties, one of which suggested he was a "principal" with Mr. Shnaider and the other stated that he and Mr. Shnaider "together" had "acquired right of ownership" of the single-purpose entities used to buy and sell the aircraft at issue. But those peripheral remarks do not a partnership make.

The first was made by Rob Lee, Midland's financial officer, who testified he had no first-hand knowledge of the terms of the arrangement between Mr. Shnaider and Mr. Slinin. Ex. D-301 (Lee Direct, ¶¶ 14, 16, 69); Tr. 189:17-19, 254:4 to 256:4. He used the term "principal" in a document that expressly noted it was only a draft of "suggested answers" for "comments," Ex. P-28, and the term "principal" was eliminated after Mr. Shnaider objected to it. Tr. 256:5 to 258:3; Exs. P-28; D-147 and D-137.

The second remark is taken from an English translation of a statement written in Russian and signed by Mr. Shnaider. Mr. Shnaider testified he did sign such a written statement submitted to Russian authorities who were investigating fraud charges based on forged Bombardier letters, although he could not be sure whether the unauthenticated document offered at trial was in fact an accurate copy of what he had signed. Tr. 43:1 to 51:25; Ex. P-29.

At trial, it was shown that the evidence strongly suggests Mr. Slinin was responsible for the forgery that was the initial focus of the Russian investigation, a fact that was revealed only during discovery in this litigation. *See* Exs. D-122 (at ¶ 7); D-101B; D-101; D-101A. Mr. Slinin admitted his involvement:

> Q. So this blank document [Ex. D-101], which is not on Mr. Likoray's letterhead, matches the description on Exhibit 122 at paragraph 7 that Bombardier said was a forgery?
>
> A. I don't know. I don't remember. I have never seen that.
>
> \* \* \*
>
> Q. This document [Ex. D-101] was produced by you, you understand that, right? It was produced to me in this litigation by you.
>
> A. I understand, but again, I'm not – I don't have any – I don't remember.
>
> Q. Well, you were involved in writing it, correct?
>
> A. No.
>
> ***Q. You directed Mr. Zilberman to write these letters?***
>
> ***A. Correct.***
>
> Q. And it was placed on Mr. Likoray's letterhead, correct?
>
> A. No, I don't recall that.
>
> Q. Well, didn't you give it to Mr. Pirumov and say, Here, Bombardier is acknowledging your deposits, you have nothing to worry about it?
>
> A. I'm not aware of it. …..
>
> \* \* \*
>
> THE COURT: OK. So they were produced in discovery by plaintiff's counsel from files maintained by plaintiff, correct?
>
> MR. LEIBOWITZ: Correct, Judge.
>
> THE COURT: Stipulate to that?

> MR. LEIBOWITZ:  Yes.
>
> THE COURT:  Yes, OK.
>
> Q.  And you have no explanation about these two documents?
>
> A.  I do not have any recollection.

Tr. 528:11 to 531:14 (emphasis added).  *See also* Tr. 549:5-8 ("THE COURT: … The issue is whether or not this man was involved in the forgery.  The fact that he has possession of them would make them pretty relevant, right?").

When Mr. Shnaider traveled to Russia to provide his statement, he was under the impression that it was a formality and that the investigation was all but officially concluded.  Tr. 58:8-16.  A Russian agent interviewed him and then either his attorney or the agent read a written statement to him, and he signed it.  Tr. 50:16 to 51:11.  Out of the entire English translation (which includes some inaccuracies, as Mr. Shnaider pointed out, Tr. 54:10-25), plaintiff relies on a single sentence stating that the parties "together" had "acquired right of ownership" of the single-purpose entities CAC and CL850.  Ex. P-22.  But that clumsy sentence is unclear.  In one sense, it is correct:  Midland created and used the entities specifically for the transactions involving Mr. Slinin and his buyers.  It is incorrect, however, to the extent it implies that Mr. Slinin had any direct or indirect ownership of these entities.  All the evidence, including Mr. Slinin's own testimony, established that these entities at all times were entirely owned and controlled solely by Midland.  Ex. D-301 (Lee Direct, ¶¶ 17-19); Tr. 402:1-16 (Slinin Cross).  *See also* Tr. 513:3-4 (Slinin Cross:  "His [Shnaider's] company had all those contracts.").

What is clear is Mr. Slinin's lack of veracity.  His testimony is not credible.  He repeatedly disavowed knowledge of business matters that he cannot credibly disavow, including, for example, that he created Jets Worldwide, LLC, as a "private aviation division" of his car service company Corporate Transport Group ("CTG"):

THE COURT: I will say this very simply. Do you recall that Jets Worldwide LLC was the private aviation division of Corporate Transportation Group?

THE WITNESS: I don't recall.

\*    \*    \*

THE COURT: You're the president of Corporate Transportation Group?

THE WITNESS: Yes, I am.

THE COURT: Are you unfamiliar with the assets and divisions of that company?

THE WITNESS: I just don't remember, Your Honor.

\*    \*    \*

THE COURT: How many airplanes does your black car business have?

THE WITNESS: None.

THE COURT: So if you don't have any airplanes, would you have a private aviation division?

THE WITNESS: Well, a private aviation division could be that you could book a job –

THE COURT: Could be. Was it?

THE WITNESS: No.

THE COURT. No, it wasn't.

THE WITNESS: No.

THE COURT: It's amazing that people are willing to use the courts to resolve disputes that are basically frauds. ….

Tr. 508:9 to 509:17.

Other evidence shows that Mr. Slinin repeatedly misrepresented his own credentials. He falsely told third-parties that, by July 2008, he had a "good track record" of successfully buying and selling Bombardier jets, that he had "done very well by purchasing airplanes from Bombardier and selling them off for substantial profit margins," and that he had been involved in "approx. 20" such transactions. Ex. D-113; Tr. 513:18 to 520:5. Mr. Slinin was compelled to admit at trial that his claimed "track record" was a lie:

Q. You think that the sentence that reads "Eddie has a lot of experience selling airplanes and has done very well by purchasing airplanes from

> Bombardier and selling them off for substantial profit margins" is an accurate statement of the contracts involving Mr. Sheikhametov and Pirumov?
>
> A. I'm not the one to judge.
>
> THE COURT: What do you mean you're not the one to judge? What substantial profit margin have you made on any airplanes sold as of July 2008?
>
> THE WITNESS: None.
>
> THE COURT: Zero?
>
> THE WITNESS: Correct.

Tr. 516:16 to 517:2.

He also overstated the market value of the jets being sold to "his" buyers in Russia. He assured his buyers that they would be able to re-sell (or "flip") the planes for substantial profits. Tr. 437:25 to 445:16; Exs. D-111 and D-120. Mr. Shnaider knew nothing about Mr. Slinin's efforts to resell the planes. Ex. D-300 (Shnaider Direct, ¶¶ 36-37); Tr. 95:21 to 96:12. The trial evidence showed that Mr. Slinin repeatedly tried to engage in purchases and sales of Bombardier aircraft that had nothing to do with Mr. Shnaider. Tr. 521:9 to 523:25; Exs. D-106, D-107 and D-113. Using Jets Worldwide, Mr. Slinin had an ownership interest in the buyer-entities that were also owned by one of his buyers (Mr. Pirumov) and Kiril Dubov, so that he would obtain additional profit from the anticipated re-sales that Mr. Slinin and CTG were frantically trying to arrange. Exs. D-5B, D-103 and D-109. At trial, Mr. Slinin sacrificed his own credibility by claiming to have no knowledge of the relevant contracts and related documents that bore his signature, memorializing his venture with Mr. Pirumov and Mr. Dubov. Tr. 411:19 to 419:2; Ex. D-103.

Finally, Mr. Slinin's testimony must be disregarded under the unclean hands doctrine. Given the stark and undeniable falsehoods in his testimony, the Court may reject the entirety of his testimony as false under the principle of *falsus in uno, falsus in omnibus*. Moreover, Mr.

Slinin's testimony about the alleged New York oral partnership, were it credited, would necessarily implicate him in tax violations and, potentially, tax fraud and tax evasion. He is the only party who claims that he was a co-owner of a New York partnership; and yet he admitted that he failed to file any partnership tax schedules or returns, or otherwise report the partnership income in New York:

> Q. But Mr. Slinin, you understand that, in your years of business, that a partnership is a separate business entity from you personally, right?
>
> A. That's correct.
>
> Q. And there are tax consequences for partnerships?
>
> A. Correct.
>
> Q. There has to be certain tax filings done by the partnership, by the entity?
>
> A. Correct.
>
> Q. And no tax filing was done by the partnership that you claim exists, right?
>
> A. Again, I'm not an accountant. I cannot give you the answer.
>
> THE COURT: Wait, wait, wait, wait. You have to be an accountant to answer that question?
>
> THE WITNESS: No.
>
> THE COURT: Do you know, as you sit here now, under oath, whether any taxes were paid for this partnership?
>
> THE WITNESS: I don't remember.
>
> THE COURT: You don't remember?
>
> THE WITNESS: I don't remember.

Tr. 451:1 to 456:6.

Similarly, Mr. Slinin repeatedly admitted to abusing the corporate form under New York law, where his businesses are based. For example, he admitted he used a company that he has a partial ownership interest in, All City Funding, a holding company for his CTG limo business, to borrow $4 million from Midland. Tr. 480:3-10 ("Q. Now, you used All City Funding as the borrower? A. Correct. Q. All City Funding had nothing to do with the alleged New York oral

partnership, right?  A. Correct.  Q. But you decided I want All City Funding to be the borrower, right?  A. Correct.").  That loan was used to refund a nonrefundable deposit to one of his Russian buyers of the Bombardier aircraft – a transaction to which All City Funding was not a party.  The implication is that All City Funding booked the loan as a business expense even though it had no legitimate business purpose for All City Funding.  Mr. Slinin provided no credible evidence to the contrary:

> Q.  And this note was accounted for on the books and records of All City Funding?
>
> A.  I don't know.  *I'm not an accountant*.
>
> THE COURT:  You're not what?
>
> THE WITNESS:  *I'm not an accountant*.  I don't know.
>
> THE COURT:  Ok, but you're the president of All City Funding -- [THE WITNESS: Correct.] – aren't you?
>
> THE WITNESS:  Yes.
>
> THE COURT:  Do you sign the tax returns for All City Funding?
>
> THE WITNESS:  Yes, I do.
>
> THE COURT:  Was there anything on the tax returns that reflected the $4 million promissory note or loan that All City Funding was responsible for?
>
> THE WITNESS:  I don't remember.
>
> THE COURT:  *Did All City Funding benefit in any way from this loan?*
>
> THE WITNESS:  *No.*
>
> \*     \*     \*
>
> Q.  I'm talking about the $450,000.  At the time you signed the promissory note, you were indicating, on behalf of All City Funding, that All City Funding owed, as an existing obligation, a debt of $450,000 to Midland, and that was not correct?
>
> A.  I don't remember.
>
> THE COURT:  *Well, All City Funding had nothing to do with the airplane transactions, right?*
>
> THE WITNESS:  *Correct.*
>
> THE COURT:  *So any debt in connection with the airplane transactions was with you, not All City Funding, right?*

> THE WITNESS:  *That's correct.*
>
> THE COURT:  What made you think that you could just use All City Funding as your own personal piggy bank?
>
> THE WITNESS:  *It wasn't me.*  It was my chief financial officer, figure out the structure –
>
> \*     \*     \*
>
> THE COURT:  Well, do you think it's OK to do that?  Do you think it's OK for you to pretend that obligations that you incur are actually obligations of your company?
>
> THE WITNESS:  No.  It's always –
>
> THE COURT:  But that's what you did here, right?
>
> THE WITNESS:  I don't know exactly.  *I'm not an accountant*.  My chief financial officer walked me through, and he was talking to his attorneys.
>
> THE COURT:  So you're unsure as to whether it's OK for your company to absorb your personal debt of $450,000; you're unsure as to whether that's ok?
>
> THE WITNESS:  I'm not sure exactly, your Honor.

Tr. 481:4 to 485:16 (emphasis added).  Mr. Slinin also was compelled at trial to admit that his prior deposition testimony that the $450,000 had been paid "right there and then" at the signing of the Promissory Note was outright false.  Tr. 485:19 to 488:16.  Even then, however, he tried to obfuscate and dissemble.  *See* Tr. 487:17-19 ("Again, I don't remember now.  Whatever I give – I mean, I went to something, through some statements, whatever.  That's how I answer those questions."); Tr. 488:2-5 ("Again, I don't remember, but there was calculation between me and Mr. Shnaider all the time because he said to me once he's going to liquidate those positions, he will do the calculation and I will return you the money back.").

Nor is Mr. Slinin's testimony about this $4 million loan credible.  He claimed that the Promissory Note (Ex. D-1) was supposed to be a way for him to share in potential losses of the alleged partnership.  But that makes no sense.  If the parties had already agreed to an oral partnership, then he was already obligated to share in any losses.  If, on the other hand, there was

no partnership since there was no agreement or intent at the outset to share in any losses – as Mr. Slinin himself admitted at trial – then no rational business person would think that a promissory note created a "partnership." This is especially so since the Promissory Note itself nowhere refers to any partnership or partnership assets or uses any express terminology that any business person would construe as referring to or creating a co-owned partnership business entity. In fact, the parties to the loan reflected in the Promissory Note are *not* the alleged partners, but rather Midland and All City Funding. That Mr. Slinin used his company All City Funding as the debtor/obligor on the Note, not himself personally, further negates his claim that the Note was supposed to be a way for him personally to share in losses in a partnership that was according to him supposedly between him, personally, and Mr. Shnaider, personally.[1]

Unlike Mr. Slinin's abuse of his business entities – to the point that he claimed he did not remember Jets Worldwide, LLC or Infinite Solutions Systems, Inc. even though he was an officer and signatory for these companies (*see* Exs. D-5B and D-103; Tr. 413:3 to 416:1) – Mr. Shnaider complied with corporate formalities. Midland's CFO attested that the aircraft contracts at issue were properly accounted for on Midland's books and records, and there is no evidence to the contrary. *See* Ex. D-301 (Lee Direct, ¶¶ 5, 8-10); Tr. 236:10 to 238:14; Tr. 321:1-14. *See also* Tr. 118:25 to 119:12.

Mr. Slinin, in contrast, regularly created companies about which he suspiciously claims to have no memory. He cannot deny his involvement in Jets Worldwide, LLC or Infinite Solutions Systems, Inc., but he – incredibly – claims to have no memory of whether he had "partners" who co-owned these entities or what they were used for, even though signed

---

[1]  Further underscoring just how confused and unmoored from the truth his own story is, his original complaint in this action named All City Funding as a co-plaintiff, suggesting without any facts that both he *and his company* were "partners" in the alleged oral partnership, a claim he later unilaterally dropped. Dckt. Nos. 5, 45, and 50.

documentation showed that he co-owned some of these entities with Mr. Pirumov (one of his

buyers) and with Mr. Dubov (supposedly his Russian broker):

> THE COURT:  You just testified under oath to me, in response to my
> question, that you created this company and that you, Eduard Slinin,
> were the owner.  Do you remember that?
>
> THE WITNESS:  Correct.
>
> THE COURT:  Ok.  You're now confronted with the document that has
> your signature on it that purports to be a limited liability company
> agreement for Jets Worldwide LLC that doesn't list you as an owner at
> all, it lists Infinite Solutions Systems as one of the members, correct?
>
> THE WITNESS:  Correct.
>
> THE COURT:  What is Infinite Solutions Systems?
>
> THE WITNESS:  I can't remember.
>
> *    *    *
>
> THE COURT:  You can't remember a company called Infinite Solutions
> Systems Inc.?
>
> THE WITNESS:  I don't remember, your Honor.
>
> THE COURT:  You keep saying that. …
>
> *    *    *
>
> THE COURT:  Back in 2008, how many companies do you think you
> were president of?
>
> THE WITNESS:  I don't remember, your Honor.
>
> THE COURT:  More than ten?
>
> THE WITNESS:  Probably more.
>
> THE COURT:  More than 20?
>
> THE WITNESS:  I can't remember.  More than ten, for sure.
>
> THE COURT:  But you don't bother to keep track of them?
>
> THE WITNESS:  I have a chief financial officer who does it, who handles
> the whole structure.
>
> THE COURT:  But it doesn't concern you whether or not you're a
> president of these companies; it's not even worth remembering?  It
> seems to be what you're saying.

Tr. 414:3 to 419:2.  Other documentation – which Mr. Slinin could not, and did not, disavow –

makes clear that Jets Worldwide was used by Mr. Slinin to co-own with Mr. Pirumov and Mr.

Dubov the buyer-entities involved in all five of the Bombardier jets that Midland (through the CAC/CL850 entities) sold to Mr. Pirumov. Ex. D-109; Tr. 420:15 to 424:16.

Another example of Mr. Slinin's prevarication is his shifting testimony about the Lear jet he purchased using a company called KSR Jet, Inc. He first testified that he was the "sole owner" of that aircraft contract (contract 207), that Mr. Shnaider "had nothing to do with that," and that contract 207 was "outside of this New York oral partnership that [Mr. Slinin] claim[s]." Tr. 431:9-21. Later in his trial testimony, Mr. Slinin contradicted himself. He was shown documents that KSR Jet was owned by Jets Worldwide and that his partner in Jets Worldwide, Mr. Dubov, had questions about the Lear jet (which Mr. Slinin claimed not to remember) – all of which suggests that he was not the "sole owner." Tr. 432:3 to 436:21 ("Q: You have no memory of any interest that Mr. Dubov or questions that Mr. Dubov had about the Learjet in and around August 2008? … THE COURT: Overruled. The fact that it seems silly for him to keep saying I don't remember doesn't mean he can't ask the question. A. I just don't remember that. … THE COURT: Did he [Mr. Dubov] have anything at all to do with the Learjet contract? A. I can't remember that.").

Next, Mr. Slinin tried to claim that the Lear jet contract was the property of the alleged partnership because Mr. Slinin agreed to terminate "his" KSR Jet contract so that Midland could use the $1 million deposit on the terminated contract (contract 207) to apply it to the Lear jet being purchased by Midland (contract 206). According to Mr. Slinin, he agreed to this even though he supposedly wanted to fulfill the KSR Jet contract and buy the airplane for himself and even though the $1 million deposit he agreed to transfer belonged to KSR Jet, which was owned by Jets Worldwide, which, in turn, was owned by Infinite Solutions Systems and Mr. Dubov. Tr. 502:7 to 503:23 ("Q. And you never raised, either with Mr. Shnaider or with anybody at

Bombardier, that you wanted to complete your contract 207, correct? A. Correct. THE COURT: But this partnership is between you and Mr. Shnaider, right? THE WITNESS: Correct. THE COURT: It's not with Midland, correct? THE WITNESS: Correct. THE COURT: And yet this agreement, this termination talks about Midland, right? THE WITNESS: He put it . . . THE COURT: There is a promissory note in writing, correct? THE WITNESS: Correct. THE COURT: There is a termination agreement in writing? THE WITNESS: Correct. THE COURT: But there is nothing related to this partnership in writing, correct? THE WITNESS: Correct.").

In this same regard, Mr. Slinin's testimony disavowing the parties' settlement and release of his "partnership" claim is unworthy of belief. He claimed that no agreement was reached at the parties' Toronto meeting – despite the evidence of both Mr. Shnaider and the sworn testimony of a disinterested third-party witness, Michael Sapir, corroborated by contemporaneous documents. In the face of an email written by Mr. Slinin's own financial officer on his behalf, asking that the parties comply with the settlement "as agreed" (Exs. D-18, D-19), Mr. Slinin testified that the reference to an "agreement" was intended to mean the opposite: that *no* agreement had been reached, but that the parties would try to agree later, after the Russian investigation was resolved. Tr. 540:2 to 544:16. That testimony is facetious, at best. It is an insufficient basis to disregard the conclusive evidence of settlement and release, including the testimony of an impartial third party. Exs. D-302 (Sapir Direct, ¶¶ 13-15, 21), D-300 (Shnaider Direct, ¶¶ 79-81), Ex. D-19.

## II.   ARGUMENT

### A.   The Disproven Oral Partnership

Plaintiff failed to carry his burden to prove the alleged New York oral partnership.

14

Taken as a whole, the evidence of the four factors/elements demonstrates that the parties never intended to and did not create and operate as co-owners a partnership business entity:

(1) Although the parties divided up excess proceeds from the transactions, they had no agreement to share in losses, as Slinin admitted;

(2) Despite the fact that Slinin claimed he contributed "sweat capital" in the form of soliciting buyers, he admitted he had no obligation to do so (on his telling the "partnership" materialized only if and when he secured a buyer, Tr. 383:9-10);

(3) As noted above, Slinin conceded at trial that he had no joint control over the management of the business transactions but rather did "whatever" Mr. Shnaider directed; and,

(4) Mr. Slinin produced no credible evidence that indicated any intent by the parties to form a New York oral partnership, especially since, as Slinin also conceded at trial, he never even mentioned the word "partnership" at the seminal New York meeting in which he claims the partnership was formed. Nor did he offer any explanation why the parties intended to form a New York business entity when neither of the alleged partners lived here, the transactions at issue did not involve New York and the other persons and entities involved were all in foreign jurisdictions.

In view of these four factors and the weight attributed to them, plaintiff failed to prove an oral partnership by a preponderance of the evidence. *See Kidz Cloz, Inc. v. Officially for Kids, Inc.*, 320 F. Supp. 2d 164, 171 (S.D.N.Y. 2004) (identifying elements/factors); *Slinin v. Shnaider*, 15-cv-9674 (RJS), Dckt. No. 103, at *2 (S.D.N.Y. July 18, 2018) (same).

Where, as here, there were no formalities or documentation of any partnership – or even any co-owned business entity – that fact is usually decisive and weighs heavily against plaintiff. Courts routinely hold that the absence of any business formalities – *e.g.*, the absence of a

business name and bank account – "strongly suggests" no partnership existed.  *Fasolo v. Scarafile*, 991 N.Y.S.2d 820, 822 (4th Dep't 2014).  Other key indicators that no partnership existed are:  the absence of partnership tax returns, absence of business books and records, absence of capital contributions, and absence of joint control in carrying out the business.  *Id.* (no partnership where "the parties did not file partnership tax returns"); *F & K Supply, Inc. v. Willowbrook Dev. Co.*, 759 N.Y.S.2d 194, 197 (3d Dep't 2003) (same).

Moreover, courts have repeatedly emphasized that sharing in business losses is "essential" to establishing a partnership.  *Hammond v. Smith*, 57 N.Y.S.3d 832, 836 (4th Dep't 2017) ("It is well established that shared losses are an 'essential element' of any partnership agreement."); *St.-Works Dev. LLC v. Richman*, 2015 U.S. Dist. LEXIS 28291, at *12 (S.D.N.Y. Feb. 3, 2015) (same).  Here, Mr. Slinin admitted at trial that he did not even consider the possibility of losses, much less agree to share any legal obligation for losses.  Moreover, the evidence established that Midland and its affiliates were contractually liable for any failure to perform the aircraft contracts and Mr. Slinin never had any responsibility for those legal liabilities and the potential business losses inherent in them.  Exs. D-300 (Shnaider Direct, ¶¶ 4, 31, 42-43, 53, 56, and 60-61), D-301 (Lee Direct, ¶¶ 17 and 19), D-3A to 8A and D-11A.

While Mr. Slinin claims he incurred (unsubstantiated) "expenses" related to his buyers, including paying legal fees to defend the Russian investigation, that is not *ipso facto* a business "loss" sufficient to prove an oral partnership.  *See St.-Works Dev. LLC*, 2015 U.S. Dist. LEXIS 28291 at *12.  If "simply expending efforts to set up a [business transaction] were sufficient to satisfy the essential element of sharing of losses, the requirement could nearly always be satisfied."  *Artco, Inc. v. Kidde, Inc.*, 1993 U.S. Dist. LEXIS 21227, at *30 (S.D.N.Y. Dec. 28, 1993).  In any event, as with much of Mr. Slinin's testimony, his claim that he incurred business

expenses is unpersuasive and unproven. He provided no independent records of any expenses. Even the sworn statement of Mr. Kopenkin, his Russian lawyer, is silent as to what amount Mr. Slinin paid. Ex. P-30 (Declaration of Igor Kopenkin). This vague statement raises more questions than it answers. What is most clear about Mr. Kopenkin's statement is what is not said: He nowhere says that he represented a "partnership," that he was ever aware of any such partnership, or even that any payment by Mr. Slinin was for legal services supposedly rendered on behalf of Mr. Shnaider. *See id*.

Plaintiff's claims about the Promissory Note are similarly unavailing. First, as shown above, Mr. Slinin's testimony about the Promissory Note is not credible. Second, the document itself does not refer to any partnership or any partnership assets or losses; nor does it establish a direct business relationship of any kind between Mr. Slinin, personally, and Mr. Shnaider personally. Obviously, had the parties intended to memorialize Mr. Slinin's legal obligation to share in the business losses as part of a partnership, they could have (and would have) simply said so directly in a written document – just as Mr. Slinin himself routinely documented his business ventures with others using LLC agreements and letter agreements. The Promissory Note, however, is much different. Its plain language documents a loan. The testimony confirmed both that $4 million was loaned by Midland to Mr. Slinin to repay the nonrefundable deposit paid by Mr. Sheikhametov, one of his buyers, and that Mr. Slinin personally owed a pre-existing debt of $450,000 to Midland related to the aircraft contracts. It was Mr. Slinin alone who decided to substitute All City Funding as the debtor in place of himself. The Note, moreover, documented that the additional $450,000 was a pre-existing debt and provided separate terms for repayment of that amount. Just as the $450,000 indebtedness had nothing to do with Mr. Slinin sharing in business losses, nor did the loan of the additional $4 million.

17

Plaintiff's reliance on a stray reference to "principal" or acquiring rights "together" is similarly insufficient proof of partnership. Occasional use by the parties of "partnership terminology" is "insufficient" to prove a partnership. *Fasolo*, 991 N.Y.S.2d at 823 ("Defendant's occasional use of partnership terminology is insufficient . . . with respect to the existence of a partnership."); *Hammond*, 57 N.Y.S.3d at 837 ("calling an organization a partnership does not make it one"). The two documents Slinin cites here – Rob Lee's draft document and Mr. Shnaider's Russian statement – are far from definitive proof of partnership. The reference to "principal" in Mr. Lee's draft was challenged by Mr. Shnaider and omitted from later versions of the same document. And the reference to "acquiring" rights to CAC/CL850 "together" with Mr. Slinin in the Russian statement is, at best, unclear. That statement did not refer to a co-owned partnership. It certainly did not use the term "partnership." It is undisputed that, regardless of how the Russian statement is interpreted, Midland owned the special purpose entities and Mr. Slinin never had any documented ownership of them. Mr. Slinin certainly knew how to document his ownership interest in various businesses, as shown at trial in the numerous LLC agreements and related documents signed by him. Were it true that he had some kind of indirect interest in CAC or CL850, he could and would have documented it.[2]

**B.      Release and Settlement of Plaintiff's Claim**

The failure of plaintiff's proof is underscored by his failure to disprove the conclusive evidence of settlement and release of his claims. The evidence of settlement is, at its core, undisputed. Mr. Slinin did not dispute at trial that he met with Mr. Shnaider in Toronto in

---

[2]  The erroneous use of the term "Borrower's Entity" in the Promissory Note to refer to CL850 is immaterial. At Mr. Slinin's urging the Note was hurriedly written during the 2008 year-end holidays, just as the extraordinary extent of the worldwide Great Recession was becoming clear, and the error was overlooked. Tr. 258:4 to 261:4. That error did not materially affect the meaning, terms or enforceability of the Note, as the witnesses attested. Nor does it change the fact that Midland was the sole owner of CAC and CL850.

February 2012 to resolve his claims and that others were witnesses to that meeting, including

Michael Sapir, whose direct testimony was not contested at trial.  Both Mr. Shnaider and Mr.

Sapir attested to the fact that the parties reached a settlement agreement in which Mr. Slinin

released any claim to having been in a partnership with Mr. Shnaider and any demand for

payment related to the aircraft contracts at issue.

Mr. Slinin disputes that any binding agreement was reached.  But as noted above, his

testimony about this meeting is not credible and makes no sense.  He cannot dispute that his own

financial officer in an email on which Mr. Slinin was copied referred to the agreement reached at

this meeting.  Exs. D-19 and D-139.  But Mr. Slinin incredibly claimed, first, that there was no

agreement, and then, when confronted with the email, changed his story to say that the

"agreement" was only that Mr. Shnaider would consider settling if and when the Russian

investigation concluded:

> Q.  Looking at it [Ex. D-139] here today, is there any doubt in your mind
> that Mr. Shnaider was referring to what was agreed in Toronto in
> February 2012?
>
> A.  We did not reach the agreement.  I told him what I was looking for. …
>
> \*     \*     \*
>
> THE COURT:  But "as agreed" is what Mr. Zilberman said.  What was
> agreed to as of Tuesday the 25th of September, 2012, as far as you
> understood?  What was agreed?
>
> THE WITNESS:  I understood that once – we had an attorney from
> Montreal that reached out to Bombardier because he said there's some
> issues.  We took an attorney.
>
> THE COURT:  No, no, no.  Here's my question. [THE WITNESS: Yes.]
> What was agreed between you and Mr. Shnaider [THE WITNESS:  It
> was --] that would result in funds being remitted to you?
>
> THE WITNESS:  If he can confirm the investigation is over.
>
> THE COURT:  And that was an agreement that you had with Mr.
> Shnaider?
>
> THE WITNESS:  Correct.
>
> THE COURT:  And what was the agreement?

THE WITNESS:  The agreement that he will then speak to Rob Lee, and he will calculate and will pay me the money he owes me.

\*     \*     \*

THE COURT:  How much money?

THE WITNESS:  I don't remember that number that we discussed.

\*     \*     \*

THE COURT:  You don't remember?  Before, a minute ago, you said there was never an agreement reached, right?

THE WITNESS:  No, no.  We never reached an agreement meaning he never proceeded with the money.  That's what I'm saying.

\*     \*     \*

THE COURT:  Wait a minute.  This is asking for remittance of funds due to Mr. Slinin as agreed.  So after the meeting with Mr. Shnaider, Kronenfeld and Sapir, what was your understanding of the agreement that existed?

THE WITNESS:  He said to me –

THE COURT:  Never mind what he said to you.  What was your understanding of the agreement?

THE WITNESS:  The agreement will be if he can confirm that investigation is closed, he will consider to settle with me.

THE COURT:  So he had agreed to consider settling with you in the event of closing the Russian investigation?

THE WITNESS:  Correct.

THE COURT:  And so "positively resolve the remittance of funds due to Mr. Slinin as agreed --"

THE WITNESS:  Correct.

THE COURT:  -- is an agreement to consider paying you funds?

THE WITNESS:  Correct.

Tr. 541:15 to 544:16.

Mr. Slinin's testimony is absurd on its face.  It is directly contradicted by the impartial third-party witness and all the contemporaneous documents of the terms of the settlement and release.  *See* Exs. D-302 (Sapir Direct, ¶¶ 13-15, 21), D-300 (Shnaider Direct, ¶¶ 79-81), D-18, D-19 and D-139.

### C.     **Doctrine of Unclean Hands**

In addition to plaintiff's failure of proof, plaintiff's claim is barred by the doctrine of unclean hands.  Where, as here, a plaintiff seeks justice from the courts while he himself has perpetrated a wrong, the unclean hands doctrine bars relief as a matter of equity.  *Dunlop-McCullen v. Local 1-S, AFL-CIO-CLC*, 149 F.3d 85, 90 (2d Cir. 1998) ("since equity tries to enforce good faith in defendants, it no less stringently demands the same good faith from the plaintiff"); *Stokely-Van Camp, Inc. v. Coca-Cola Co.*, 646 F. Supp. 2d 510, 534 (S.D.N.Y. 2009) (plaintiff's "own unclean hands also preclude [] equitable relief").

Here, Mr. Slinin is the only party who claims that a New York oral partnership existed.  In pressing this claim at trial, he was forced to admit that he failed to file or pay New York partnership taxes or otherwise to comply with New York laws, including the statutory requirement that the books and records of any such partnership be maintained at the partnership's "principal place of business."  N.Y. Pship. L. § 41.  *See* Tr. 448:6-22 ("Q. So as far as you know, there are no partnership books that are kept in New York City, right?  A. Correct.  Q. Even though, in your view, New York City is the principal place of business of this oral partnership, right?  A. Correct.").  Thus, in pressing his claim that an oral partnership existed, he is simultaneously admitting to violation of the law, including tax violations such as intentionally failing to file tax returns in this State.  *See* Tr. 449:3 to 450:20 ("THE COURT:  Wait.  Did you pay taxes on the income you got under this partnership?  THE WITNESS:  Under this partnership, I don't know.  I don't remember.").  The unclean hands doctrine bars such a claim.  No court should credit a legal claim – especially one as dubious as Mr. Slinin's – that would necessarily result in such violations of law.

For the same reason, the alleged partnership agreement should be deemed unenforceable as against public policy since upholding Mr. Slinin's claim of an oral partnership runs the risk of

sanctioning his failure to comply with New York tax and partnership law. *United Paperworkers Int'l Union, AFL-CIO v. Misco, Inc.*, 484 U.S. 29, 42 (1987) ("[A] court may refuse to enforce contracts that violate law or public policy . . . no court will lend its aid to one who founds a cause of action upon an immoral or illegal act."); *Commercial Union Ins. Co. v. Lines*, 378 F.3d 204, 208-09 (2d Cir. 2004) ("[T]he powers of the court can never be exerted in behalf of one who has acted fraudulently, or who by deceit or any unfair means has gained an advantage.").

In addition, Mr. Slinin's testimony demonstrated that he regularly abused the corporate form. As noted, his denial of knowledge of his own companies and corporate entities for which he was a signatory defies credulity. In arranging for the $4,450,000 promissory note, Mr. Slinin used All City Funding, as the borrower and obligor, even though it had nothing to do with the aircraft transactions. Tr. 480:3-10 ("Q. All City Funding had nothing to do with the alleged New York oral partnership, right? A. Correct. Q. But you decided I want All City Funding to be the borrower, right? A. Correct."); Exs. D-1, D-180 and D-181. *See also* Tr. 429:6-13 ("THE COURT: I guess I'm trying to understand. Do these airplane deals have anything to do with your companies? THE WITNESS: No. THE COURT: But you paid expenses associated with the airplane deals from moneys that came from your companies, is that right? THE WITNESS: I don't remember. I think so. Honestly, I don't remember, your Honor.").

For all of these reasons, the Court "should not use its equitable power to come to plaintiff's assistance and should invoke the doctrine of unclean hands and leave the parties where it finds them." *Devils Films, Inc. v. Nectar Video*, 29 F. Supp. 2d 174, 175 (S.D.N.Y. 1998).[3]

---

[3] The Court also sharply questioned Mr. Shnaider about the loan. Mr. Shnaider frankly acknowledged that Midland had no obligation to extend the loan, nor was it required to use any credit from Bombardier to offset the loan. Tr. 169:8 to 170:20. There was nothing improper about the loan or Note, which was prepared by legal counsel for Midland, included standard business safeguards such as interest rates and was properly monitored and accounted for in

## CONCLUSION

Based on the evidence adduced at trial, the Court should return a verdict for defendant and against plaintiff.


Dated:  New York, New York
         January 11, 2019                    Respectfully submitted,

                                             KASOWITZ BENSON TORRES LLP

                                             By: *s/ Michael Paul Bowen*
                                             Michael Paul Bowen
                                             mbowen@kasowitz.com
                                             Bradley Peter Lerman
                                             blerman@kasowitz.com
                                             1633 Broadway
                                             New York, New York 10019
                                             Telephone: (212) 506-1700
                                             Facsimile: (212) 506-1800

                                             *Attorneys for Alex Shnaider*

---

Midland's books and records.  Tr. 214:14 to 215:6, 217:15 to 218:15 (Lee).  There was no proof at trial that Mr. Shnaider ever disregarded the corporate form or engaged in business transactions without the knowledge and consent of the other Midland owner.  To the contrary, all of the evidence at trial consistently established that Midland kept accurate books and records and accurately reported all of its transactions to the relevant tax jurisdictions (*see, e.g.*, Ex. D-12, recording GST, a Canadian tax on the delivered aircraft).  Mr. Shnaider may have had reason to question why Mr. Slinin was using his company as the debtor-obligor instead of himself, as the Note had originally been drafted.  Exs. D-180 (draft note designating Mr. Slinin as debtor) and D-181 (same); Tr. 307:11 to 308:3 (Lee).  That, however, is a question that depends on Mr. Slinin and his relationship to his own company and the co-owners of All City Funding – matters that are wholly unrelated to Mr. Shnaider and are not his legal responsibility.  If there were any infraction by Mr. Shnaider in this regard, it pales in comparison to Mr. Slinin's outright violations of law and proven abuse of the corporate form.  *See generally Stokely-Van Camp*, 646 F. Supp. 2d at 533 (where both parties are in the wrong, courts will not aid a plaintiff whose wrong is the same or worse than the defendant's).