**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| EDWARD SLININ,<br><br>     Plaintiff,<br><br> v.<br><br>ALEX SHNAIDER,<br><br>     Defendant. | Case No. 15-cv-9674 (RJS)<br><br>**EDWARD SLININ'S POST-TRIAL BRIEF** |

# TABLE OF CONTENTS

Introduction ........................................................................................................................1

Statement of Facts ..............................................................................................................2

I.     The parties have a longstanding relationship...........................................................2

II.    After a series of conversations, Slinin and Shnaider agree to sell jets together. .....................3

III.   Slinin sells 5 jets to Georgiy Pirumov and 2 jets to Oleg Sheikhametov...........................4

IV.   The financial crisis leads Pirumov and Sheikhametov to renege. ......................................7

V.    Sheikhametov threatens Slinin, and Shnaider to get his deposits back. ................................8

VI.   Shnaider negotiates a resolution with Bombardier............................................................11

VII.  Shnaider sells the '161 plane but then refuses to settle up with Slinin. ...........................13

Argument ..........................................................................................................................14

I.    Slinin and Shnaider formed a partnership because all the necessary elements of a partnership are present....................................................................................................14

    A.   Slinin and Shnaider agreed to split both profits and loss. ...................................15

    B.   The parties each had substantial control over various aspects of the partnership. ............17

    C.   Both Slinin and Shnaider contributed significantly to the partnership.............................18

    D.   The nature of the agreement and the contemporaneous evidence make clear the parties intended to form a partnership....................................................................18

    E.   Shnaider's likely arguments that the parties entered into a commission agreement are meritless........................................................................................................19

II.   Because Slinin and Shnaider formed a partnership, Slinin is entitled to half the partnership profits and prejudgment interest. .........................................................................21

III.  The Court should not grant Shnaider a multi-million-dollar windfall based on the doctrine of unclean hands because Slinin's hands are clean and the doctrine is not applicable to Slinin's claims. 24

    A.   Slinin has not engaged in improper conduct. ..................................................25

    B.   The doctrine of unclean hands does not apply here..........................................28

IV.  No public policy justifies handing Shnaider a multi-million-dollar windfall for the same reasons that the doctrine of unclean hands is not applicable.......................................................30

V.  Shnaider's settlement defense fails because his story is contrary to the evidence and the law. 30

Conclusion .................................................................................................................................32

# TABLE OF AUTHORITIES

## CASES

*2138747 Ontario, Inc. v. Samsung C & T Corp.*,
103 N.E.3d 774 (N.Y. 2018) ......................................................................30

*Aetna Cas. & Sur. Co. v. Aniero Concrete Co., Inc.*,
404 F.3d 566 (2d Cir. 2005) .....................................................................29

*Agarwal v. Sandy Dalal, Ltd.*,
2006 WL 2621048 (D. Neb. Sept. 12, 2006)............................................28

*Anderson v. Nat'l Producing Co.*,
253 F.2d 834 (2d Cir. 1958) .....................................................................17

*Aurnou v. Greenspan*,
161 A.D.2d 438 (N.Y. App. Div. 1990) ...................................................23

*Bild v. Weider*,
567 F. App'x 49 (2d Cir. 2014) ...............................................................28

*Bistricer v. Bistricer*,
659 F. Supp. 215 (E.D.N.Y. 1987)...........................................................28

*Carola v. Grogan*,
102 A.D.2d 934 (N.Y. App. Div. 1984) ...................................................29

*Carola v. Grogan*, 102 A.D.2d 934, 934 (N.Y. App. Div. 1984) ............................24

*Chipman v. Steinberg*,
106 A.D. 34 (N.Y. App. Div. 1984) .........................................................17

*Cohen v. Biernoff*,
84 A.D.2d 802, 444 N.Y.S.2d 152 (1981).................................................14

*Colli v. Wirth*,
1996 WL 442835 (S.D.N.Y. Aug. 6, 1996) .............................................29

*Collins v. Comm'r*,
3 F.3d 625 (2d Cir. 1993) .........................................................................25

*Cruz v. OneSource Facility Servs., Inc.*,
No. 03 CIV. 8233 (LAP), 2005 WL 2923517 (S.D.N.Y. Nov. 4, 2005) ...........31

*Dinerstein v. Dinerstein*,
300 N.Y.S.2d 677 (1 Dep't 1969) ............................................................28

F&K Supply, Inc. v. Willowbrook Dev. Co.,
304 A.D.2d 918 (N.Y. App. Div. 2003) ...................................................20

*Fasolo v. Scarafile*, 120 A.D.3d 929, 930 (N.Y. App. Div. 2014)..........................20

*Forden v. Bristol Myers Squibb*,
63 F. App'x 14 (2d Cir. 2003).................................................................31

*Glob. Minerals & Metals Corp. v. Holme*,
35 A.D.3d 93 824 N.Y.S.2d 210 (2006)...................................................25

*Hammond v. Smith*,
    151 A.D.3d 1896 (N.Y. App. Div.), *leave to appeal denied*, 153 A.D.3d 1677 (N.Y. App.
    Div. 2017) .................................................................................................14, 19

*Hand v. New York City Hous. Pres. & Dev.*,
    11CV1076RRMJO, 2017 WL 4296751 (E.D.N.Y. Sept. 25, 2017) ..................................31

*In re Ampal-Am. Israel Corp.*,
    545 B.R. 802 (Bankr. S.D.N.Y. 2016) ..............................................................................29

*In re Cavalry Constr., Inc.*,
    2013 WL 5682741 (Bankr. S.D.N.Y. Oct. 18, 2013)........................................................18

*In re Cross Media Mktg. Corp.*,
    367 B.R. 435 (Bankr. S.D.N.Y. 2007) ..............................................................................17

*James v. United States*,
    366 U.S. 213 (1961) ..........................................................................................................25

*Kidz Cloz, Inc. v. Officially For Kids, Inc.*,
    320 F. Supp. 2d 164 (S.D.N.Y. 2004) ..................................................................14, 18, 21

Kyle v. Brenton,
    184 A.D.2d 1036 (N.Y. App. Div. 1992) ..........................................................................20

*Lyons P'ship, L.P. v. Morris Costumes, Inc.*,
    243 F.3d 789 (4th Cir. 2001) ............................................................................................29

*Mallis v. Bankers Tr. Co.*,
    615 F.2d 68 (2d Cir. 1980) ...............................................................................................24

*Petrella v. Metro-Goldwyn-Mayer, Inc.*,
    572 U.S. 663 (2014) ..........................................................................................................29

*Richbell Info. Servs., Inc. v. Jupiter Partners, L.P.*,
    309 A.D.2d 288 (N.Y. App. Div. 2003) ...........................................................................17

*Sound Video Unlimited, Inc. v. Video Shack Inc.*,
    700 F. Supp. 127 (S.D.N.Y. 1988) ...................................................................................18

*The Filtron Mfg. Co., Inc. v. Fil–Coil Co., Inc.*,
    1981 WL 1288 (E.D.N.Y. Mar. 12, 1981 .........................................................................29

*Weiss v. Mayflower Doughnut Corp.*,
    135 N.E.2d 20 (N.Y. 1956) ..............................................................................................24

## STATUTES

N.Y. P'ship Law § 10 .............................................................................................17, 19, 20

N.Y. P'Ship Law § 60 ...................................................................................................23

N.Y. P'Ship Law § 61 ...................................................................................................22

N.Y. P'Ship Law § 69 ...................................................................................................21

N.Y. P'Ship Law § 71 ...................................................................................................21

N.Y. P'Ship Law § 74 ...................................................................................................23

## RULES

Fed. R. Civ. P. 16 .................................................................................................29

Fed. R. Civ. P. 26 .................................................................................................27

Fed. R. Evid. 801 .................................................................................................26

Fed. R. Evid. 802 .................................................................................................26

N.Y.C.P.L.R. § 500 .............................................................................................23

N.Y.C.P.L.R. § 5004 ...........................................................................................24

## Introduction

It is undisputed that Eduard Slinin and Alex Shnaider agreed to work together to sell Bombardier Jets and split any profit equally between them. The dispute is only over whether this arrangement was an oral partnership, as Slinin claims, or a commission agreement, as Shnaider now claims. Slinin's position is consistent with the documentary evidence and common sense. Shnaider's is not. In pre-litigation statements and documents, including statements to legal authorities and heavily edited loan documents, Shnaider and his trusted employee, Robert Lee, repeatedly referred to Slinin as a partner, a co-owner, or a principal. The efforts of two careful, sophisticated men to explain away those statements at trial were unconvincing.

And so is the very nature of a 50% commission agreement. The special-purpose vehicles the partners used to buy planes from Bombardier for resale took on over $100 million in obligations. Shnaider asks this Court to believe that he gave Slinin 50% of the profit without requiring Slinin to shoulder some of that risk. That is implausible. Contrary to Shnaider's inventiveness on the stand, Lee testified that Shnaider has never paid a broker a 50% commission in nearly 40 transactions. The Court must decide if Slinin is the first or, more likely, if the agreement was to shoulder risk and share profit alike—i.e., the agreement was for a partnership.

If the Court determines that Slinin and Shnaider were partners, it must then consider two defenses. The only defense Shnaider raised is that he and Slinin settled their dispute in an oral agreement whereby Shnaider agreed to pay Slinin a fraction of his demand only if Slinin was able to stop a foreign, criminal investigation. Shnaider again asks the Court to believe the fantastic. People do not part with half the profit without offloading some of the risk and people in the real world do not part with their claims on the off chance something beyond their control will happen. This dispute did not settle.

Finally, the Court raised whether inequitable conduct by Slinin justifies dismissing his claims. Respectfully, it does not. As explained below, the tax and corporate-form issues raised by the Court during trial do not render Slinin's hands unclean or provide a public-policy justification for the dismissal of his claims. Likewise, Slinin's failure to recall many of the documents and details raised during his examination only reflects the fact that the exhibits and issues he was asked about at trial were improperly omitted from Shnaider's pretrial disclosures. Because of those omissions, Slinin was unable to review and prepare for the questions about minor details that occurred a decade ago. The only real injustice would be to hand Shnaider a windfall victory based on inferences that Slinin was unprepared to rebut, only because Shnaider did not raise the relevant defenses, issues, or documents in his pretrial disclosures, despite being represented by able counsel from two of the most respected law firms in the country.

The just result here is to give effect to the agreement the parties made. The Court should find in favor of Slinin and award him the share of the partnership proceeds that he is due.

## Statement of Facts

### I.     The parties have a longstanding relationship.

Eduard Slinin was born in the Ukraine and immigrated to the United States as a boy with his parents in 1977. Slinin Aff. ¶ 1. Slinin dropped out of high school to work and, by the age of 20, owned his own limousine service company. *Id*. ¶ 2. Today, Slinin lives in New Jersey, and his family-owned transportation business is one of the largest in New York. *Id.*

Alex Shnaider, like Slinin, emigrated from the former Soviet Union. Shnaider Aff. ¶ 7. Shnaider left Russia at 3 for Israel and ultimately immigrated to Canada at 12. *Id*. Like Slinin, Shnaider is a successful businessperson, who has worked in, and owned, businesses in steel, mining, shipping, retail, real estate, and aircraft. *Id*. ¶ 9.

Slinin and Shnaider met in Miami around 2004. Slinin Aff. ¶¶ 3-4. They kept in touch and became friends. *Id.* During Shnaider's visits to New York, the two would often meet for meals. *Id*. Their families vacationed together and attended each other's family events. *Id*. ¶ 6. About a year after they met, Slinin and Shnaider invested together in a real estate project in Ukraine. Slinin Aff. ¶ 5; Shnaider Aff. ¶ 14. They also routinely discussed business and shared investment ideas. Shnaider Aff. ¶ 13.

## II.     After a series of conversations, Slinin and Shnaider agree to sell jets together.

One of the businesses that Slinin and Shnaider discussed was airplanes. Shnaider had developed a great deal of knowledge about the private aircraft industry by buying and selling aircraft and aircraft contracts from jet-manufacturer Bombardier. Shnaider ¶¶ 11-12. Shnaider typically purchased and sold aircraft via his principal business, Midland Resources Holdings, Ltd., which he owned 50/50 with Eduard Shyfrin. Tr. 234:8-240:13; Shnaider ¶ 3, 10; PX 100. Over the years, Shnaider had bought or sold more than 30 Bombardier aircraft. Shnaider Aff. ¶ 11. Because he was such a good customer, Bombardier would give Shnaider favorable pricing on its products. Shnaider Aff. ¶ 15.

Slinin had little experience in private aircraft but was interested in expanding his transportation business. *Id*.

Over the course of many conversations, an idea took form. Shnaider had a good relationship with Bombardier that gave him access to aircraft in a hot market with favorable pricing. Slinin Aff. ¶¶ 7-11; Shnaider Aff. ¶¶ 15-20; Tr. 74:3-12. Slinin had a large network in Russia from his transportation business, which included individuals who had expressed interest in buying aircraft. Slinin Aff. ¶¶ 7-11; Shnaider Aff. ¶¶ 15-20. The economy, including in Russia, was red hot. *Id*. And the pair learned that aircraft prices in Russia were significantly higher than in the United States and Canada. *Id*.

Over breakfast at the Four Seasons in New York, Slinin and Shnaider made a deal to become partners. *Id*. Slinin would tap his network to locate buyers. *Id*. And, if he found any, Shnaider would handle the contracts necessary to buy and resell the jets from Bombardier. *Id*. The pair would split 50/50 whatever profit remained after reimbursing themselves for their expenses. *Id*.

That was their deal. And while the pair never put the agreement in writing, Slinin trusted Shnaider and expected that he would honor his word. Slinin Aff. ¶ 12.

### III.     Slinin sells 5 jets to Georgiy Pirumov and 2 jets to Oleg Sheikhametov.

Shnaider and Slinin met several more times in New York to discuss their arrangement. *Id*. ¶¶ 14-16. One of those meetings was over dinner at Milos in New York. *Id*. ¶ 16; Shnaider Aff. ¶¶ 24-26; Tr. 70:8-72:7, 394:20-398:9. Joining Slinin and Shnaider at that dinner were Jahid Karim, the head of global sales at Bombardier at the time, and George Rependa, then an independent aircraft broker that worked heavily with Bombardier. Slinin Aff. ¶ 16; Shnaider Aff. ¶¶ 15-16, 24-26; Tr. 69:3-8, 70:8-72:7, 394:20-398:9.

At the meeting, Slinin and Shnaider discussed with Karim their plan to buy planes from Bombardier and resell them to buyers in Russia. Slinin Aff. ¶ 16; Shnaider Aff. ¶¶ 24-26; Tr. 69:3-8, 70:8-72:7, 394:20-398:9. Shnaider introduced Slinin to Karim at that meeting as his partner. Tr. 396:2-5. And the pair discussed pricing on Bombardier aircraft, specifically, Challenger 850s and Learjets. *Id*. at 69:3-8, 70:8-72:7, 394:20-398:9. At the end of the meeting, both Slinin and Shnaider each agreed with Karim to buy a Learjet for themselves as individuals and not for the partnership. *Id*. at 69:3-8, 70:8-72:7, 394:20-398:9; DXs. 9, 10.

Before the Karim-meeting, Slinin had already identified two potential buyers, Georgiy Pirumov and Oleg Sheikhametov. Tr. 394:22-395:2. In consultation with Shnaider, Slinin negotiated and came to terms with both on the purchase of Bombardier jets. Shnaider Aff. ¶ 17-18;

DX 20. Slinin made clear to both buyers that he was working with Shnaider as a partner. Shnaider Aff. ¶ 20. Pirumov agreed to buy five planes: four Challenger 850s and one Global XRS. *Id*. And Sheikhametov agreed to buy two planes, both Challenger 850s. *Id.*

Shnaider instructed Robert Lee, then Chief Financial Officer of Midland, to put together the paperwork necessary to buy the seven planes from Bombardier and resell them to Pirumov and Sheikhametov. Shnaider Aff. ¶ 30; Lee Aff. ¶¶ 4, 8, 10, 12. Each aircraft transaction required several contracts and was supposed to work as follows.

First, the partnership would set up a special-purpose vehicle (SPV) that would enter into an aircraft purchase agreement for a single plane with Bombardier. *E.g.*, DX 3A. That agreement would set an overall price, a payment schedule, and identify the aircraft type and a delivery date. *E.g.*, *id*. at §§ 1, 2. Simultaneously, the same SPV [1] that entered into the agreement with Bombardier to buy the plane would enter into a mirror agreement to sell the plane to another SPV. *E.g.*, DX 3. That agreement would again set-out an overall price, a payment schedule, and identify the aircraft and a delivery date. *Id.* at §§ 1, 2. The first contract price would be higher than the second, and the difference would be the partnership's profit. Lee Aff. ¶ 27-28. Finally, a separate agreement would transfer the equity of the ultimate-purchaser SPV to Pirumov or Sheikhametov. *E.g.*, DX 4B.

Each set of contracts identified the corresponding plane by a number. The two Challenger 850s ordered by Sheikhametov were planes '161 and '162. DXs. 3-4. The four Challenger 850s ordered by Pirumov were planes '169, '170, '171, and '172 and the Global XRS was plane '298. DXs. 5-8.

---

[1] Lee mistakenly mismatched some of the contracts. For example, for the '161 plane, the SPV that bought the plane from Bombardier was CL 850 Aviation Holdings Ltd. DX 3A. But the SPV that sold it on to the next SPV was Challenger Aircraft Company. DX 3; Tr. 340:22-341:18.

The SPVs that the partnership used to contract to buy the planes from Bombardier were called Challenger Aircraft Company, CL 850 Aviation Holdings, and CL 850 Aircraft Investments. Lee Aff. ¶ 17. None of these companies had assets or bank accounts. *Id.* ¶ 18. They existed solely to help the partnership buy and re-sell aircraft. *Id.* ¶¶ 17-18. Neither Shnaider nor Slinin were individually listed as an owner of these SPVs on their formation documents. Shnaider Aff. ¶ 31. But Slinin, Shnaider, and Lee each understood that the companies would be operated to benefit the partnership; Slinin and Shnaider—the partners—were in practice the SPVs' principals. DX 1 at P364 (defining CL 850 Aviation as an entity "owned or controlled" by Slinin); PX 22 at 4 (Shnaider stating "I together with E. Slinin acquired right of ownership on two controlled companies: Challenger aircraft company ltd and CL850 Aircraft investments ltd."); PX 28 at AS9544 (referring to Slinin and Shnaider as "principals" of Challenger Aircraft); Tr. 188:3-205:16. They were the partnership's SPVs.

With the paperwork ready, Slinin handled obtaining signatures and initial deposits from Pirumov and Sheikhametov. Slinin Aff. ¶¶ 22-23; Lee Aff. ¶¶ 34-36; Tr. 407:12-15, DX 20 at P392-93 (Slinin informing Shnaider by text that Pirumov "sign[ed] contracts and will start wire money Tuesday I will keep you posted [sic]"), at P386 ("Alex we will get deposit on Global next week my guy just called me"); at P394 ("Do you[, Slinin,] believe we will have [Pirumov's] full deposit on all 5 planes next [sic] week? Is he serious about it.?"); DXs. 21, 22. Slinin collected the deposits called for in the mirror agreements from Pirumov and Sheikhametov. Slinin Aff. ¶¶ 22-23; Tr. 232:25-234:7, 324:1-325:6, 328:12-21; DX 22. He then passed on the deposit amounts that each contract called for between the partnership's SPVs and Bombardier. Slinin Aff. ¶¶ 23.

Because Pirumov's and Sheikhametov's deposits were larger than the deposits required by Bombardier, there was money left over. Slinin ¶ 23; DX 22. Slinin paid some of this money as a commission to a broker who introduced him to Pirumov and Sheikhametov and then split the rest

equally between himself and Shnaider as a profit distribution under their agreement. Slinin ¶ 23; DX 22. Slinin and Shnaider each received $3.1 million from those distributions. Lee Aff. ¶¶ 34-36; DXs. 21, 22.

## IV.  The financial crisis leads Pirumov and Sheikhametov to renege.

Pirumov and Sheikhametov signed their contracts and paid their deposits in late 2017. *E.g.*, DX 1 (signed by Sheikhametov on October 17, 2007). As the financial crisis began and deepened, both men backed out of their agreements to buy planes from the partnership. Slinin Aff. ¶ 24.

To see if the partnership could salvage the deal with Pirumov, Slinin traveled to Geneva to meet with Pirumov and his lawyer. Slinin Aff. ¶ 26. Shnaider arranged this meeting and arranged for a Bombardier senior executive named Bob Horn to attend. *Id*. Shnaider spoke to Pirumov on the phone during this time. PX 22 at 3 ("around the end of Spring/beginning of Summer 2008 [Pirumov] called me, and I had telephone conversation with him … ."). The purpose of the meeting was for Bombardier to confirm for Pirumov that the partnership's relationship with Bombardier was legitimate. *Id*.

Next, Shnaider suggested that Slinin (not the partnership itself) buy back Pirumov's interest in the '169 plane to appease Pirumov and preserve the remainder of the partnership's business with him. Slinin Aff. ¶¶ 27-29; Lee Aff. ¶¶ 44-45. Slinin did so. *Id*.; DX 5B. Slinin paid Pirumov $3.5 million. Slinin Aff. ¶ 27. Shnaider later found an alternative buyer for the '169, an acquaintance named Eugeni Vasiliev. Slinin Aff. ¶¶ 27-29; Lee Aff. ¶¶ 44-45; DXs. 5C- 5E; PX 22 at 6. Vasiliev paid Slinin $2 million to assume the '169 contracts, but later failed to make any more payments, bringing the plane contract back under Slinin's control. Slinin Aff. ¶¶ 27-29; Lee Aff. ¶¶ 44-45. Pirumov ultimately took over the '172 plane's contracts and handled things directly with Bombardier but was still unsatisfied with the resolution. PX 22 at 5-6; DXs. 8B- 8D.

Pirumov then initiated a criminal investigation in Moscow, accusing the partners of fraud and alleging that they never passed Pirumov's money on to Bombardier. Slinin Aff. ¶ 30; Tr. 520:16-25. Slinin hired a Moscow-based lawyer, Igor Kopenkin, to represent the partners in connection with the investigation; he paid Kopenkin $800,000 for the representation. Slinin Aff. ¶¶ 30; PX 30. As part of the investigation, the partners and Lee traveled to Moscow to give statements and worked with Bombardier to try to get Bombardier to confirm to Russian law enforcement that the contracts were genuine. Lee Aff. ¶ 64; PX 22.

Shnaider's statement to the authorities outlined the structure of the partnership and its dealings with Pirumov, including the partnership's use of the SPVs, the deal to transfer the '169 plane to Slinin, and the deal for Pirumov to take over the '172 plane directly with Bombardier. PX 22. The partnership, with the help of Lee, also drafted answers for Bombardier to provide to written questions it received from Russian law enforcement. PX 28; Tr. 197:17-25. One of those questions was "Who represented the interests of Bombardier Inc. and Challenger Aircraft Company Ltd. when the purchase and sale agreements for [the four Pirumov Challenger 850s] were being concluded?" PX 28. Lee's proposed answer was: "Challenger Aircraft Company Ltd: Principals (AS and E Slinin), Aircraft consultant (GR) Financial department (RL)."[2] PX 28; Tr. 188:3-197:25.

Ultimately, Kopenkin told Slinin the case had been discontinued, and Slinin conveyed that to Shnaider. Tr. 535:3-21.

## V. Sheikhametov threatens Slinin, and Shnaider to get his deposits back.

Like Pirumov, Sheikhametov wanted his deposit money back. Sheikhametov called Slinin, Shnaider, and Shnaider's partner in Midland, Eduard Shyfrin. Slinin Aff. ¶ 31; Tr. 97:5-98:12,

---

[2] References to AS, E Slinin, GR, and RL, are to Alex Shnaider, Eddie Slinin, George Rependa, and Robert Lee, respectively.

457:4-459:9, 465:3-467:12, 468:23-469:21. The message Sheikhametov delivered to Slinin was clear: if Sheikhametov did not have his money back by the end of the year, then Sheikhametov would kill him. Tr. 457:4-459:9, 465:3-467:12, 468:23-469:21. Shyfrin later called Slinin to explain that Sheikhametov had a reputation as someone not to be trifled with, and strongly encouraged Slinin and Shnaider to return the money. *Id.* at 457:4-459:9, 465:3-467:12, 468:23-469:21.

Slinin and Shnaider made the decision together to return Sheikhametov's money. Tr. 471:5-9. But Slinin lacked the liquidity to meet Sheikhametov's deadline, and Shnaider did not want to pay millions of dollars himself. Slinin Aff. ¶¶ 33-34; Shnaider Aff. ¶ 47. Shnaider told Slinin, "You have to have skin in the game. You are my partner. If you don't have the cash available at this time, I am willing to provide you that money, but we are 50/50 until we liquidate those positions." Slinin Aff. ¶ 34.

Taking advantage of the pressure Sheikhametov's threat and deadline created, Shnaider insisted that any loan be subject to terms very favorable to him. Shnaider Aff. ¶ 49-53. Shnaider got a 12% interest rate. *Id.* ¶ 52. And Shnaider "asked that [Slinin] personally guarantee the loan and that his wife and limo company, All-City Funding, also sign guarantees." *Id.* ¶ 49. Ultimately, Shnaider put the loan in All-City's name and had Slinin personally guarantee it. DXs. 1, 2. Shnaider carefully instructed Lee on how the loan documents should be structured and had Lee tap a U.S. law firm to prepare the documents. Lee Aff. ¶¶ 47-48; Tr. 198:14-199:12. Lee reviewed up to 10 drafts of the loan paperwork because he wanted to make sure it met Shnaider's expectations. Tr. 200:15-201:1.

In effect, the loan pledged Slinin's share of any future proceeds that the partnership obtained due to its interest in the Sheikhametov planes ('161 and '162). DX 1 at P364. It accomplished this by requiring Slinin to make "mandatory prepayment [with] any cash proceeds

received … by the Borrower or any Borrower Entity arising from the sale of any … ownership or other interest in any aircraft, or any contract for purchase or manufacture of any aircraft." *Id*. at P364. The loan defined a "Borrower Entity" as "any entity directly or indirectly owned by or under the direct or indirect control of the Borrower or Eduard Slinin." *Id*. It then defined CL 850, the partnership SPV that contracted with Bombardier for the '161 and '162 planes, as a Borrower Entity. *Id*. The loan documents explained that "the Lender will obtain from CL 850 Aviation Holdings Limited (a Borrower Entity) an interest in the '161 and '162 contracts with Bombardier, and then it would try to "liquidate [those] interests … by either selling its rights under such contract … or by making arrangements with Bombardier, Inc. for the termination of such contract." *Id*. The loan documents provided that Shnaider "expects to receive approximately $4,000,000 from" disposing of the two contract interests, which corresponds to the amount the partnership deposited with Bombardier. *Id*.; DX 22.

As security, the loan documents also took Slinin's interest in two airplanes that Slinin held outside the partnership. DX 1 at P365. By the time the parties prepared the loan documents, Slinin had already paid Pirumov for the '169 plane. Slinin Aff. ¶ 27-29; Lee Aff. ¶¶ 44-45; DX 5B. And Slinin had also put down a deposit on the Learjet he agreed to buy that night in New York with Jahid Karim. DX 10. For these planes, the loan called for a "collateral assignment" in a section that made no mention of the partnership SPVs. DX 1 at P365.

With the paperwork in order, Slinin and Shnaider wired Sheikhametov $5 million to refund to Sheikhametov the deposits he put down on planes '161 and '162. Slinin Aff. ¶ 33; Tr. 472:19-473:11. Slinin and Shnaider provided $1 million to Sheikhametov in cash. Slinin Aff. ¶ 33. The remaining $4 million of that was, in effect, loaned by Shnaider to Slinin and then contributed by Slinin. Slinin Aff. ¶ 33.

## VI.    Shnaider negotiates a resolution with Bombardier.

After the partnership paid Sheikhametov back, the partnership—through CAC and CL850—had pending contracts to buy from Bombardier four Challenger 850s (planes '161, '162, '170, and '171) and a Global XRS (plane '298). And it had paid $10.5 million in deposits to Bombardier on those contracts. DX 22. But it no longer had buyers ready to make further deposits. Accordingly, Shnaider began talks with Bombardier to come to a negotiated resolution. Shnaider Aff. ¶ 57.

Ultimately, Shnaider called Slinin and informed him that "I'm going to take the position [plane '169] from you, we're going to all return back [all of the deposits] to Bombardier and we [are] going to get credited for everything … and take a delivery of two aircrafts, one Challenger 850 green and one Lear 60-XR." Tr. 447:2-9. What Shnaider was referring to is an agreement he reached with Bombardier, on behalf of the partnership. Bombardier agreed to, in effect, to take all of the deposits it had received and apply those deposits toward the purchase of the '161 plane in "green" condition[3] and to the purchase of the '206 plane. Slinin Aff. ¶¶ 37-44; Shnaider Aff. ¶¶ 57-64. Because further payments on the contracts were not due until delivery, the contracts were not yet in default. Tr. 34311-18. The credited deposits included all the remaining partnership planes ('161, '162, '170, '171, '298), the Learjet that Slinin had contracted to buy for himself ('207), the Challenger 850 Slinin had bought back from Pirumov and failed to sell to Vasiliev ('169), the Learjet Shnaider had contracted to buy for himself ('207), and several additional planes that Shnaider was buying for Midland. *Id.* The '161 and '206 contracts were amended, and the remaining contracts cancelled. *Id.*

---

[3] A plane in "green" condition is flyable but without interior finishing and comes at a lower price. Slinin Aff. ¶¶ 37-44; Shnaider Aff. ¶¶ 57-64.

This arrangement allowed the partnership to pay for the '161 and '206 planes without additional cash. Tr. 110:10-18, 225:3-229:19; DX 12. After the restructuring of deposits with Bombardier, the intended and final disposition of the planes the partnership attempted to sell to Pirumov and Sheikhametov is as follows:

| Plane Designation | Original Buyer | Partnership SPV | Buyer SPV | Disposition |
|---|---|---|---|---|
| The '161 Plane (Challenger 850) | Sheikhametov | Challenger Aircraft Company* | Olave Equities | Sold by the partnership to a Chinese buyer for $23.3 million (DX 3 series; Lee Aff. ¶¶ 54-63; Slinin Aff. ¶ 37) |
| The '162 Plane (Challenger 850) | Sheikhametov | Challenger Aircraft Company* | Colley International | Cancelled, deposit credited to the partnership by Bombardier (DX 4 series; Lee Aff. ¶ 51; Slinin Aff. ¶ 37) |
| The '169 Plane (Challenger 850) | Pirumov | Challenger Aircraft Company | Blue Industrial Skies | Assigned from Pirumov to Slinin for $3.5 million and on to Vasiliev for $2 million; cancelled after Vasiliev (SPV: Woren) defaulted and deposit credited to the partnership by Bombardier (DX 5 series; Slinin Aff. ¶¶ 27-28, 37) |
| The '170 Plane (Challenger 850) | Pirumov | Challenger Aircraft Company | Jofan Holding | Cancelled, deposit credited to the partnership by Bombardier (DX 6 series; Slinin Aff. ¶ 37) |
| The '171 Plane (Challenger 850) | Pirumov | Challenger Aircraft Company | Setius Technologies | Cancelled, deposit credited to the partnership by Bombardier (DX 7 series; Slinin Aff. ¶ 7) |
| The '172 Plane (Challenger 850) | Pirumov | Challenger Aircraft Company | Xaman Holdings | Pirumov completed the purchase directly with Bombardier (DX 8 series; Slinin Aff. ¶ 29) |
| The '298 Plane (Global Express XRS) | Pirumov | Challenger Aircraft Company | Stogan Assets | Cancelled, deposit credited to the partnership by Bombardier (DX 11 series; Slinin Aff. ¶ 37) |
| The '206 Plane (Learjet XR60) | Shnaider | None | None (Midland) | Put into the partnership by Shnaider, purchased by the partnership but then returned to Bombardier at a loss (DX 10 series; Slinin Aff. ¶ 37) |

| Plane Designation | Original Buyer | Partnership SPV | Buyer SPV | Disposition |
|---|---|---|---|---|
| The '207 Plane (Learjet XR60) | Slinin | None | KSR Jet, Inc. | Put into the partnership by Slinin, cancelled, deposit credited to the partnership by Bombardier (DX 11 series; Slinin Aff. ¶ 37) |

## VII. Shnaider sells the '161 plane but then refuses to settle up with Slinin.

Bombardier and the partnership entered into their restructuring agreement in the summer of 2009. It took two more years for the partnership to dispose of the '206 and '161 planes.

Neither Shnaider nor Slinin could find a buyer for the '206 plane. Shnaider arranged to, in effect, give it back to Bombardier for a $9.5 million credit that he took individually for the purchase of other planes. Lee ¶¶ 62-63. Shnaider and Slinin discussed that transaction and agreed that the partnership would treat it as a loss of $1 million since the partnership had paid $10.5 million for Lear, but Bombardier only credited it for $9.5. Slinin Aff. ¶ 44.

As for the '161 plane, Shnaider ultimately found a buyer in China. Shnaider took delivery of the '161 in unfinished condition, paid $3.5 million of his own funds to finish it, paid additional incidental costs, and sold it to the buyer for $23,300,000 in June of 2011. Lee Aff. ¶¶ 55-58; Shnaider Aff. ¶¶ 65, 67; Slinin Aff. ¶ 43. Slinin learned about the sale through George Rependa and tried to reach Shnaider to ask him for his share of the money. Slinin Aff. ¶ 45. Unable to reach Shnaider, Slinin called Lee, and Lee told Slinin that he would likely receive around $6.5 million, but that Lee would need to confirm with Shnaider before sending the funds. *Id*. ¶¶ 45-46.

After that, Shnaider went radio silent. Slinin tried to reach Shnaider repeatedly, without success. *Id*. ¶¶ 45-47. When Slinin did manage to reach Shnaider, Shnaider claimed to be on vacation. *Id*. After that, Shnaider refused to answer Slinin's calls. *Id*.

After a series of emails and letters exchanged between one of Slinin's employees and Lee about the money Shnaider owed Slinin, Shnaider offered Slinin about $243,000. Slinin Aff. ¶ 48; DXs. 12-16. Slinin refused this offer. Slinin Aff. ¶ 48. Next, Shnaider and Slinin met in Toronto

to negotiate. *Id*. ¶¶ 49-50. At that meeting, Shnaider said that he did not want to pay Slinin because the Pirumov investigation in Russia was still ongoing. *Id*. ¶ 50. Shnaider offered to pay Slinin $500,000 if the investigation were deemed closed by a certain date. *Id*. Slinin refused this offer to. *Id*.; Tr. 534:11-15, 539:11-14, 541:15-23. Thereafter, he sued. ECF No. 1, Compl.

<u>Argument</u>

## I.    Slinin and Shnaider formed a partnership because all the necessary elements of a partnership are present.

Under New York law, "A partnership is an association of two or more persons to carry on as co-owners a business for profit." N.Y. P'ship Law § 10(1). No written agreement is needed to form a partnership; it is well established that an oral or "handshake" partnership can be formed under New York law. *Cohen v. Biernoff*, 84 A.D.2d 802, 802, 444 N.Y.S.2d 152, 153 (1981). "To demonstrate the existence of a partnership, courts look to four elements: (1) the parties' sharing of profits and losses; (2) the parties' joint control and management of the business; (3) the contribution by each party of property, financial resources, effort, skill, or knowledge to the business; and (4) the parties' intention to be partners." *Kidz Cloz, Inc. v. Officially For Kids, Inc.*, 320 F. Supp. 2d 164, 171 (S.D.N.Y. 2004). "No single factor is determinative; a court considers the parties' relationship as a whole." *Hammond v. Smith*, 151 A.D.3d 1896, 1897 (N.Y. App. Div.), *leave to appeal denied*, 153 A.D.3d 1677 (N.Y. App. Div. 2017).

There is no dispute that Slinin and Shnaider had an oral agreement. And there is no dispute about the agreement's key terms: Slinin would find buyers, Shnaider would obtain airplanes, and the two would split the profit after expenses. The dispute is only about which legal label to attach to the agreement. Slinin believes he and Shnaider were equal partners, having agreed to work together to make a profit buying and reselling jets. Shnaider's current story is that Slinin was a broker and that Slinin's 50% share of the profit was nothing more than a commission.

Only Slinin's position is consistent with the documentary evidence and common sense. Indeed, to find for Shnaider on this point, the Court would have to believe that Shnaider, a sophisticated businessman and billionaire, would agree to give Slinin 50% of the profit without bearing any risk in transactions worth well-over $100 million. The Court would also have to ignore the prelitigation statements of Shnaider and Lee that implicitly or explicitly refer to Slinin as Shnaider's partner, including the promissory note (DX 1), Lee's email (PX 28), and Shnaider's statement to Russian law enforcement (PX 22). And the Court would have to do this on behalf of a man who could not credibly explain away those statements and who brought to trial a loyal employee who likewise utterly failed to explain how his prelitigation words and actions could possibly be consistent with Shnaider's "broker" theory. This Court should accept Slinin's version of the parties' relationship because it is both simpler and more consistent with the documentary evidence and commonsense.

In addition to showing that Shnaider's "commission" story is fabricated, the trial evidence also shows that each factor supports a finding of a partnership.

**A.      Slinin and Shnaider agreed to split both profits and loss.**

It is undisputed that the parties agreed to and did share profits. Slinin Aff. ¶ 11; Shnaider Aff. ¶¶ 5, 21, 28, 33, 35; Tr. 232:25-234:7, 324:1-325:6, 328:12-21; DX 21, 22. The parties also shared the risk of loss in at least two ways.

First, Slinin and Shnaider each bore the risks associated with the Aircraft Purchase Agreements entered into between Bombardier and the SPVs Lee set up to facilitate the airplane sales. Those SPVs are Challenger Aircraft Company, CL 850 Aviation, and CL 850 Aircraft Investments. Lee Aff. ¶ 17. While Slinin was not listed as an owner of the shell companies, the documentary evidence establishes that Slinin and Shnaider were using them as partners:

- The Promissory Note executed between Shnaider and Slinin defined "borrower entity" as an entity "directly or indirectly" "owned" or "controlled" by Eduard Slinin and defined CL 850 Aviation Holdings Ltd. as a borrower entity. DX 1.

- In an April 11, 2011 email from Lee to Shnaider, Lee referred to both Slinin and Shnaider as "principals" of Challenger Aircraft Company. PX 28.

- In Shnaider's May 25, 2009 interview with the Russian authorities, Shnaider stated "I together with E. Slinin acquired right of ownership in two controlled companies: Challenger aircraft company ltd and CL850 Aircraft Investments ltd." PX 22 at 4.

Slinin and Shnaider used those entities to enter into Aircraft Purchase Agreements with Bombardier. DXs. 3A-8A, 11A. Those contracts obligated the entities to make scheduled payments to Bombardier on pain of forfeiture of payments made and liquidated damages. *See, e.g.*, DX 3A at art. 2, art. 9.5. Both men were at risk: if the special purpose vehicles defaulted, the value of each partner's share of the vehicle would be imperiled, diminished, or outright lost. And both men understood that if the companies became liable as a result of the transactions with Bombardier, they would be equally responsible. Shnaider has no cogent explanation for why this would have occurred if Slinin were merely a broker.

Second, both men bore the risk of loss because both men put substantial amounts of money at stake during the partnership—money that would have been lost, had the '161 plane never been sold. Slinin used $3,500,000 of his own money to buy back the '169 contract from Pirumov. Slinin Aff. ¶¶ 27-28; DX 5B. Slinin put $800,000 towards the legal defense of the partners in Russia. Slinin Aff. ¶ 30; PX 30 (admitted as "stipulation of what the testimony of Igor Kopenkin would have been had he been called live" at Tr. 293:8-16). Both men, in effect, turned over to the partnership million-dollar deposits they had placed with Bombardier on jets they had contracted to buy for their personal use so that those deposits could be put towards the partnership's purchase of the '161 plane. Slinin Aff. ¶¶ 35, 39; Shnaider Aff. ¶¶ 38-39, 61-63.

That Slinin and Shnaider agreed to share losses only makes sense. Shnaider concedes that he agreed to split net profits equally with Slinin. Shnaider ¶¶ 5, 21. This concession itself stands

as evidence that the parties here intended to share the risk of loss because it belies logic that an experienced businessperson like Shnaider would agree to yield half the profits to a counterparty taking zero risk. *E.g.*, ECF No. 103, Order Denying Summary Judgment at 4 (citing *Chipman v. Steinberg*, 106 A.D. 343, 344 (N.Y. App. Div. 1984) and *Anderson v. Nat'l Producing Co*., 253 F.2d 834, 837-38 (2d Cir. 1958) ("The agreement to share losses may be inferred where all of the other elements of a partnership are present.").

Finally, sharing of losses may not even be required under New York law. Many cases suggest that it is not. ECF No. 103, Order Denying Summary Judgment at 4 (collecting cases). And the New York Partnership Law itself is inconsistent with treating loss-sharing as a requirement because it treats "the receipt by a person of a share of the profits of a business is prima facie," that is sufficient standing alone, "evidence that he is a partner in the business … ." N.Y. P'ship Law § 10(4); *In re Cross Media Mktg. Corp*., 367 B.R. 435, 456 (Bankr. S.D.N.Y. 2007). If, as a matter of statute, profit-sharing is sufficient evidence of a partnership, then it follows that loss-sharing cannot be an independent requirement. Regardless, the parties were each subject to substantial losses if the partnership failed.

**B.     The parties each had substantial control over various aspects of the partnership.**

The trial evidence established that Slinin and Shnaider exercised the requisite joint management and control over the partnership's affairs. The parties to a partnership do not need to "actually exercise the same degree of management control." *Richbell Info. Servs., Inc. v. Jupiter Partners, L.P.*, 309 A.D.2d 288, 299 (N.Y. App. Div. 2003). The requisite degree of joint control is low: "[A]ny measure of control will do." *Id*. (emphasis in original). Both men had some measure of control.

To varying degrees, both parties were involved in negotiations with Bombardier. While Shnaider took the lead on negotiations with Bombardier throughout the partnership, Shnaider Aff.

¶¶ 24, 57, Slinin was also involved in early negotiations with Bombardier, at a dinner in New York attended by Shnaider and Bombardier's Jahid Fazal-Kamir. Slinin Aff. ¶ 16; Shnaider Aff. ¶ 24; Tr. 69:3-72:7, 395:3-398:12. Shnaider, through his agent Lee, prepared the necessary transactional documents. Shnaider Aff. ¶¶ 30-32. And Slinin principally worked with the buyers, Pirumov and Sheikhametov. Slinin ¶¶ 17-23. Slinin also collected initial deposits paid by Pirumov and Sheikhametov and distributed them to Bombardier and Shnaider. Slinin ¶¶ 17-23. The division of duties between Slinin and Shnaider is wholly consistent with the existence of a partnership. *See Sound Video Unlimited, Inc. v. Video Shack Inc.*, 700 F. Supp. 127, 139 (S.D.N.Y. 1988) ("[T]he parties delegated the daily management responsibility to the person most familiar with a particular branch of the business[, that] is evidence of joint control sufficient to raise an issue of fact."); *In re Cavalry Constr., Inc.*, 2013 WL 5682741, at *12 (Bankr. S.D.N.Y. Oct. 18, 2013).

### C. Both Slinin and Shnaider contributed significantly to the partnership.

Slinin and Shnaider both contributed "property, financial resources, effort, skill, or knowledge to the business" of their partnership. *Kidz Cloz*, 320 F. Supp. 2d at 174. Shnaider contributed, among other things, his relationship with Bombardier and knowledge about buying the company's jets. Shnaider Aff. ¶¶ 15-16, 19, 24-26, 30-32, 57. Slinin contributed, among other things, his relationship with potential buyers and a great deal of his own money. Slinin Aff. ¶¶ 18, 27-28, 30; DX 5B; PX 30; Tr. 293:8-16.

### D. The nature of the agreement and the contemporaneous evidence make clear the parties intended to form a partnership.

The parties' prelitigation statements and the way they structured their dealings establish their intent to form a partnership. Shnaider repeatedly referred to Slinin as his partner or as a co-owner of the SPVs used to conduct the partnership's business. Slinin Aff. ¶ 34; Tr. 395:25-396:8; PX 22 at 4. Slinin understood himself to be entering a 50/50 partnership with Shnaider. Tr. 391:21-25. In writing, Lee referred to both the men as "principals." Tr. 188:3-198:1. Lee had no source of

information on these matters other than Shnaider, so his description of Slinin and Shnaider as being joint owners is strong evidence of what Shnaider actually thought and intended prior to the dispute. Tr. 189:3-191:8.

The structure of their relationship is also evidence of their intent. There is no dispute that Slinin and Shnaider agreed to share profits equally and did share the net proceeds of the initial round of deposits equally. Slinin Aff. ¶ 11; Shnaider Aff. ¶¶ 5, 21, 28, 33, 35; Tr. 232:25-234:7, 324:1-325:6, 328:12-21; DXs. 21, 21. Lee testified that Shnaider had never paid a 50% "commission" to any other putative broker. Tr. 242:8-22. This makes sense because one does not share half the profits with someone who is merely a broker and one does not share half the profits with someone who takes none of the risk. But one does share half the profits with an equal partner, which is why New York makes profit-sharing sufficient evidence of a partnership, N.Y. P'ship Law § 10(4). From this, the Court can reasonably infer that the men intended to be partners.

### E. Shnaider's likely arguments that the parties entered into a commission agreement are meritless.

Slinin expects Shnaider to make several arguments against partnership formation, none of which has merit. First, Shnaider's counsel has attempted to argue that there was no partnership because Slinin's and Shnaider's arrangement lacked certain corporate formalities: "there has to be some modicum of formality. There has to be a business name, a business account, business records." Tr. 12:1-8. That is plain wrong.

To determine whether an oral partnership exists, a court "looks to the parties' conduct, intent, and relationship" and "[n]o single factor is determinative; a court considers the parties' relationship as a whole." *Hammond*, 151 A.D.3d at 1897. If creating a separate name, opening a separate bank account, or registering with the State of New York were mandatory prerequisites to partnership formation, the New York Partnership Law would say as much. Instead, it only requires "an association of two or more persons to carry on as co-owners a business for profit." N.Y. P'ship

Law § 10(1). A lack of formalities therefore cannot preclude a finding of partnership where, as here, all the elements of a partnership are otherwise established.

And corporate formalities are not particularly relevant under the circumstances here. Slinin and Shnaider trusted each other because, when they formed the partnership, they were old friends had who previously done business together. Slinin Aff. ¶¶ 3-12. Because of their close relationship, they were willing to move forward without a written agreement or other formalities. Slinin Aff. ¶¶ 12. While formalities are no doubt relevant where they tip the balance regarding the parties' intent, *see Fasolo v. Scarafile*, 120 A.D.3d 929, 930 (N.Y. App. Div. 2014), their absence says little in these circumstances when expecting formalities between two old friends would be unrealistic. Second, to the extent Shnaider relies on the handful of cases he cited in his trial brief, ECF No. 23-4, Def.'s Tr. Br. at 3-4, each case is distinguishable from this one.

In each case that Snaider has previously relied on, the absence of a partnership was either admitted or all but admitted by the plaintiff. *Fasolo* held that no partnership existed because "the plaintiff admitted that defendant never agreed to share plaintiffs' losses with respect to the property at issue … ." 120 A.D.3d at 930. *F&K Supply, Inc. v. Willowbrook Dev. Co.* held that no partnership existed because one of the alleged partners accounted for income from other ventures as partnership income on his taxes but did not do so for the alleged partnership entity and because the same alleged partner "filed a business certificate indicating that the [alleged partnership entity] was a sole proprietorship." 304 A.D.2d 918, 920–21 (N.Y. App. Div. 2003). These actions were wholly inconsistent with the intent to form a partnership as alleged by the plaintiff. *Kyle v. Brenton* held that no partnership existed because neither party contributed any capital whatsoever to the enterprise. 184 A.D.2d 1036, 1036 (N.Y. App. Div. 1992). And in *Kidz Cloz*, this Court found that the parties lacked the intent to form a partnership because the plaintiff admitted that, when he

proposed partnership to the defendant, the defendant explicitly said no. 320 F. Supp. 2d at 176. No such extreme facts are present here.

## II. Because Slinin and Shnaider formed a partnership, Slinin is entitled to half the partnership profits and prejudgment interest.

When a partnership dissolves, the partners are entitled to be paid back their capital investments and then have any remaining money distributed as profit. N.Y. P'Ship Law §§ 69(1)(a) & (2), 71(c). To determine how much Slinin is owed, the Court must first determine the partnership's assets at the time of dissolution, which is the sum of revenues and contributions, net of expenses. Based on the evidence introduced at trial, the net assets of the partnership at dissolution were roughly $26.7 million.

### Partnership Assets at Dissolution

| Revenue, Expenses, Contributions | Amount | Evidence |
|---|---|---|
| Deposits paid by G. Pirumov | $ 19,400,000.00 | DX 22 |
| Deposits paid by O. Sheikhametov | $ 5,200,000.00 | DX 22 |
| Commissions paid to K. Dubov | $ (3,900,000.00) | DX 22 |
| Deposits paid to Bombardier in connection with G. Pirumov's & O. Sheikhametov's planes | $ (14,500,000.00) | DX 22 |
| Profit distribution to E. Slinin (from initial deposits) | $ (3,100,000.00) | DX 22 |
| Profit distribution to A. Shnaider (from initial deposits) | $ (3,100,000.00) | DX 22 |
| Contribution to repay $5 million to O. Sheikhametov | $ 5,000,000.00 | Slinin Aff. ¶ 33 |
| Repayment of $5 million to O. Sheikhametov | $ (5,000,000.00) | Slinin Aff. ¶ 33 |
| Contribution of $1 million deposit on '207 by E. Slinin | $ 1,000,000.00 | Slinin Aff. ¶ 39 |
| Contribution of $1 million deposit on '206 by A. Shnaider | $ 1,000,000.00 | Slinin Aff. ¶ 39 |
| Contribution of $1.5 million net deposit on '169 by E. Slinin | $ 1,500,000.00 | Slinin Aff. ¶¶ 27-28, 37 |
| Contribution of other deposits by A. Shnaider | $ 6,000,000.00 | Shnaider Aff. ¶ 58[4] |

---

[4] Shnaider did not put in evidence the value of these deposits and therefore the value of this contribution to the partnership. Doing so was his burden. *Natalie TRACT, As Administratrix CTA*

| Revenue, Expenses, Contributions | Amount | | Evidence |
|---|---|---|---|
| Gross sale price of the '161 plane | $ | 23,300,000.00 | DX 12 |
| Sales commission on the '161 plane | $ | (1,048,500.00) | DX 12 |
| Completion costs of the '161 plane by Flying Colours | $ | (3,500,000.00) | Slinin Aff. ¶ 42 |
| Commissions on re-structuring re: sale of the '161 plane | $ | (180,000.00) | DX 12 |
| Insurance, maintenance and registration costs re: sale of the '161 plane | $ | (160,326.00) | DX 12 |
| Delivery costs and change orders | $ | (344,607.00) | DX 12 |
| Loss on the trade-in of the '206 plane | $ | (1,100,000.00) | DX 12 |
| Contribution by E. Slinin of funds to pay legal expenses for Russian investigation | $ | 800,000.00 | Slinin Aff. ¶ 30; PX 30; DX 13 |
| Legal expenses for Russian investigation | $ | (800,000.00) | Slinin Aff. ¶ 30; PX 30; DX 13 |
| **Net Assets at Dissolution** | **$** | **26,466,567.00** | |

Having determined the net assets of the partnership, the next step is to pay back the parties' capital contributions. N.Y. P'Ship Law §§ 61(1) and (2).

### Repayment of Parties' Capital Contributions

| Repayment of Capital Contributions | To Shnaider | To Slinin | Remaining Partnership Assets |
|---|---|---|---|
| Net partnership assets at dissolution | | | $ 26,466,567 |
| Contribution to repay $5 million to O. Sheikhametov | | $ 5,000,000 | $ 21,466,567 |
| Contribution of $1 million deposit on '207 by E. Slinin | | $ 1,000,000 | $ 20,466,567 |
| Contribution of $1 million deposit on '206 by A. Shnaider | $ 1,000,000 | | $ 19,466,567 |
| Contribution of $1.5 million net deposit on '169 by E. Slinin | | $ 1,500,000 | $ 17,966,567 |
| Contribution of other deposits by A. Shnaider | $ 6,000,000 | | $ 11,966,567 |

*of the Estate of Harold M. Tract, Petitioner-Appellant, v. KROLL & TRACT*, et al., 2000 WL 34455048, at 28-29 (N.Y.A.D. 2 Dept. Nov. 22, 2000) (aggregating cases). While Slinin is entitled to hold Shnaider to his burden and give this contribution no value, *id.*, Slinin recognizes that Shnaider did provide value through contribution of deposits. Because equity should reach a fair result, Slinin will instead estimate that Shnaider's contribution was worth $6 million, which is a reasonable estimate based on the typical size of deposits to Bombardier and the value Bombardier gave in exchange for these deposits in credit for the purchase of the '161 plane and '206 plane.

| Repayment of Capital Contributions | To Shnaider | To Slinin | Remaining Partnership Assets |
|---|---|---|---|
| Contribution by E. Slinin re: legal expenses for Russian investigation | | $ 800,000 | $ 11,166,567 |
| Contributions to completion and sale of '161 Plane by A. Shnaider | $ 4,184,933 | | $ 6,981,634 |
| **Totals** | **$ 11,184,933** | **$ 8,300,000** | **$ 6,981,634** |

What remains after the repayment of capital contributions is profit, $6,981,634, to be divided equally according to the parties' agreement. One-half of the profit is $3,490,817. That would be the end of the matter, except for the promissory note. The parties understood that the note would be paid back out of the proceeds of any final resolution with Bombardier. DX 1. There is $5,650,657.53 due under the note.[5] The amount owed to Slinin therefore is the sum of his capital contributions and share of the profit, less the amount due under the note, which amounts to $6,140,159.47.

### Net Amount Due to Slinin

| Net Amount Due from Shnaider to Slinin | | |
|---|---|---|
| Return of Slinin Capital Contributions | $ | 8,300,000.00 |
| Slinin Share of Profits | $ | 3,490,817.00 |
| Repayment of the Promissory Note | $ | (5,650,657.53) |
| **Total Due** | **$** | **6,140,159.47** |

To that amount, New York law adds prejudgment interest. N.Y.C.P.L.R. § 5001(a); *Aurnou v. Greenspan*, 161 A.D.2d 438, 440 (N.Y. App. Div. 1990) (reversing as abuse-of-discretion failure to award prejudgment interest in partnership accounting case). That interest runs from "the earliest ascertainable date the cause of action existed … ." N.Y.C.P.L.R. § 5001(b). Slinin's right to an accounting under § 74 of the Partnership Law arose at "dissolution," which is defined by § 60 as "the change in the relation of the partners caused by any partner ceasing to be associated

---

[5] Under the Promissory Note, Slinin owes $4,450,000 in principal and $1,200,657.53 in interest. DX 12.

in the carrying on as distinguished from the winding up of the business." The date can be fixed when any partner unequivocally manifests an intention to leave the partnership. *E.g.*, *Carola v. Grogan*, 102 A.D.2d 934, 934 (N.Y. App. Div. 1984). Here, the latest date that could possibly be is October 7, 2011—the date of Shnaider's letter rejecting Slinin's requests for his share of the partnership proceeds. DX 14. That letter rejects Slinin's demands and thereby repudiates the partnership. Using that date as the date for prejudgment interest leads to the following calculation:

$$\$6{,}140{,}159.47\ (Total\ Principal\ Due) \times 9\%[6] \times 7.3\ years[7] = \mathbf{\$4{,}037{,}869.80}$$

Finally, taking the principal Shnaider owes Mr. Slinin plus prejudgment interest leads to the following damages:

| Total Damages | | |
|---|---|---|
| Total Due (Principal) | $ | 6,140,159.47 |
| Prejudgment Interest Due | $ | 4,037,869.80 |
| **Total Judgment** | **$** | **10,178,029.27** |

## III. The Court should not grant Shnaider a multi-million-dollar windfall based on the doctrine of unclean hands because Slinin's hands are clean and the doctrine is not applicable to Slinin's claims.

"New York ordinarily permits an unclean hands defense only when plaintiff's reprehensible conduct is 'directly related to the subject matter in litigation and the party seeking to invoke the (unclean hands) doctrine was injured by such conduct.'" *Mallis v. Bankers Tr. Co.*, 615 F.2d 68, 75 (2d Cir. 1980); *Weiss v. Mayflower Doughnut Corp.*, 135 N.E.2d 208, 210 (N.Y. 1956). Here, the Court raised whether potential "tax evasion and misuse of the corporate form" would satisfy this standard. ECF No. 138, Order at 1. The Court has observed that the promissory note was nominally executed by entities that had nothing to do with the note's purpose and has

---

[6] "Interest shall be at the rate of nine per centum per annum, except where otherwise provided by statute." N.Y.C.P.L.R. § 5004.

[7] The total number of years between October 7, 2011 (dissolution of the partnership) until January 25, 2019 (date of the post-trial hearing).

suggested that the loan from Shnaider/Midland to Slinin/All City appears structured to evade taxes. Tr. 137:1-5. Compounding the Court's concern was Slinin's inability to recall a number of details of relevant transactions, documents, and corporate entities. These facts, as far as Slinin's conduct is concerned, have innocent explanations. And the Court should not preclude a recovery based on the doctrine of unclean hands for two reasons.

### A.    Slinin has not engaged in improper conduct.

To start, there is nothing inherently improper about the owner of a closely-held corporation pledging, with the consent of fellow shareholders, the assets of that corporation to satisfy a personal or other business obligation. Absent any deception of a co-owner, fraud on the government, or injury to any third party, a business owner can pledge a share of his business as collateral for a loan, sell it for $1, or wager it in a poker game. [8] *See Glob. Minerals & Metals Corp. v. Holme*, 35 A.D.3d 93, 101, 824 N.Y.S.2d 210, 217 (2006) (upholding summary judgment on a closely-held corporation's claim against one its shareholders, despite the fiduciary duty the shareholder owed the company, because the company had sufficient knowledge of any the questionable dealings by the former officer and shareholder).

Mr. Slinin stated, without contradiction, that the only other shareholder of All City was informed of the promissory note. Tr. 480:11-22. And, as to the tax issue, Mr. Slinin provided all necessary information to his accountant. *Id*. Regardless, a loan is not income for tax purposes such that it would have to be reported on any business or personal tax filing. *Collins v. Comm'r*, 3 F.3d 625, 632 (2d Cir. 1993) (citing *James v. United States,* 366 U.S. 213, 219 (1961))*.* And there is no

---

[8] It would of course be improper (and unlawful) for a partial owner to use a business in a manner not authorized by the other shareholders. And it is likewise improper and illegal to claim a business expense for payments made for a non-business purpose, or to fail to pay taxes on business income. But there is simply no evidence that anything like that occurred here.

evidence that Slinin ever claimed the payment of interest on the note as a business expense.[9] The use of All City as the signatory to the note did not defraud anyone and creates no basis to suggest tax fraud. There is accordingly no basis to deny Slinin relief based on his use of All City to enter into the promissory note, particularly when Slinin signed a personal guarantee.

Further, at the time the parties executed the note, Slinin was not responsible for, or even remotely interested in, the details of the structuring of the loan. Slinin took to heart Sheikhametov's threat. Tr. 458:17-459:7, 465:8-467:12. He was genuinely terrified for himself and his family. *Id*. But he did not have the liquidity to satisfy Sheikhametov's demands. Shnaider Aff. ¶ 47. Shnaider did, and although Shnaider was equally responsible for the deal he and Slinin had made with Sheikhametov, Shnaider required Slinin to sign note that his attorneys drafted to confirm that Slinin would share the risk. Slinin Aff. ¶¶ 31, 33-34. Slinin should not be punished for something that was forced on him, and Shnaider should not be rewarded with an economic windfall for taking advantage of Slinin's position.[10]

---

[9] Had Shnaider given Slinin $4 million on the understanding that Slinin would never have to repay the loan, that would have been a gift, the failure of which to report could in some circumstances lead to tax fraud. But there is simply no evidence to suggest that was the understanding of the parties. To the contrary, both parties testified that Shnaider pushed aggressively to ensure the note would be repaid, including requiring that Slinin guarantee the note in his personal capacity, and even pushed to have Slinin's wife sign the note. Shnaider Aff. ¶ 49.

[10] Shnaider also attempted to imply that Slinin falsified a letter from Bombardier that was sent to the Russian authorities. Tr. 527:10-528:14. But this line of attack is based on rank hearsay and inadmissible exhibits. The only basis for suggesting there was a falsified letter purporting to be from Bombardier, or even that *any* such letter was ever sent, was a separate letter from Bombardier that Shnaider attempted to introduce as DX 122 (without pretrial disclosure). This letter is hearsay and cannot be considered for the truth of the assertion that there was a falsified document or that any document was sent. Fed. R. Evid. 801, 802.

Shnaider then attempted to introduce DX 101, which is a document Slinin produced in discovery that Shnaider has suggested is draft text of a letter from Bombardier. This document has no relevance without the improper hearsay that Shnaider attempted to introduce through DX 122. And Shnaider did not lay any foundation as to the document's origins. This exhibit carried no header and no address information and Slinin did not recall it, Tr. 528:11-530:2, which is not surprising given he produced thousands of pages of documents and this one was likewise not in Shnaider's pretrial disclosures. Beyond being inadmissible, the Court should not draw any

Second, Slinin's failure to recall certain events that occurred a decade ago must be considered in light of Shnaider improperly sandbagging him at trial. Shnaider examined Slinin on more than two-dozen exhibits that were not on Shnaider's exhibit list. (Shnaider's exhibit list ended with DX 26; Shnaider examined Slinin with DX 100 through 147, 180 and 181).[11] This conduct is not countenanced by the rules, which require the parties to disclose all exhibits they "may present at trial other than solely for impeachment ... ." Fed. R. Civ. P. 26(a)(3). These exhibits went well beyond impeachment. Shnaider therefore robbed Slinin of his opportunity to adequately prepare himself to testify about a decade-old series of events involving no fewer than 15 separate corporate entities and dozens of separate transactions.

The effect of Shnaider's sandbagging was exacerbated further by the nature of Slinin's business.[12] Slinin's transportation and business holdings encompass roughly 50 corporate entities, some long-term and some single-purpose. For these entities, Slinin is often the principal, managing member, owner, or some combination thereof. His personal and corporate income tax returns are, for most years, over one thousand pages long. In addition to tax returns, Slinin must also submit approximately 200 discrete filings per year to various franchise authorities. To manage all this, his accountants and tax advisors for the last 25 years, Kalick & Associates,[13] routinely spend in excess of 500 hours a year on Slinin's personal and business accounts. Given the range and complexity

---

negative inferences as to its existence because Shnaider has offered no evidence that Slinin had anything to do with its creation. There are multiple innocent explanations that are equally plausible, including that the draft text could have been an attachment to an email Slinin *received* or it could have been a draft that was sent to Bombardier with a request that Bombardier send the letter.

[11] The Court did not admit the vast majority of these documents during the trial and should not consider them if asked to rely on them now. To the extent Shnaider seeks their admission now, Slinin objects for the reasons described above.

[12] Slinin did not present the facts related to the nature of his business at trial. Had Shnaider fulfilled his disclosure obligations, Slinin would have been prepared to and would have done so. He offers them now in the nature of a proffer.

[13] The "Mr. Levine" referred to by Slinin at trial is a principal of Kalick & Associates.

of his affairs, Slinin has long relied heavily on the Kalick team and other legal and financial advisors, including trusted partners like Shnaider.

In addition to being party to a complex business structure, Slinin is a man who came to the United States at 13, speaking no English and left school 2 years later to work. Slinin recognizes that he is responsible for the legal consequences of the documents he signed. *Compare* Tr. 479:25-480:2 *with* Tr. 507:22-508:23. But that does not mean he can reasonably be expected to recall, off-the-cuff, the organizational details of one of dozens of companies in which he held an interest a decade ago. He is not a details man and, as this Court has already observed, his statements sometimes "reflect a layman's understanding of his ultimate interest" in his business activities. *See* ECF No. 103, Order Denying Summary Judgment at 3. Had Shnaider disclosed the dozens of specific exhibits in his pretrial disclosures as required, and had he raised the unclean hands defense posited by the Court, Slinin could have reviewed the documents in advance and been prepared to speak to their structure. It is for this very reason that the pretrial disclosure process exists. Shnaider clearly could have listed these exhibits in his pretrial disclosures. The Court should not allow him to benefit from sandbagging Slinin with them at trial.

### B. The doctrine of unclean hands does not apply here.

Even if there had been wrongdoing on Slinin's part, there is no evidence, nor any allegation, that it injured Shnaider. The defense of unclean hands is therefore unavailable to him. *See Bild v. Weider*, 567 F. App'x 49, 51 (2d Cir. 2014) ("Bild's alleged 'unconscionable act' of tax avoidance did not injure Weider"); *Bistricer v. Bistricer*, 659 F. Supp. 215, 217–18 (E.D.N.Y. 1987) (rejecting tax-fraud based unclean hands argument because "[i]f a plaintiff is not guilty of inequitable conduct toward the defendant in the transaction, his hands are as clean as the law requires."); *Agarwal v. Sandy Dalal, Ltd.*, 2006 WL 2621048, at *8 (D. Neb. Sept. 12, 2006) (same) (applying New York law); *Dinerstein v. Dinerstein*, 300 N.Y.S.2d 677, 678 (1 Dep't 1969).

Unclean hands cannot save Shnaider for two other reasons. First, Shnaider waived the defense by failing to include it in the final pretrial order. Fed. R. Civ. P. 16(e); *Colli v. Wirth*, 1996 WL 442835, at *1 (S.D.N.Y. Aug. 6, 1996) ("It is an established procedural principle that a party's failure to include a legal theory or defense in the pre-trial order results in its subsequent abandonment or waiver."). This waiver rule applies to unclean hands. *The Filtron Mfg. Co., Inc. v. Fil–Coil Co., Inc.*, 1981 WL 1288, at *6 (E.D.N.Y. Mar. 12, 1981). Shnaider did not preserve unclean hands in the final pretrial order, ECF No. 122, so it cannot help him absent a showing of "manifest injustice." Fed. R. Civ. P. 16(e). And it would not be manifestly unjust for Shnaider to avoid paying Slinin what he is due under these circumstances. The exact opposite would be true.

Second, the doctrine of unclean hands does not apply to the statutory accounting remedy provided for under the New York Partnership Law. *See Carola v. Grogan*, 102 A.D.2d 934, 934 (N.Y. App. Div. 1984) ("While the doctrine of unclean hands may, arguably, be used to defeat the right to an accounting … , it should be noted that such an argument has never been made successfully."). It is well-established that equitable defenses cannot defeat legal claims. *E.g., In re Ampal-Am. Israel Corp.*, 545 B.R. 802, 810 (Bankr. S.D.N.Y. 2016) ("As an equitable defense, unclean hands will not bar a legal claim") (citing *Aetna Cas. & Sur. Co. v. Aniero Concrete Co., Inc.*, 404 F.3d 566, 607 (2d Cir. 2005). And the right to an accounting at issue here, under § 74 of the New York Partnership Law, ECF No. 121 at 2, is a legal claim. *E.g., J&J Sports Prods., Inc. v. Three Bros. of Hyattsville, LLC*, 2016 WL 4699416, at *2 (D. Md. Sept. 8, 2016) ("[S]tatutory causes of action are not equitable in nature ... ."). Unclean hands is no defense to it.

This makes sense. Equitable defenses are by nature judge-made, and courts are rightly hesitant to overrule legislative commands with a wholly judge-made doctrine. *E.g.*, *Petrella v. Metro-Goldwyn-Mayer, Inc.*, 572 U.S. 663, 679 (2014) (laches inapplicable to federal Copyright Act claim); *Lyons P'ship, L.P. v. Morris Costumes, Inc.*, 243 F.3d 789, 798 (4th Cir. 2001)

("Moreover, because laches is a judicially created doctrine, whereas statutes of limitations are legislative enactments, it has been observed that '[i]n deference to the doctrine of separation of powers, the [Supreme] Court has been circumspect in adopting principles of equity in the context of enforcing federal statutes.'").

Under these circumstances, it would be inequitable for the Court to give Shnaider a windfall.

## IV.   No public policy justifies handing Shnaider a multi-million-dollar windfall for the same reasons that the doctrine of unclean hands is not applicable.

"[I] is a deeply rooted principle of New York contract law that parties may contract as they wish in the absence of some violation of law or transgression of a strong public policy." *2138747 Ontario, Inc. v. Samsung C & T Corp.*, 103 N.E.3d 774, 777 (N.Y. 2018) (internal alterations and citations omitted). For the same reasons that the unclean hands defense is not called for, neither is rejecting Slinin's claim based on public policy. Certainly, the object of the partnership was neither illegal nor against public policy.

## V.   Shnaider's settlement defense fails because his story is contrary to the evidence and the law.

Shnaider's defense that Slinin settled his claims should be rejected. It is not credible for at least three reasons. First, it would have been irrational for Slinin to accept an offer of $500,000 conditioned on his ability to stop a foreign, criminal investigation when, just months before, Shnaider had offered Slinin $243,409.47, and Slinin refused. Shnaider Aff. ¶ 77; Lee Aff. ¶¶ 70-71; PX 25 at P335. Shnaider has offered no explanation for why Slinin would have so radically changed his bargaining position in such a short time. The reasonable inference is that he would not.

Second, it would also have been irrational for Shnaider to agree to settle a contested, multi-million dollar claim without a written release. Shnaider asked Slinin for "an exchange of mutual

releases at the time of payment" in Lee's October letter. DX 14 at P335. It is unreasonable to think he would have settled without one later. *See Forden v. Bristol Myers Squibb*, 63 F. App'x 14, 16 (2d Cir. 2003) (to determine whether to enforce an oral settlement agreement, courts must consider whether the agreement is one that would usually be written down) (applying New York law).

Third, Shnaider's own witnesses do not agree on the nature of the settlement. Shnaider said that the deal was that he "agreed to pay Mr. Slinin $500,000 if and only if, within two months, he obtained written confirmation that the Russian investigation was closed; if he failed to get that confirmation within that period, Mr. Slinin agreed he was entitled to nothing from me or Midland." Shnaider Aff. ¶ 79. His childhood friend Michael Sapir agrees. Sapir Aff. ¶ 13; Tr. 538:24-539:1. But Lee does not. Lee's testimony was that Slinin and Shnaider settled their dispute and, separately, made an independent agreement that if Slinin could end the Russian investigation, Shnaider would pay him for that service. Tr. 351:12-354:12. This conflict among affiliated, key witnesses suggests that the settlement story is fiction.[14]

Shnaider's also cannot prove his settlement story through an email that he has chosen to misread. DX 19. Six months after the Toronto meeting, Slinin's employee forwarded to Lee and Shnaider an email from Bombardier lawyers, translated from French, indicating that the Russian investigation had been suspended. DX 19 at P321. Based on that, the employee wrote that he "trust[ed] it will enable you to positively resolve the remittance of the funds due to Mr. Slinin as agreed." DX 10 at 320. Shnaider argues that the "as agreed" refers to the settlement he claims was

---

[14] At minimum, to the extent there was any settlement, these conflicting versions suggest that the parties were not on the same page about exactly which claims Slinin would be releasing in exchange for $500,000. "Courts have repeatedly found a purported settlement agreement unenforceable where there was no 'meeting of the minds' on the scope of a general release." *Hand v. New York City Hous. Pres. & Dev.*, 11CV1076RRMJO, 2017 WL 4296751, at *1 (E.D.N.Y. Sept. 25, 2017) (applying New York law) (aggregating cases); *see also Forden*, 63 F. App'x at 26; *Cruz v. OneSource Facility Servs., Inc.*, No. 03 CIV. 8233 (LAP), 2005 WL 2923517, at *1 (S.D.N.Y. Nov. 4, 2005) (applying New York law).

agreed to in Toronto. Under the circumstances, the more reasonable inference is that "as agreed" refers to the partnership agreement itself.

## Conclusion

For the foregoing reasons, the Court should enter judgment in Slinin's favor in the amount of $10,178,029.27.

Date: January 11, 2019        Respectfully Submitted,

/s/ Tom Kayes

Tom Kayes
  tk@kellerlenkner.com
KELLER LENKNER LLC
150 N. Riverside Plaza, Suite 4270
Chicago, Illinois, 60606
(312) 741-5222

Warren Postman
  wdp@kellerlenkner.com
KELLER LENKNER LLC
1300 I Street NW, Suite 400E
Washington, D.C. 20005
(202) 749-8334

Laurence J. Lebowitz
  llebowitz@dsblawny.com
DEALY, SILBERSTEIN
  & BRAVERMAN, LLP
225 Broadway, Suite 1405
New York, New York 10007
212.385.0066

*Attorneys for Plaintiff*

**CERTIFICATE OF SERVICE**

I certify that I caused the foregoing document to be served on all ECF-registered counsel of record via the Court's CM/ECF system.

Date: January 11, 2019

/s/ Tom Kayes
Tom Kayes